This form is to be retyped in full (including all instructions) and all material inserted in proper sequence and not by means of attached riders except as provided below. (Please number all pages)

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### TRENTON VICINAGE
### HONORABLE GARRETT E. BROWN, JR.

| | | |
|---|---|---|
| PAULETTE BROGNA, ET AL., | : | |
| Plaintiffs, | : | Civil No. 05-cv-4839 (GEB) |
| v. | : | FINAL PRETRIAL ORDER |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; and **PETER CHAMAS, ESQ.** having appeared for plaintiff, and **COLLETTE BUCHANAN, ESQ.** having appeared for defendant; the following Final Pretrial Order is hereby entered:

1. **JURISDICTION** (set forth specifically).

Pursuant to 28 U.S.C. 1346(b), this Court has jurisdiction in that plaintiffs allege claims against the United States of America, for money damages, for personal injury caused by the negligence or wrongful act or omission of an employee and/or department of the government while acting within his/its employment, under the circumstances where the United States of America, if a private person, would be liable to the plaintiffs in accordance with the laws of the State of New Jersey.

Pursuant to 28 U.S.C. 2675, an administrative claim has been presented and has been left without action for six (6) months, permitting suit to be instituted without final action on the claim.

2. **PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).

No pending motions.

Contemplated Motions:

1)  Plaintiffs will move to bar defendant from asserting that responsibility lies with
George Brogna as defendant failed to assert a claim against him.

*Trial Brief*

2)  Plaintiffs will move to bar defendant from asserting that George Brogna can be
found comparatively negligent as there is no claim against him.

*Trial Brief*

3)  Plaintiff will move to bar defendant employees, Jared Leighty and CDR David
Trettel from testifying at trial due to defendant's failure to produce these
individuals for deposition after same were noticed.  *Resolved*

*If Defendant intends to call at trial they shall be produced at least 5 days prior.*

4)  Plaintiff anticipates bringing a motion in limine to exclude defendant's liability
expert, Stephen W. Rickard, from testifying on the basis that his anticipated
expert testimony and reports are inadmissible under Federal Rule of Evidence
702.

*Trial Brief if Warranted*

5)  Defendant anticipates bringing a motion in limine to exclude plaintiff's liability
expert, Wayne F. Nolte, Ph.D., from testifying on the basis that his anticipated
expert testimony and reports are inadmissible under Federal Rule of Evidence
702.

*Trial Brief if Warranted*

**3. STIPULATION OF FACTS** (Set forth in narrative form a comprehensive listing of
all uncontested facts, including all answers to interrogatories and admissions, to which
there is agreement among the parties).

This incident occurred on the premises of Earle Naval Weapons Station.
Plaintiffs were admitted to the station on a contract with the government to pick up a load
of ammunition for delivery. This incident occurred on Monday, January 26, 2004, at the
Scale House, Bldg. L-25, United States Naval Weapons Station Earle, Colts Neck, New
Jersey. The defendant was conducting business in New Jersey through the Department of
the Navy at NWS Earle.

On the day of the incident, plaintiffs Paulette Brogna and her husband, George
Brogna, were over-the-road truck drivers, working as a tandem team, employed by Tri-
State Motor Transit, designated hereafter as TSMT. TSMT is an over-the-road trucking
and hauling company with the sole purposes of hauling freight for various shippers.
These shipping vendors are both private and public entities. The Brognas did not own
their own tractor. TSMT provided its employees with the trucks and equipment to
perform their duties as truck drivers for TSMT. TSMT trained the Brognas on
HAZMAT material transportation and TSMT provided them with training and testing for
the HAZMAT endorsements. All wages and benefits paid to the Brognas are paid by
TSMT.

On the day of the incident, the Brognas were to pick up a trailer loaded with ammunition at NWS Earle, a military facility under the command of the Department of the Navy. The Ordinance Command at NWS Earle contracted with TSMT through a bill of lading, for transportation of the ammunition, HAZMAT material, from NWS Earle to the Crane Army Ammunition Activity in Crane, Indiana. The Bill of Lading indicated regulatory requirements for the shipment of ammunition. The Department of Energy requires certain clearances for transportation of certain classified materials. These clearances are issued by the federal government.

At NWS Earle, tractors with hazardous cargo must process through the Scale House where paperwork is approved, copied and filed.

On the morning of January 26, 2004, it was snowing and snow had accumulated on the ground around the Scale House. The Scale House where the incident occurred has two (2) separate doors. The west door is for employees only, and the east door is for the truck drivers. Ralph Leutbecher is a civilian employee assigned as a traffic management specialist at the Scale House at NWS Earle. He arrived at the Scale House that morning and entered through the employee door. Thomas Fitzgerald is also a civilian employee assigned to the Scale House at NWS Earle. When he arrived that morning, he also entered through the employee door.

On the morning of January 26, 2004, Mr. Luetbecher cleared and shoveled the walkway in front of the west/employee door and also made a path from the employee door to the scale.

The Brognas, along with one (1) other trucker, arrived at the Scale House prior to its opening at 7:00 a.m. The Brognas waited in the cab of their tractor until the Scale House opened and then Mrs. Brogna entered the Scale House after the other trucker. After obtaining the paperwork necessary to pick up the preloaded trailer, Mrs. Brogna exited the Scale House through the truckers' door. The Brognas then proceeded to the area of the base where they were instructed to pick the loaded trailer.

The Brognas returned to the Scale House with the loaded trailer. Mrs. Brogna entered the Scale House and asked if the truck could be weighed. The employees said "yes", that the Brognas could weigh the load. Mrs. Brogna then exited the Scale House. Mr. Brogna, who was in the truck across the street from the Scale House, made a u-turn to get the truck to the scale and stopped the tractor with the steering axle tires on the scale. Mr. Fitzgerald could see the front of the truck through the window near his desk. From its position, he could tell that Mr. Brogna had moved the truck forward toward the scale that ran parallel to the Scale House. This would have put the passenger side door of the truck near the corner of the building. Mrs. Brogna opened the passenger door and got into the tractor and told her husband he could weight the entire rig. She then got out of the cab and closed the door. Mrs. Brogna then slipped on ice under the snow and then slid under the tractor. Mr. Brogna put the truck in gear and began to move it forward, rolling over the lower extremities and buttock region of Mrs. Brogna.

Mr. Fitzgerald and Mr. Leutbecher heard a screeching sound. Both employees went outside and heard Mrs. Brogna screaming. Mr. Leutbecher waved to Mr. Brogna to stop the rig, which he did. He told him to turn the rig off. Mr. Fitzgerald went back inside the Scale House to call for help and also called his supervisor to report the incident. Mr. Leutbecher crawled under the truck and spoke to Mrs. Brogna. He stayed with her and talked to her to keep her conscious until emergency responders arrived. Mr. Leutbecher observed blood on the snow where Mrs. Brogna had been dragged. Mrs. Brogna told Mr. Leutbecher that she slipped on ice and snow. Emergency responders arrived and assisted Mrs. Brogna. She was removed from under the truck and taken from NWS Earle in an ambulance to Jersey Shore University Medical Center.

As a result of the incident, plaintiff suffered severe injuries to her lower extremities. The total amount of medical bills paid for treatment for Paulette Brogna was $678,505.06. The specific injuries suffered by the plaintiff are as follows: complex wounds of the buttock and bilateral lower extremities, including but not limited to multiple large open wounds of both posterior knees, large degloving wound of the right buttock areas with an avulsion of a portion of skin and subcutaneous tissue; bilateral fibular head fractures; right Grade II open ankle fracture; left proximal tibia fracture; hypercoagulation; large right thigh hematoma; and post-traumatic stress disorder.

Plaintiff underwent multiple surgical procedures including an open reduction internal fixation of the right ankle, flap closure of the buttocks, split thickness skin grafts to the lower extremities, multiple debridements and repeat skin grafts and insertion of a Greenfield Filter.

Plaintiff was out of work from January of 2004 until March 2005. She returned to work in March 2005, however, was forced to stop work in September 2005 due her injuries.

Mrs. Brogna had been working for Tri-State Motor Transit Company. The Workers' Compensation carrier for TSMT is AIG.

**4. PLAINTIFF'S CONTESTED FACTS** (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).

A. Plaintiffs intend to prove the following contested facts with regard to liability:

    1.    Plaintiffs were not special employees of the defendant.

    2.    There were no established paths on the side of the Scale House that the truck drivers would enter.

    3.    The plaintiff Paulette Brogna was not directing her husband onto the scale when she was run over.

4.    Defendant employees failed to clear the ice and snow from the walkway and surrounding areas which caused plaintiff to fall and slide underneath the truck.

5.    Plaintiff George Brogna operated the tractor trailer in a reasonable and safe manner.

6.    Plaintiffs were neither told to back the truck off the scale, nor were any indications made by the defendant employees that they wanted the truck off the scale.

7.    Plaintiff Paulette Brogna's actions were reasonable in walking in the area where the incident took place.

8.    Plaintiff Paulette Brogna was unaware that there was ice underneath the snow in the area where she fell.

9.    Plaintiff George Brogna was authorized to move his vehicle onto the scale.

10.   Plaintiff Paulette Brogna did not fall while walking on piled snow and ice.

11.   Defendant was responsible for ensuring that the ice and snow near and about the Scale House was cleared and safe for the drivers entering and exiting the Scale House and for performing their duties in and about the Scale House.

B. Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).

As to Paulette Brogna:

1)    Plaintiff Paulette Brogna has sustained the following permanent damages:

    a)    Pain and suffering—unliquidated damages
    b)    Disability—unliquidated damages
    c)    Impairment—unliquidated damages
    d)    Loss of enjoyment of life—unliquidated damages
    e)    Medical expenses—$678,505.06
    f)    Economic losses—$290,000.00 (lost wages through age 65)

In addition to plaintiffs' testimony and the testimony of plaintiffs' witnesses, the following supports the damages set forth above:

Plaintiff underwent multiple surgical procedures including an open reduction internal fixation of the right ankle, flap closure of the buttocks, split thickness skin grafts to the lower extremities, multiple debridements and repeat skin grafts and insertion of a Greenfield Filter. Paulette has left with gross skin deformity. Paulette sustained significant loss of tissue in the legs and buttocks. Plaintiff has loss of sensation in her feet and no surface feeling over the skin graft sites. Paulette has obvious and extensive scarring of the buttocks and lower extremities. In the right leg, Paulette has soft tissue deformity and loss of muscle tissue and scarring of the thigh, knee and lower leg. In the left leg, Paulette has soft tissue deformity and loss of muscle tissue and extensive scarring. Plaintiff endures extreme swelling of the lower extremities and ankles. Plaintiff walks with an obvious limp favoring the right lower extremity.

Plaintiff was out of work from January of 2004 until March 2005. She returned to work in March 2005, however, was forced to stop work in September 2005 due her injuries. Plaintiff would have continued to work until age 65 if she had not been injured.

Mrs. Brogna had been working for Tri-State Motor Transit Company as an over-the-road truck driver with her husband as a dual driver team. The Workers' Compensation carrier for TSMT is AIG. The current Workers' Compensation lien owed to AIG is $715,513.21. The lien is made up of the following: $678,505.06 was paid for medical; and $27,008.15 was paid for temporary disability.

Plaintiff has difficulty walking and can not squat or kneel due to restricted range of motion of her knees and ankles due to the extensive skin grafting and swelling. Plaintiff can not sit or stand for any periods of time and ambulates with a cane for short distances and a wheel chair for any extended periods. She has daily pain in her buttocks and legs and chronic pain in her back. She is restricted in reaching, lifting and carrying. Plaintiff has severe nocturnal cramps of her calves which awakens her and her husband through the night. She had chronic fatigue and insomnia. She can not do house work or place things on her lap. She has decreased sexual relations with her husband due to her restrictions and pain and discomfort. Her and her husband's social and recreational activities are extremely limited due to Paulette's injuries.

As to George Brogna:

2)     Plaintiff George Brogna has sustained the following permanent damages as a result of the damages sustained by his wife, Paulette Brogna:

       g)     Loss of consortium - -unliquidated damges
       h)     Loss of society—unliquidated damages
       i)     Loss of companionship—unliquidated damages

Mr. Brogna can no longer work with Mrs. Brogna as a tandem team as before the incident. His social and recreational activities with his wife are extremely limited. Their marital relationship has been severely disrupted and remains limited.   Mr. Brogna is required to perform much of the household duties that Mrs. Brogna did before her

injuries. Mr. Brogna was forced to care for Mrs. Brogna due to the severity of her
injuries.

5. **DEFENDANT'S CONTESTED FACTS** (State separately for each defendant.
See instructions above).
    A. Defendant intends to prove the following contested facts with regard to
liability.

The Bill of Lading incorporated by reference regulatory requirements for the
Shipment of Ammunition. The Ordnance Command, now the Naval Munitions
Command, had the mission of providing technical and material support including
worldwide ordnance transportation requirements for Naval Weapons Station and tenant
activities.

The United States Transportation Command of the Department of Defense has the
mission of providing air land and sea transportation for the Department of Defense. The
Department of the Defense is the principal executive department that includes the Navy,
the Army and the Air Force. The mission of the Department of Defense requires
maintaining the readiness of the services to meet national security threats.

The Bill of Lading notations required a dual driver, satellite monitoring and
provided Department of Defense emergency hotline for transit emergencies. All carriers
must comply with SDDC Freight Traffic Rules. Carriers acknowledge that violations of
rules regarding transport would result in revocation of approval to serve as a carrier. All
carriers agree to permit unannounced inspections of facilities, terminals, equipment,
employees and procedures by DOD personnel. All records, route plans and driver
qualification files are subject to DOD inspection.

The shipment the Brognas picked up was subject to dual driver protection service
and subject to the terms of the SDDC Freight Traffic Rules. The shipment the Brognas
picked up was also subject to satellite motor surveillance service. Satellite Motor
Surveillance service would track the plaintiff's vehicle making reports every 15 minutes,
provided in transit movement status changes and emergency situation notification. To
meet the SNS requirements, the vehicle required special equipment including continuous
messaging and positioning service and emergency button activators. Drivers cannot
leave the shipment pickup location until the SNSV provides the driver with on screen
verification that DTTS has been enabled. The SNSV component of this contract required
actual monitoring of the trip.

With SNSV, the government may contact the drivers directly if there is no
response by the carrier. If an emergency or irregular activity occurs, the drivers must hit

the panic button. The panic button permits immediate directions to be given to the drivers and permits response by the government. The monitor enables the sending of messages. When a load is delivered, an offload message is sent to the satellite.

The remarks on the bill of lading and  regulation required all emergency information to process through the military in accordance with Department of Defense directive 6055.13 which establishes policy and procedures for emergency response measures for transportation accidents occur involving DoD conventional munitions.

Earle Naval Weapons Station is a military installation owned by the United States and within the Mid Atlantic Region of the Department of the Navy. The station was originally founded as a weapons depot. Earle serves today to provide combat logistics support of ordnance functions. The transport of ammunition is a primary function of the Ordnance Command. " An integrated work force of military and civilian personnel operate the inland storage, renovation, transhipment and demilitarization facilities." At Earle, ammunition is stored for transport and loaded for transport. In addition to consigning private carriers to transport ammunition, the Navy also transports such ammunition itself by many methods of transportation.

The shipment from Earle was to be transported to Crane Army Ammunition Activity where the Naval Surface Warfare Center is located. The Crane Division is one of five divisions of NSWC which maintains a full spectrum research, development, acquisition, test and evaluation and support capability for surface warfare combat and weapon systems and hull, mechanical, and electrical systems.

It was daylight when this accident occurred on Monday January 26, 2004. The scale house was closed over the weekend.

On the day of the accident there was a path that had been shoveled through the accumulated snow. After he arrived at work, Thomas Fitzgerald unlocked the driver's door and shook the snow off the mat. He put down ice melt outside the driver's door. There was light snow on the shoveled path, but the path was visible. The path leading from the driver's door on bldg. L-25 diagonally away from the building to the road was periodically cleared of fresh snow and sanded or salted by one of the two Scale House personnel as needed. This path allowed drivers to enter and exit the Scale House without having to walk through the snow.

The path leading from the driver's door of Bldg. L-25 to the road was approximately two feet wide. Footprints from the various drivers were visible in the path to the drivers' door. There is a metal bar alongside the drivers' doorway where Mrs. Brogna entered the building. The metal bar directs an approach to the doorway along the path that had been shoveled to the road.

When the Brognas picked up the loaded trailer they failed to activate the satellite monitoring system at that time. Mr. Brogna knew from having picked up prior shipments

from Earle that he was supposed to wait for direction from the employees before moving onto the scale.

Mrs. Brogna walked along side the scale house across snow and ice to approach the tractor. She did not walk on the shoveled path, but rather on an area that was piled with snow from previous snowfalls. The area where Mrs. Brogna walked and stood was not meant for pedestrian use. Mrs. Brogna was not wearing boots or shoes for snow. Mrs. Brogna stood on a mound of hard packed and icy snow.

The scale at the Earle NWS weighs tractor trailers, such as the Brogna's in two increments; it's called a split-weight. Before the tractor or trailer is placed on the scale, the scale is zero'd by the government employees. This zeroing accounts for snow or other debris on top of the scale. To obtain a true gross weight for a load, both drivers must be weighed along with the truck. It is a common practice throughout the trucking industry to weigh a truck with both drivers because that represents the actual load of the truck. The weight readings are recorded (printed) in the scale house by scale house employees. The scale readout is a screen approximately six inches by one inch. This screen is located approximately 40 feet beyond the counter in the area where only the Scale House operators are allowed and is not readable by anyone in the area where drivers are allowed to stand. Driver's are permitted to come inside the scale house to look at the readings. A print out is also provided to the drivers if requested. Drivers are not allowed beyond the counter that divides the two interior spaces inside the Scale House.

Proper procedure was for one of the employees to go out and wave the truck on to the scale. The employee must visually inspect the truck, verify that it was in good working condition, signal working, that the satellite system was activated, verify that there are two drivers. The scale house employees are required to zero the scale before any part of the rig is on the scale. No driver is permitted to waive a rig onto the scale - prematurely moving the rig means they have to start the process over - backing the tractor and trailer off the scale to zero it. The plaintiffs had been at Earle previously and knew that their company required them to get a scale weight.

Mr. Brogna pulled the tractor onto the scale before the scale could be zeroed. Before Mr. Brogna drove forward he did not check to see where his wife was located. He did not check to see that she was clear of the truck. Tom Fitzgerald got up to head out the employee door to direct the driver.

Mrs. Brogna told Fireman Bullock that she had been directing her husband onto the scale. After the accident, Mr. Fitzgerald and Mr. Leutbecher saw footprints leading from the driver's door on the end of the Scale House, through the snow along the edge of the building and up to an 8 to 10 inch high mound of packed, icy snow at the corner of the building.

Patrolman Jared Leighty responded to the scene of the accident. He observed scrape marks in the snow at the corner of the building that appeared to be left from shoes

sliding and scraping the ice and snow. He observed scrape marks in the snow under the truck from the corner of the building to where Mrs. Brogna lay when the truck stopped that appeared consistent with her body being dragged. Patrolman Leighty took photographs of the scene that day. Patrolman Leighty saw a path that had been shoveled in the snow leading from the drivers' door to the road. The path had a thin layer of snow in it but was visible.

Commander Trettle responded to the scene that morning. Commander Trettle observed a clear path through the snow from the road to the driver's door of the scale house. The path had some snow in it but was clearly visible and obvious and was several inches lower than the snow on either side of it.

Mr. Brogna was negligent in that he knew he was supposed to wait for the direction of the government employees, but did not do so. By moving the truck forward while his wife was in the Scale House, Mr. Brogna prevented his wife from returning to the truck via the cleared path. Mr. Brogna was reckless in that he wilfully moved his vehicle with a disregard of the rights or safety of others, in a manner so as to endanger, or be likely to endanger, his wife. It was the action of Mr. Brogna that proximately caused the injury to his wife.

Mrs. Brogna was negligent in directing her husband to move the truck onto the scale, ignoring protocols for weighing the vehicle Mrs. Brogna chose to walk along the edge of the building and stand on the icy snow mound at the corner of the building rather than ask her husband to back the truck up so she could use the cleared path. Mrs. Brogna was negligent in not using the cleared path. Mrs. Brogna was negligent in standing between the building and the truck in an area not cleared of ice and snow and not for pedestrian use.

The snow was not removed from the area adjacent to the scale. Plows do not ordinarily plow this area because the scales are sensitive and plows could damage the mechanism. Plowing of the scale and adjacent area is not necessary because the drivers should remain in the cab to get the correct gross vehicle weight and should not be walking on the scale.

The Brognas were negligent in that the snow was falling throughout the morning and posed an open and obvious condition.

Mrs. Brogna was negligent in that the accumulated snow which she walked on was an open and obvious condition. Mrs. Brogna chose to walk across the ice and snow in an area not shoveled or for pedestrian use, believing she had to direct her husband onto the scales, and because her husband chose to stop the truck on the scale in an area not for pedestrian use. Mrs. Brogna was negligent in her choice of sneakers as foot wear on a day where ice and snow were everywhere.

Mrs. Brogna was not injured as a result of the failure of defendant to perform any duty owed to plaintiff. Defendant was not negligent.

Mrs. Brogna was a statutory employee of the defendant at the time of the accident. The defendant controlled the details of the plaintiff's work with regard to the shipment of ammunition. The plaintiffs accepted the conditions of the contract for shipment as detailed on the bill of lading and the referenced Freight Traffic Rules and directives. Plaintiffs had an implied contract of hire with the defendant. Plaintiffs accepted the conditions of satellite surveillance monitoring of the shipment. The transportation of ammunition is the business and part of the mission of the defendant.

Plaintiff's fall and injuries did not occur as a result of the failure of defendant to perform any duty owed to plaintiff. Defendant was not negligent.

B. Defendant intends to prove the following contested facts with regard to damages. (This statement must include the factual basis for each defense against plaintiff's claims for damages).

Paulette Brogna did not sustain any neurological injury as a result of the accident. She has no measurable loss of strength in her lower extremities. Paulette Brogna walks without difficulty and without assistance. Paulette Brogna's wounds are well-healed and the surgeries were successful. Plaintiff can carry out the regular activities of daily living without assistance.

The fracture of plaintiff's right proximal fibula healed in anatomic alignment. Plaintiff does not have any permanent physical impairment as a result of the injury to the right proximal fibula. The fracture of the right distal tibia has healed in good alignment with mild residual bony deformity. Plaintiff sustained a mild to moderate degree of permanent physical impairment as a result of the injury to the distal lower leg and ankle. The fracture of plaintiff's left tibial plateau and proximal fibula have healed well in anatomical alignment. Plaintiff sustained a mild degree of permanent physical impairment as a result of the injury to the left knee.

6. **PLAINTIFF'S WITNESSES** (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).

A. **On liability,** plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

1) **Paulette Brogna:**

Plaintiffs Paulette and George Brogna, were over the road truck drivers employed by TSMT. Paulette Brogna will testify about her employment with TSMT and her duties and responsibilities as a TSMT employee. She will testify that she was neither advised

that she was submitting to an employment relationship with the defendant, nor was such a relationship implied.

She will testify that on January 26, 2004, they were assigned to pick up a loaded trailer at Earle Naval Weapons Station, in Colts Neck, New Jersey. She will testify that they arrived at the scale house at approximately 6:45 A.M. They were provided with the location of the trailer and proceeded to the area where it was located. After attaching the trailer to their tractor, they proceeded to the scale house, prior to exiting the base. Shortly after 8:00 A.M., plaintiff Paulette Brogna entered the scale house to obtain paperwork for the trailer and to obtain permission to enter onto the scale to weigh the tractor and trailer prior to departing. Plaintiffs were concerned with the motor vehicle weight restrictions for tractor trailers and wanted to make sure their rig did not exceed the legal gross weight limit.

Mrs. Brogna will testify about what actions she took on the morning of the incident, and her interactions with the defendant employees.

Mrs. Brogna will testify that when she entered the scale house, there was approximately 3-4 inches of snow on the ground. The scale house had two entrances; one on the left side of the building and one on the right. When facing the scale house, the entrance on the left side of the building was for employees and the entrance on the right side of the building was for trucker drivers. The walkway on the left side of the building had been shoveled. However, the walkway on the right side of the building where the truck drivers would enter was not shoveled nor was salt or sand put down. Furthermore, there was no salt or sand placed in the area of the scale. When Mrs. Brogna exited the building she had signaled to George Brogna to bring the truck over to the scale. At the time of the fall, Mrs. Brogna had exited the truck to go back into the Scale House. However, she fell on snow and ice causing her to slide under the truck.

Mrs. Brogna will testify about what occurred after she fell and as the truck pulled forward and over her.

Mrs. Brogna will testify about her experience transporting freight for private and public entities. She will discuss her background and employment history. She will also discuss the medical treatment she received following the incident. Mrs. Brogna will also testify about her life up until the incident and her life since the incident. She will discuss the injuries she suffered and the impact they have had upon her life, physically, mentally, emotionally and financially.

2)    **George Brogna:**

George Brogna will testify about his background and his employment. He will discuss his experience transporting freight for private and public entities. He will testify about his employment with TSMT and his duties and responsibilities as a TSMT employee. He will testify that he was neither advised that he was submitting to an employment relationship with the defendant, nor was such a relationship implied.

George Brogna will testify regarding the condition of the area around the scale house when he and his wife arrived and when his wife fell. He will testify regarding the defendant's employees actions and omission upon their arrival and after his wife fell. He will also testify to the events leading up to his wife's fall. He will testify about his interactions with the defendant employees and investigators. He will testify about their arrival at the base and about each time they went to the scale house. He will testify that there was a cleared path on the employees' side of the building, but none on the truck drivers' side of the building. He will testify about the movement of his truck and the location it stopped at before the incident.

He will discuss the course of medical treatment rendered to Paulette. He will testify about his life with Paulette before and after the incident. Mr. Brogna will testify to the physical and mental condition of his wife, and the impact her injuries have on their lives. He will further testify to the complaints of his wife after the fall, as well as through the course of the extensive medical treatment endured by her. Further, he will testify as to the activities they participated in together prior to the fall and those activities that they no longer do together. He will also testify to those services that his wife can no longer perform as a result of the subject accident.

3) **James Wingfield:**   *MAY PROPOSE DE BENE ESS E*

Mr. Wingfield is the Vice-President of Risk Management of TSMT. Mr. Wingfield will testify as to the corporate structure and operations of TSMT and will testify as to the customers of TSMT. Mr. Wingfield will testify as to the employment responsibilities of its employees, including the Brognas. Mr. Wingfield will also testify as to how the Brognas are compensated for their work for TSMT and what in terms of equipment is provided to TSMT employees.

4) **Jay Ellis:**   *MAY PROPOSE DE BENE ESS.E.*

Mr. Ellis will testify as to the conditions on the ground on the morning of the incident at and about the Scale House. He will testify about what he did and what he observed on the morning of the incident. He will further testify as to his employment relationships and his activities as a truck driver transporting freight.

5) Plaintiff reserves the right to call in their case in chief, as to liability, any witnesses listed by defendant.

**B. On damages** plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

See summaries of Paulette and George Brogna above. Further,

1) through 3)  **George Brogna** and **Greg Brogna** (sons); **Joanne Stone** (Mrs. Brogna's sister):

These individuals will testify as to how the injuries sustained by Mrs. Brogna effected her and their family.  They will describe Mrs. and Mr. Brogna before the incident and how this incident changed their lives.  They will testify as to the pain and suffering Mrs. Brogna endured during her treatment of her injuries and the pain and suffering Mrs. Brogna endures on a daily basis from the time of the incident to the present.  They will testify as to the daily restrictions and limitations this incident has placed on the lives of Mrs. and Mr. Brogna.  They will testify to the impact that this incident has had on the companionship with their parents and sibling, respectively.

C. Defendant objects to the following witnesses for the reasons stated:

Defendant objects to James Wingfield testifying at time of trial. Plaintiff did not identify Mr. Wingfield as a witness in their disclosures or answers to interrogatories. *Resolved – to be deposed if Defendant requires at least five days prior to trial*

7. **DEFENDANT'S WITNESSES** (See instructions above).

A. **On liability**, defendant intends to call the following witnesses who will testify in accordance with the following summaries:

1.    Ralph Leutbecher, 209 Elmwood Drive, Brick, NJ 08723

Mr. Leutbecher will testify regarding his duties as a civilian employee assigned as a traffic management specialist at the scale house at Earle Naval Weapons Station, his responsibilities, interaction with drivers, the procedures followed , the actions required of the drivers, the operation of the scale and other equipment, the layout of the scale house and surrounding area. He will testify regarding the documentation used for transportation of ammunition.  He will testify regarding snow removal around the scale house.  Mr Leutbecher will testify regarding his activities on January 26, 2004 in particular his interactions with plaintiffs. Mr. Leutbecher will testify that it was snowing the morning of January 26, 2004; that there was a path cleared from the driver's door to the road, that there was a small accumulation of snow in that path, but it was visible. He will testify as to the condition of the area around the scale house. He will testify that after Mrs. Brogna left the scale house after asking if the truck could be weighed he heard a screeching sound and ran out the employees' door, heard Mrs. Brogna screaming and  he yelled to the driver to stop the truck. He will testify that he called to his coworker to call for help. He will testify to his interactions with Mr. and Mrs. Brogna  while she was under the truck, as well as to his observations of Ms. Brogna, the truck, the snow and area around the truck and Mrs. Brogna. He will testify to his interaction with his coworkers and responders.

2.      Thomas Fitzgerald, 459 Street Thomas Drive, Toms River, NJ 08757

Mr. Fitzgerald will testify regarding his duties as a civilian employee assigned as a traffic management specialist at the scale house at Earle Naval Weapons Station, his responsibilities, interaction with drivers, the procedures followed , the actions required of the drivers, the operation of the scale and other equipment. He will testify regarding snow removal around the scale house. . He will testify regarding the documentation used for transportation of ammunition. He will testify as to the proper procedure for weighing a truck and loaded trailer. He will testify regarding his activities on January 26, 2004 in particular his interactions with plaintiffs. He will testify that it was snowing the morning of January 26, 2004, that there was a path cleared from the driver's door to the road, that there was a small accumulation of snow in that path, but it was visible. He will testify as to the condition of the area around the scale house. He will testify that he saw the truck Mr. Brogna was driving pull onto the scale by the window near his duty station. He will testify as to his observations of the truck. He will testify that after Mrs. Brogna left the scale house the last time he saw the truck start to move. He will testify that the truck should have moved off the scale so he could clear the scale. He will testify that heard yelling and he went outside and stopped the truck with hand signals. He will testify that he went inside and called 911. He will testify to his interactions with Mr. and Mrs. Brogna while she was under the truck, as well as to his observations of Ms. Brogna, the truck, the snow and area around the truck and Mrs. Brogna. He will testify to his interaction with his coworkers and responders.

      3.        CDR Dave Trettel, OIC, Atlantic Ordnance Command Detachment, Earle NWS, NJ

Commander Trettel will testify generally as to his employment and duties. He will testify as to his observations and activities after responding to the scale house on January 26, 2004, after the accident. He will testify that he observed a clear path through the snow from the road to the driver's door of the scale house. He will testify that the path had some snow in it but was clearly visible and obvious and was several inches lower than the snow on either side of it. He will testify as to his interactions with other people at the scene.

      4.        Jared Leighty, US Navy

Mr. Leighty will testify regarding his employment and duties as a patrolman with the Naval Weapons Station Earle. He will testify regarding his observations and activities at the scene of the accident on January 26, 2004. He will testify that Mrs. Brogna was under the truck when he arrived. He will testify regarding photographs that he took at the scene. He will testify that he saw scrape marks at the corner of the building that appeared to be left from shoes sliding and scraping the ice and snow. He will testify regarding scrape marks that he saw in the snow under the truck from the corner of the building to where Mrs. Brogna lay when the truck stopped that appeared consistent with her body being dragged. He will testify that he saw a path shoveled in the snow leading from the drivers' door to the road. He said the path had a thin layer of snow in it but was visible.

5.      Roy Bullock, Firefighter, Naval Weapons Station Earle, NJ

Mr. Bullock will testify regarding his employment and duties as a firefighter employed at Earle.  Mr. Bullock will testify regarding his responding to the accident scene on January 26, 2004. He will testify to his obervations, actions, conversations and interaction with Mrs. Brogna, Mr. Brogna and other persons at the scene. He will testify regarding his observations of Mrs. Brogna and her condition. He will testify regarding care and treatment provided to her. He will testify to the procedures used and actions taken to extricate Mrs. Brogna from under the truck. He will testify regarding his obervations of the scene. He will testify regarding the actions of other responders on that day.

6.      Carol Gaskiewicz, Naval Weapons Station Earle, 201 Hwy 34 South, Colts Neck, NJ 07722-5001

Ms. Gaskiewicz will testify regarding her employment and duties in her position as the Transportation Officer for Navy Munitions Command CONUS East Division (CED) Detachment Earle. She will testify regarding the mission and operations of Navy Munitions Command CED Detachment Earle.  She will testify regarding the bill of lading issued for the shipment the Brognas were to transport on January 26, 2004 and the terms of the contract for transportation. She will testify regarding the requirements for the shipment, including dual driver, satellite motor surveillance monitoring and SDDC Freight Traffic rules.  She will testify regarding the hiring of drivers for the shipments of ordnance. She will testify regarding the transport of ordnance from Earle in general. She will testify that the Department of Defense transports ammunition itself in addition to consigning private carriers to transport shipments.

7.      Ms. Deborah Jackson, Military Surface Deployment and Distribution Command, 709 Ward Dr., Scott AFB, IL 62225

Ms. Jackson will testify regarding the Defense Transportation Tracking System (DTTS), the system DOD uses to track ammunition shipments. This includes the Satellite Surveillance program.

8.      Kathleen L. Rockwell,  SWT Program Analyst, Naval Operational Logistics Support Center, Norfolk, VA

Ms. Rockwell will testify regarding the Defense Transportation Tracking System (DTTS), the system the Defense Department uses to track ammunition shipments. This includes the Satellite Motor Surveillance program. She will testify regarding the details and requirements of the system. She will testify regarding the procedures the drivers were to follow for satellite tracking for the load that they had picked up. She will testify regarding the records for the Brognas' activity and shipment the day of the accident.

9.      Mr. Brian Rivera,   Military Surface Deployment and Distribution Command, 709 Ward Dr., Scott AFB, IL 62225

*MAY PROPOSE DE BENE ESSE*

Mr. Rivera will testify regarding the contract requirements for ammunition shipments, including the  Military Freight Traffic Rule Publication 1C (MFTRP 1C)

10.     Mr. Evert Bono, Military Surface Deployment and Distribution Command, 709 Ward Dr., Scott AFB, IL 62225

*MAY PROPOSE DE BENE ESSE*

Mr. Bono  will  testify  regarding  the  contract  requirements  for  ammunition shipments, including the  Military Freight Traffic Rule Publication 1C (MFTRP 1C)

11.     Mr. James Gilmore, Military Surface Deployment and Distribution Command, 709 Ward Dr., Scott AFB, IL 62225

Mr. Gilmore will testify regarding the Surface Deployment and Distribution Command Carrier Registration and Performance monitoring, inspections, reports and required actions.  *MAY PROPOSE DE BENE ESSE*

12. Defendant reserves the right to call in its case in chief, as to liability, any witnesses listed by plaintiff.

13.  If stipulations cannot be reached as to the admissibility of exhibits with plaintiff's counsel, defendant reserves the right to call the applicable records custodian to authenticate any records listed on defendant's exhibit list

**B. On damages,** defendant intends to call the following witnesses who will testify in accordance with the following summaries:

C. Plaintiff objects to the following witnesses for the reasons stated:

1)      Plaintiffs object to Jared Leighty and CDR Dave Trottel testifying at the time of trial.  The depositions of these witnesses were requested and defendant failed to produce these individuals for deposition.  Defendant had advised the Court that it would produce these witnesses for deposition if it intended on calling them to testify. Defendant has failed to produce these witnesses.

*Resolved: if Defendant intends to call at trial they will be produced 5 days prior to trial*

2)      Plaintiffs  object  to  Carol  Gaskiewicz;  Deborah  Jackson;  Kathleen Rockwell; Brian Rivera; Evert Bono; and James Gilmore testifying at the time of trial. These witnesses were available to the defendant in January 2007 when defense counsel advised the Court that defendant would be filing a dispositive motion based on its position that the plaintiffs were statutory, "special", employees of the defendant.  This Court's scheduling Order of January 9, 2007, instructed the parties to conduct all fact

discovery concerning this issue prior to the filing of the motion for summary judgment. All discovery was conducted. Defendant was not successful on its motion and is now seeking to add additional witnesses that should have been done prior to the motion for summary judgment. The proffered testimony of these witnesses is no longer relevant in light of the Court's rulings. *Whether testimony is relevant shall be addressed in trial brief*

      3)    Plaintiffs object to Deborah Jackson; Kathleen Rockwell; Brian Rivera; Evert Bono; and James Gilmore testifying at the time of trial. Defendant did not disclose the identity of these individuals at any point during discovery.

*Resolved — Depositions May be Conducted up to five days prior to trial.*

      8. **EXPERT WITNESSES** (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).

      A. Plaintiff's expert witnesses are:

      1)    **Wayne F. Nolte, Ph.D., P.E.**

      Dr. Nolte will testify as to the contents of his report dated June 4, 2008. More specifically, he will testify as to his qualifications; the description of the subject incident; the description of his inspection of the area where the subject incident took place; the applicable Codes; and his findings and conclusions.

      2)    **John W. King, D.O.** *MAY PROPOSE DE BENE ESSE*

      Dr. King will testify as to the contents of his reports dated November 14, 2006 and February 7, 2007. More specifically, he will testify as to his qualifications; the history of Mrs. Brogna's injuries and treatment; his review of the medical records and diagnostic tests; explanation of her subjective complaints; her past medical history; her personal history; his physical examination, his diagnosis, prognosis and conclusions; permanency of her injuries and resulting functional impairment; and the proximate cause of these injuries, all within a reasonable degree of medical probability.

      3)    **Rudolph C. Thompson, M.D.** *MAY PROPOSE DE BENE ESSE*

      Dr. Thompson will testify as to the contents of his report dated November 14, 2006. More specifically, he will testify as to his qualifications; the history of Mrs. Brogna's injuries and treatment; his review of Mrs. Brogna's medical records and treatment protocols; explanation of her subjective complaints; his physical examination; his diagnosis, prognosis and conclusions; permanency of her injuries and resulting scarring; her functional impairment and the proximate cause of these injuries, all within a reasonable degree of medical probability.

      4)    **P Brent Koprivica, M.D.**

Dr. Koprivica will testify as to the contents of his report dated February 25, 2006, and the addendum report dated October 23, 2006. More specifically, he will testify as to his qualifications; Mrs. Brogna's educational and vocational history; the history of Mrs. Brogna's injuries and treatment; her subjective complaints; her past medical history; her personal history; his physical examination; his diagnosis, prognosis, conclusions and recommendations; functional impairment; and the proximate cause of these injuries, all within a reasonable degree of medical probability.

B. Defendant's objections to the qualifications of plaintiff's expert are:

*N/A*

C. Defendant's expert witnesses are:

1.     Steven W. Rickard, 5107 Mountain Ridge Lane, Harrisburg, PA 17112

Mr. Rickard, the defendant's liability expert, will testify in accordance with his report dated December 17, 2007 and supplemental report dated August 30, 2008.

2.     Arnold S. Witte, M.D., 2 Princess Road, Lawrenceville, NJ 08648

Dr. Witte, the defendant's neurology expert, will testify in accordance with his report dated December 31, 2007.

3.     Michael C. Bercik, M.D., 711 Westminster Avenue, Elizabeth, NJ 07208

Dr. Bercik, the defendant's orthopaedic expert, will testify in accordance with his report dated November 6, 2007.

4.     James N. Gardner, M.D., FACS, 47 Maple Street, Suite 406, Summit, NJ 07901

Dr. Gardner, the defendant's expert in plastic surgery, will testify in accordance with his report dated November 25, 2007.

D. Plaintiff's objections to the qualifications of defendant's experts are:

*N/A*

9. **PLAINTIFF'S EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).

A. Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

**See Attached.**

B. Defendant objects to the introduction of plaintiff's exhibits (set forth number of an exhibit and grounds for objection):

P-26-56   Defendant objects to these photographs of the area around the scale house as irrelevant because the photographs do not represent the area as it was on the day of the accident. *At Trial*

P-79   Defendant objects to the report of Dr. Rudy Thompson as plaintiff did not provide it to defendant during discovery. *Resolved — Shall be provided to Defendant by 10/15/08.*

P-80   Defendant contends that this is an inadmissible expert opinion/report under Federal Rule of Evidence 702. This objection will be addressed in the ~~anticipated motion in limine.~~ *Trial brief if Warranted*

Defendant reserves the right to object to any exhibit on hearsay grounds.

**10. DEFENDANT'S EXHIBITS** (See instructions above).
A. Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

See attached exhibit list.

B. Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

1) D-3:   The Navy Munitions Command Mission Statement was never produced in discovery. The Statement is from a website for which no date of origination is provided. *← Shall be produced by 10/15/08        ← at Trial*

2) D-6:   The DOD Motor Freight Carrier In-Transit Surveillance Inspection Reports are not relevant to any issue, claim or defense at bar.  The Subject Inspection reports do not relate to TSMT, the Brognas or the subject Bill of Lading. *At Trial*

3) D-13:   The Defense Transport Tracking System Intransit History of Shipment was not served on plaintiffs. *Shall be produced by 10/15/08*

4) D-14:   The climatological data for Newark, NJ is not relevant as it does not reflect the weather conditions at NWS Earle on January 26, 2004. *at Trial*

5) D-27:      Plaintiff contends that this is an inadmissible expert opinion/report under Federal Rule of Evidence 702. This objection will be addressed in the ~~anticipated motion in limine~~. *Trial Brief if Warranted*

6) D-32:      The report of Dr. James N. Gardner dated November 25, 2007 was never served on plaintiffs. *Resolved – already produced*

(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial. If counsel desires to display exhibits to the jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).

## 11. PLAINTIFF'S LEGAL ISSUES:

1) Whether defendant breached its duty of care to plaintiffs.

2) Whether defendant's breach of its duty of care was a proximate cause of plaintiffs' damages.

3) Whether plaintiffs sustained permanent damages pursuant to the Federal Tort Claim Act.

4) Plaintiffs contend that defendant is barred from asserting that responsibility lies with George Brogna as defendant failed to assert a claim against him.

5) Plaintiffs contend that George Brogna can not be found comparatively negligent as there is no claim against him.

6) Defendant employees, Jared Leighty and CDR David Trettel are barred from testifying at trial due to defendant failing to produce these individuals for deposition.

7) Plaintiffs are not special employees of defendant and are not barred from recovery by New Jersey's workers' compensation statute.

## 12. DEFENDANT'S LEGAL ISSUES:

A.  Whether defendant breached any duty of care owed to plaintiff Paulette Brogna.

B.  Whether defendant's breach of a duty of care owed to plaintiff Paulette Brogna proximately caused plaintiff's injury.

C.  Whether defendant was negligent.

D.  Whether plaintiff Paulette Brogna was negligent and, if so, the comparative degree of her causal negligence.

E.  Whether plaintiff George Brogna was negligent, and if so, the comparative degree of his negligence.

F.  Whether plaintiff George Brogna's negligence was the proximate cause of Paulette's injuries.

G.  Whether plaintiff Paulette Brogna was a statutory or special employee of the defendant at the time of the accident.

H.  Whether the workers compensation immunity applies to the United States under the circumstances of this case.

**13. CHOICE OF LAW:**
(If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question. This issue shall be separately briefed in accordance with an order to be entered herewith).

Not applicable.  New Jersey law applies as res judicata.

**14. MISCELLANEOUS** (Set forth any other matters which require action by, or should be brought to the attention of the Court):

**15. JURY TRIALS** - Not later than _____.

A.  Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

B.  Counsel for each party shall submit to the Judge, with a copy to opposing counsel, written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

C.  Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.

**16. NON-JURY TRIALS** - Not later than *10 days prior to trial.*
*unless otherwise directed.*

A. Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B with citation to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

B. Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law. There is reserved to counsel the right to submit additional proposed findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.

17. **TRIAL COUNSEL** (List the names of trial counsel for all parties).

<u>Attorneys for Plaintiffs</u>
**PETER CHAMAS, ESQ.**
**ERROLL J. HAYTHORN, ESQ.**
Gill & Chamas, LLC
655 Florida Grove Road
Woodbridge, NJ 07095

<u>Attorneys of Defendant</u>
**CHRISTOPHER J. CHRISTIE, ESQ.**
UNITED STATES ATTORNEY
**COLETTE R. BUCHANAN, ESQ.**
Assistant United States Attorney
970 Broad Street
Newark, NJ 07102

18. **BIFURCATION** (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).
*Defendant will move for bifurcation*
*Whether* The issues of liability and damages SHALL ~~NOT~~ be tried separately *is issue for Court.* *Trial Brief*

19. **ESTIMATED LENGTH OF TRIAL**

_____3_____ DAYS FOR LIABILITY
and
_____2_____ DAYS FOR DAMAGES.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.

(ATTORNEY FOR PLAINTIFF)

_(signature)_

(ATTORNEY FOR DEFENDANT)

_(signature)_

UNITED STATES MAGISTRATE JUDGE

DATED: _10/9/08_

(EXHIBIT LIST ATTACHED HERETO)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PAULETTE BROGNA
AND GEORGE BROGNA,                          Civil Action No. 05-4839

                            :       Hon. Garrett E. Brown, Jr.
         Plaintiffs,                     :

        v.                                  :

UNITED STATES OF AMERICA,             :       PLAINTIFFS' EXHIBIT LIST

        Defendant.                      :

| No. | Description of Exhibit | ID | EV |
|---|---|---|---|
| P-1 | Department of the Navy Accident Report | | |
| P-2 | Department of the Navy Voluntary Statement of Thomas Fitzgerald | | |
| P-3 | Department of the Navy Voluntary Statement of Ralph Lutbecher | | |
| P-4 | Department of the Navy Voluntary Statement of George Paul Brogna | | |
| P-5 | Department of the Navy Communications Log | | |
| P-6 | Department of the Navy Photograph Log | | |
| P-7 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-8 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-9 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-10 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-11 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-12 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-13 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-14 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-15 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-16 | Photograph taken at the scene of the accident on 1/26/04 | | |

| | | | |
|---|---|---|---|
| P-17 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-18 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-19 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-20 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-21 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-22 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-23 | Photograph taken at the scene of the accident on 1/26/04 | | |
| P-24 | Department of the Navy diagram depicting revisions to the scale house area | | |
| P-25 | Department of the Navy daily schedule of loads for 1/26/04 | | |
| P-26 | Photographs of the area surrounding the scale house | | |
| P-27 | Photographs of the area surrounding the scale house | | |
| P-28 | Photographs of the area surrounding the scale house | | |
| P-29 | Photographs of the area surrounding the scale house | | |
| P-30 | Photographs of the area surrounding the scale house | | |
| P-31 | Photographs of the area surrounding the scale house | | |
| P-32 | Photographs of the area surrounding the scale house | | |
| P-33 | Photographs of the area surrounding the scale house | | |
| P-34 | Photographs of the area surrounding the scale house | | |
| P-35 | Photographs of the area surrounding the scale house | | |
| P-36 | Photographs of the area surrounding the scale house | | |
| P-37 | Photographs of the area surrounding the scale house | | |
| P-38 | Photographs of the area surrounding the scale house | | |
| P-39 | Photographs of the area surrounding the scale house | | |
| P-40 | Photographs of the area surrounding the scale house | | |
| P-41 | Photographs of the area surrounding the scale house | | |
| P-42 | Photographs of the area surrounding the scale house | | |
| P-43 | Photographs of the area surrounding the scale house | | |
| P-44 | Photographs of the area surrounding the scale house | | |
| P-45 | Photographs of the area surrounding the scale house | | |
| P-46 | Photographs of the area surrounding the scale house | | |
| P-47 | Photographs of the area surrounding the scale house | | |
| P-48 | Photographs of the area surrounding the scale house | | |
| P-49 | Photographs of the area surrounding the scale house | | |
| P-50 | Photographs of the area surrounding the scale house | | |
| P-51 | Photographs of the area surrounding the scale house | | |
| P-52 | Photographs of the area surrounding the scale house | | |
| P-53 | Photographs of the area surrounding the scale house | | |

| P-54 | Photographs of the area surrounding the scale house | | |
| P-55 | Photographs of the area surrounding the scale house | | |
| P-56 | Photographs of the area surrounding the scale house | | |
| P-57 | Diagram of the scale house area | | |
| P-58 | Jersey Shore Medical Center records from 1/26/04 through 2/24/04 | | |
| P-59 | Memorial Regional Hospital records from 2/24/04 through 3/20/04 | | |
| P-60 | Memorial Regional Hospital records from 3/31/04 through 4/16/04 | | |
| P-61 | Memorial Regional Hospital records from 6/8/04 through 6/9/04 | | |
| P-62 | Medical records of Dr. Alan Novak | | |
| P-63 | Medical records of Dr. Stephen Steiniluf | | |
| P-64 | Medical records from Parkway Regional Medical Center Radiology Group | | |
| P-65 | Photographs of plaintiff's injuries | | |
| P-66 | Photographs of plaintiff's injuries | | |
| P-67 | Photographs of plaintiff's injuries | | |
| P-68 | Photographs of plaintiff's injuries | | |
| P-69 | Photographs of plaintiff's injuries | | |
| P-70 | Photographs of plaintiff's injuries | | |
| P-71 | Photographs of plaintiff's injuries | | |
| P-72 | Photographs of plaintiff's injuries | | |
| P-73 | Photographs of plaintiff's injuries | | |
| P-74 | Photographs of plaintiff's injuries | | |
| P-75 | Photographs of plaintiff's injuries | | |
| P-76 | Medical bills for treatment plaintiff received | | |
| P-77 | Income documents | | |
| P-78 | Expert narrative report and curriculum vitae from Dr. John W. King | | |
| P-79 | Expert narrative report and curriculum vitae from Dr. Rudy Thompson | | |
| P-80 | Expert report, photographs and curriculum vitae from Wayne F. Nolte, Ph.D. | | |
| P-81 | Expert report of P. Brent Koprivicia, M.D. | | |
| P-82 | Medical bills, AIG costs and Explanation of Benefits | | |
| P-83 | Defendant's Answers to Interrogatories | | |
| P-84 | Defendant's Rule 26 Disclosures | | |
| P-85 | Narrative report and curriculum vitae from Dr. Michael Bercik | | |
| P-86 | Narrative report and curriculum vitae from Dr. Arnold Witt | | |

| P-87 | Expert report and curriculum vitae from Stephen Richard | | |
|---|---|---|---|
| P-88 | Plaintiffs' Answers to Interrogatories | | |
| P-89 | Plaintiffs' Rule 26 Disclosures | | |
| P-90 | Transcript, Deposition of Paulette Brogna | | |
| P-91 | Transcript, Deposition of George Brogna | | |
| P-92 | Transcript, Deposition of Thomas Fitzgerald | | |
| P-93 | Transcript, Deposition of Ralph Leutbecher | | |
| P-94 | Transcript, Deposition of Roy Bullock | | |
| P-95 | Transcript, Deposition Agustinho Calcado | | |
| P-96 | | | |
| P-97 | | | |
| P-98 | | | |
| P-99 | | | |
| P-100 | | | |
| P-101 | | | |
| P-102 | | | |
| P-103 | | | |
| P-104 | | | |
| P-105 | | | |
| P-106 | | | |
| P-107 | | | |
| P-108 | | | |
| P-109 | | | |
| P-110 | | | |
| P-111 | | | |
| P-112 | | | |
| P-113 | | | |
| P-114 | | | |
| P-115 | | | |
| P-116 | | | |
| P-117 | | | |
| P-118 | | | |
| P-119 | | | |
| P-120 | | | |
| P-121 | | | |
| P-122 | | | |
| P-123 | | | |
| P-124 | | | |
| P-125 | | | |

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PAULETTE BROGNA AND            :
GEORGE BROGNA,                 :          Civil Action No. 05-4839
                               :
          Plaintiff(s),        :          Hon. Garrett E. Brown, Jr.
                               :
          v.                   :
                               :          DEFENDANT'S EXHIBIT LIST
UNITED STATES OF AMERICA       :
                               :
          Defendant(s).        :

| No. | Description of Exhibit | ID | EV |
|---|---|---|---|
| D-1 | Regulation 1005 Access Control at Earle NWS | | |
| D-2 | SDDC Freight Traffic Rules Pub. No. 1C | | |
| D-3 | Navy Munitions Command Mission Statement | | |
| D-4 | Department of Defense Directive 5158.4 | | |
| D-5 | Department of Defense Directive 6055.13 | | |
| D-6 | DOD Motor Freight Carrier In-transit Surveillance Inspection reports | | |
| D-7 | Commercial Bill of Lading | | |
| D-8 | Standard Tender 003484 | | |
| D-9 | Signature and Tally Record | | |
| D-10 | Lease agreement with Tri State Motor Transportation | | |
| D-11 | Aerial photo of scale house area at Earle NWS | | |
| D-12 | Daily Schedule of Loads (1/26/04) | | |
| D-13 | Defense Transport Tracking System Intransit History of Shipment | | |
| D-14 | Local Climatological Data, January 2004, Newark, NJ | | |
| D-15 | Record of Climatological Observations January 2004 Freehold, NJ | | |

| D-16 | Floor plan of Scale House Bldg. L-25 | | |
|------|--------------------------------------|--|--|
| D-17 | Traffic Accident report | | |
| D-18 | Photo log with photos (10) | | |
| D-19 | Statement of Tom Fitzgerald | | |
| D-20 | Statement of Ralph Leutbecher | | |
| D-21 | Statement of George Brogna | | |
| D-22 | Transcript, Deposition of George Brogna | | |
| D-23 | Transcript, Deposition of Paulette Brogna | | |
| D-24 | Transcript, Deposition of Ralph Leutbecher | | |
| D-25 | Transcript, Deposition of Tom Fitzgerald | | |
| D-26 | Transcript, Deposition of Roy Bullock | | |
| D-27 | Report of Steven W. Rickard, December 17, 2007 | | |
| D-28 | Report of Steven W. Rickard, August 30, 2008 | | |
| D-29 | Resume of Steven W. Rickard | | |
| D-30 | Report of Arnold S. Witte, M.D., Dec. 31, 2007 | | |
| D-31 | CV of Dr. Witte | | |
| D-32 | Report of James N. Gardner, M.D., Nov. 25, 2007 | | |
| D-33 | CV of Dr. Gardner | | |
| D-34 | Report of Michael C. Bercik, M.D., Nov. 6, 2007 | | |
| D-35 | CV of Dr. Bercik | | |
| D-36 | List of prior testimony of Mr. Rickard | | |
| D-37 | List of prior testimony of Dr. Witte | | |
| D-38 | List of prior testimony of Dr. Gardner | | |
| D-39 | List of prior testimony of Dr. Bercik | | |
| D-40 | Desk Journal | | |
| D-41 | Communications Log | | |
| D-42 | Notice of Claim, Paulette Brogna | | |
| D-43 | Notice of Claim, George Brogna | | |

| D-44 | Plaintiff's Answers to Interrogatories | | |
|------|----------------------------------------|--|--|
| D-45 | Photograph of Scale House | | |
| D-46 | Photograph of Scale House (driver door) | | |