```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

PAULETTE BROGNA and        .  Case No. 05-cv-4839-GEB-TJB
GEORGE BROGNA,             .
                           .
         Plaintiffs,       .
                           .
         v.                .  402 East State Street
                           .  Trenton, NJ 08608
UNITED STATES OF AMERICA,  .
et al.,                    .
                           .
         Defendants.       .
                           .  April 14, 2009
. . . . . . . . . . . . . ..  9:56 a.m.

                      TRANSCRIPT OF TRIAL
              BEFORE HONORABLE GARRETT E. BROWN, JR.
             UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES:

For the Plaintiffs:        Gill & Chamas, LLC
                           By:  PETER CHAMAS, ESQ.
                                ERROLL J. HAYTHORN, ESQ.
                           655 Florida Grove Road
                           P.O. Box 760
                           Woodbridge, NJ  07095


For the United States      Office of the U.S. Attorney
of America:                By:  MARK CHRISTOPHER ORLOWSKI, AUSA
                                DANIEL J. GIBBONS, AUSA
                           402 East State Street
                           Room 430
                           Trenton, NJ  08608


Audio Operator:            Kim Korchick
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609)**

**I N D E X**

**WITNESSES**                                    **PAGE**

DR. WAYNE NOLTE
        Direct by Mr. Chamas                    3
        Voir Dire by Mr. Orlowski               5
        Cont'd Direct by Mr. Chamas             7
        Cross by Mr. Orlowski                   31
        Redirect by Mr. Chamas                  58

RALPH LEUTBECHER
        Direct by Mr. Orlowski                  72
        Cross by Mr. Chamas                     122

THOMAS FITZGERALD
        Direct by Mr. Orlowski                  158
        Cross by Mr. Chamas                     173


| **EXHIBITS** | | **ID** | **EVID** |
|---|---|---|---|
| P-1 | | -- | 70 |
| P-58 to 64 | Medical Records | -- | 70 |
| D-16A | Scale House Layout | -- | 75 |
| D-45 | Photos of Scale House | -- | 85 |
| P-7 | Photo | -- | 103 |
| P-8 | Photo | -- | 103 |
| P-9 | Photo | -- | 103 |
| P-28 | Photo | 131 | 132 |

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:   Are we ready now?

2              MR. CHAMAS:  Yes, Your Honor.

3              THE COURT:   All right, proceed.  Proceed.

4              MR. CHAMAS:  Sorry.  Your Honor, plaintiff calls Dr.

5  Wayne Nolte.

6              THE COURT:   Okay.

7  W A Y N E   F   N O L T E, WITNESS, SWORN

8              THE CLERK:   Please state your full name for the

9  record and spell your last name.

10             THE WITNESS:  It's Wayne F. Nolte, N-o-l-t-e.

11             THE COURT:   Proceed.

12             MR. CHAMAS:  Thank you, Your Honor.

13                          DIRECT EXAMINATION

14 BY MR. CHAMAS:

15 Q    Good morning, Dr. Nolte.

16 A    Good morning.

17 Q    Doctor, can you begin by telling the Court your

18 educational background?

19 A    Yes, I have a bachelor's degree in civil engineering that

20 I received from the New Jersey Institute of Technology.  I also

21 have a master's degree also from the New Jersey Institute of

22 Technology in civil engineering but with a concentration in

23 structural engineering and applied mechanics.  Applied

24 mechanics is mathematics and physics and I also have a PhD from

25     the New Jersey Institute of Technology in a combination

**J&J COURT TRANSCRIBERS, INC.**

1  of civil and mechanical engineering.

2  Q    Can you give us your employment history?

3  A    When I first received my PhD I was working for the New

4  Jersey Institute of Technology as a lecturer in the areas of

5  civil and mechanical engineering.  I then became the director

6  of applied research at NJIT and I left there in 1981 to start

7  my own business.  When I went into business I concentrated on

8  the reconstruction of existing buildings and existing sites.  I

9  then got involved with real estate management companies,

10  architects, public housings, school boards and eventually I

11  became involved in matters in litigation doing site

12  evaluations, reconstruction of accidents and today it's a

13  hundred percent of what I do.

14  Q    Accident reconstruction?

15  A    Reconstruction and building evaluations.

16  Q    Okay.  Are you -- you are a registered and licensed

17  engineer, I assume?

18  A    Yes, I am a licensed professional engineer in the states

19  of New Jersey, Pennsylvania and Ohio.

20  Q    Do you belong to any professional associations?

21  A    Yes.  I belong to the American Society of Civil Engineers,

22  the American Society of Safety Engineers, the Society of

23  Automotive Engineers in Jersey, Society of Accident

24  Reconstruction and also the International Building code.

25  Q    Aside from the education you've proposed from NJIT, have

1  you continued with your education throughout the years?

2  A    Yes.  I've been trained by the Society of Automotive

3  Engineers in accident reconstruction.  Also from the University

4  of North Florida, and I do regularly attend conferences and

5  seminars given by the American Society of Civil Engineers in

6  various aspects of civil engineering including transportation

7  engineering.

8  Q    You testified in federal court in the past?

9  A    Yes, I have.

10 Q    As an expert in engineering and accident reconstruction?

11 A    Yes, I have.

12       MR. CHAMAS:  Your Honor, at this time I would like to

13 offer Dr. Nolte as an expert in engineering and accident

14 reconstruction.

15       THE COURT:  Counsel?

16       MR. ORLOWSKI:  Your Honor, some voir dire please.

17       THE COURT:  Yes, go ahead.

18               VOIR DIRE EXAMINATION

19 BY MR. ORLOWSKI:

20 Q    Dr. Nolte, in your degree for civil engineering from NJIT

21 did any of your courses relate to snow removal?

22 A    Not specifically snow removal but site maintenance which

23 would include snow removal.

24 Q    And have you had any other formal training in snow

25 removal?

1   A    No.

2   Q    Do you have a commercial driver's license?

3   A    I do not.

4   Q    Have you ever operated a commercial vehicle?

5   A    No.  Actually let me back that up.  I do work for New

6   Jersey Transit and I did have an opportunity once to drive one

7   of their busses on their own property just to have a feel for

8   how it operated?

9   Q    Okay, but you've never driven a commercial motor vehicle

10  on a roadway in the State of New Jersey or any other state?

11  A    That's correct.  I am not licensed to do so and I have

12  not.

13  Q    Have you ever been involved with the weighing of tractor

14  trailers?

15  A    No.

16  Q    And you don't have any expertise in the weigh station

17  procedures, correct?

18  A    Not particularly, no, no.

19       MR. ORLOWSKI:  Your Honor, we would object to the

20  admission of Dr. Nolte as an expert in this matter.

21       THE COURT:  Counsel?

22       MR. CHAMAS:  I'm not sure what the basis of the

23  objection is, Your Honor.  Because -- I'm not sure what the

24  basis of the objection is.

25       THE COURT:  He is called as an accident

1  reconstruction expert.  Does your objection go to the weight or

2  does it go to whether or not he can so testify?

3           MR. ORLOWSKI:  Your Honor, this is an accident

4  involving a commercial motor vehicle and Mr. Nolte has

5  basically just testified that he doesn't have a commercial

6  driver's license, he's never driven a commercial motor vehicle

7  and I submit to the Court that he's not all that familiar with

8  commercial motor vehicles sufficient to be able to render an

9  expert opinion in this case.

10           THE COURT:  Well, I will deny that without prejudice

11  and your examination may show that his opinion should be

12  considered or it may not.  But right now I will allow it.  All

13  right, right now your objection goes to wait.  Proceed.

14           MR. CHAMAS:  Thank you, Your Honor.

15                CONTINUED DIRECT EXAMINATION

16  BY MR. CHAMAS:

17  Q    Dr. Nolte, before I get into what I was going to start

18  with, is this -- how do you describe this accident?  Is this

19  -- how would you describe it?

20  A    I would describe it as a fall down accident based on

21  property maintenance.

22  Q    Okay.  All right, so let's start.  Did my office contact

23  you with respect to rendering an opinion with respect to this

24  accident?  Is that correct?

25  A    That's correct.

Nolte - Continued Direct                                  8

1   Q    And did you review any documents in connection with this

2   matter?

3   A    I did, yes.

4   Q    All right.  Did you also conduct an inspection of the

5   property?

6   A    I did, yes.

7   Q    Can you tell the Court what documents you reviewed?

8   A    Yes, I had the Department of the Navy desk journal, naval

9   weapons station for Earle for Monday, January 26, 2004, the

10  Department of the Navy law enforcement communication log for

11  January 26, 2004, the traffic accident report, the Department

12  of Navy voluntary statement from Thomas Fitzgerald, the log of

13  Mr. Brogna, the statement from Mr. Brogna, the statement from

14  Mr. Leutbecher, photographs of the accident site, photocopies

15  of photographs showing the accident site.

16        I had the transcript from the deposition of Augustino

17  Calcado, the transcript from the deposition of Ralph

18  Leutbecher, the transcript from the deposition of Thomas

19  Fitzgerald, the transcript from the deposition of George

20  Brogna, the transcript from the deposition of Paulette Brogna,

21  the transcript from the deposition of Roy Bullock, the building

22  L-25 scale house apron pavement repair drawings, climatological

23  data from the National Oceanic and Atmospheric Administration

24  for January 26, 2004 for the State of New Jersey, and the

25  report by Steven Rickard of Steven Rickard Associates issued in

1  December 2007.

2  Q    Subsequent to rendering your opinion, have you received

3  any other information, any other documentation?

4  A    Yes.  I received two additional transcripts.  One was from

5  a Mr. Ellis, another truck driver, and also from Commander

6  Treddle.

7  Q    Your inspection was conducted on what date?

8  A    The inspection was conducted on May 20 of last year, 2008.

9  Q    What, as a result of your inspection, would you point out

10  areas that you found relevant with respect to the site?

11  A    Right, what I found is that the scale house was located on

12  what was termed Guadalcanal Road. It's on or off the westside

13  of Route 34 through Colts Neck Township.  The scale house is a

14  one-story, brick masonry building that has its long sides

15  facing north and south and short sides facing east and west.

16  The building is 35 feet long, 27 feet wide.

17        In front of the building on its south side is a scale

18  with a concrete deck and the scale is ten feet wide and 50 feet

19  long.  It's offset between the corner of the building and the

20  scale is about four feet.

21  Q    I'm sorry, Doctor, what was that?

22  A    It was the offset between the east side of the scale and

23  the east side of the building.  There is an offset.

24  Q    So the difference between the two of those?

25  A    Right.

1  Q     Okay.

2  A     Right.  And then there is a concrete walkway on the east

3  side of the building and I understand there is a door there

4  that is designated as the driver's door so that when drivers

5  pull up to the weigh station this is the side of the building

6  that they use to go in and out of that building.  There is, as

7  I said, a concrete walkway that is four feet six inches wide

8  along --

9  Q     I'm sorry.  I'm going to interrupt.

10 A     Sure.

11 Q     You are shooting out a lot of numbers and I should have

12 done this previously.  Let me -- I'm going to give you two

13 documents, two photographs that have been depicted -- I'm

14 sorry, that have been moved into evidence as P-29 and P-33.  Is

15 that the scale house you are describing?

16 A     Yes.  Yes, this is it.

17 Q     Maybe it would be easier for us to grasp the measurements

18 you've given if you can actually point it out while it is up on

19 the screen.  Which would be easier for you?

20 A     Let's see, I think P-33 would be the better one to look

21 at.

22 Q     And there may be, you can check, a laser pointer.

23 A     Yes, this here?

24 Q     And it's that button right there?

25 A     This one here, okay.  Okay, so this is the building.  This

1   is the south wall of the building.  The light area in front of

2   it is the scale itself.  I did say before that the distance

3   between the end of the building and scale was about four feet

4   and I am incorrect in that.  The actual distance is two feet

5   three inches between this corner of the building and the scale.

6   The walkway that is at the east side of this building has a

7   width of four feet six inches.  This side of the building, the

8   east side of the building, is the driver's side of the building

9   as opposed to the west side which is the employee's entrance

10  side of the building.

11          And my concentration was really on this portion of

12  the building, that being the south east side of the building

13  and the east side of the building because that is the vicinity

14  of concern in this accident.

15  Q    Can you tell us what your understanding is as a result of

16  reviewing the documents?  What is your understanding of what

17  occurred?

18  A     My understanding is that the accident occurred on Monday,

19  January 26, 2004 at about 8:20 or 8:30 a.m.  The Brognas are a

20  husband and wife driving team.  They work for Tri-State Motor

21  Transit.  On the day of this accident they arrived at the weigh

22  station and parked on the -- am I pressing the right button

23  here, yes -- they parked on the south side of the roadway that

24  fronts the scale house to wait for the scale house to open.

25          They saw personnel from the scale house come, go into

1  the west side of the building and then all the sudden they were

2  ready to then go to the scale house.  They moved the truck

3  around or Mrs. Brogna rather got out and went to the scale

4  house to get the paperwork for the trailer that they were to

5  pick up.  Once she got the paperwork they then went into the

6  naval base, picked up the trailer.  They came that morning with

7  only the tractor bobtail.

8          When they got the trailer, they returned to the scale

9  house and again parked on the south side of the roadway.  Mrs.

10 Brogna then went into the scale house to request a weigh

11 because they were going out on public roads and wanted to

12 confirm that they were not overweight.  She then got the okay

13 for the weigh.  She came out and signaled to her husband to

14 come out and to move the truck over.  She was then informed

15 that they were going to actually put the entire truck onto the

16 scale and weigh it at one time.

17         She got into the truck, told her husband that they

18 were going to weigh the entire truck and then she got out so

19 that she could then again retrieve the numbers so she had those

20 documented weights.  When she got out of the truck, she stepped

21 out from the passenger side which was closest to the south wall

22 of the scale house building.  She had to turn to her right in

23 order to go to the driver's side located on the east side of

24 the building.  She took one, two steps and she slipped  and her

25 legs went under the truck.  Mr. Brogna then moved the truck

1  forward after looking in his mirrors and not seeing anyone

2  around.  He then moved the truck forward and the drive wheels

3  of the tractor then went over her legs.

4  Q    As a result of your review of the documents and inspection

5  of the photographs, did you form opinions with respect to this

6  case?

7  A    I did, yes.

8  Q    Before we get to those opinions, Doctor, what I'd like to

9  do is point the information you found relevant that you relied

10 upon to render your opinion?  And if you need to refer to

11 photographs of the scene of the accident just let me know and I

12 can put them up on the screen.

13 A    Okay, fine.

14 Q    Starting with -- well tell us what you began -- what facts

15 you found relevant with respect to rendering your opinion?

16 A    The most important fact of all this is that there was snow

17 on the ground.  I did look at the weather records for, I

18 believe it was the Newark area and specifically the Freehold

19 Marlboro weather station, which showed that it had snowed a

20 week before.  There was some snow the day of the accident, but

21 there was cold temperatures throughout that week.  When I say

22 cold temperatures, I believe they were in the teens leading up

23 to the day of the accident.

24      So there clearly was snow on the ground.  I did see

25 photographs that showed that there was snow on the ground at

1   the scale house on the morning of this accident.  The snow was

2   on the ground at the east side of the building where the

3   drivers enter the building.  There was snow along the front of

4   the building, that would be the south side of the building

5   adjacent to the front wall of the building and between the

6   building and the scale.  And I understand from review of some

7   of the documents from Mr. Fitzgerald from his testimony, and

8   also Mr. Leutbecher, that they claim that they did some

9   clearing of snow but that was on the employee's side of the

10  property.

11         They did open the door on the driver's side of the

12  property but there is no evidence in the photographs that I saw

13  that there was really any cleaning done on that side of the

14  building at all.  The sidewalk, the concrete sidewalk, that

15  appears to be an original because of its coloration was not

16  cleared.

17  Q    I'm sorry, which side were you referring there?

18  A    The sidewalk on this side of the building and there is

19  one, a sidewalk four feet, six inches wide that is tight

20  against the east side of building that comes up to the concrete

21  that exists between the building and the scale.  It's right in

22  this area.

23  Q    Doctor, what I'm going to do is get another photograph.

24  A    Actually I think if you look at P-29 it might show what we

25  need to -- what I'm describing.  Okay.  The sidewalk that I was

1  referring to is this concrete sidewalk on the east side of the

2  building.  This is the four feet six inch wide sidewalk and its

3  color is very similar to the color of the concrete on the scale

4  -- it shows the discoloration so it shows that it's been there

5  for a while.

6          There is also this concrete strip that is between the

7  building and the scale.  This is of the same color.

8  Immediately behind this one barrel that is shown in this

9  photograph, there is a patch area that I saw on the day of the

10  accident and it appears it is only just a patch of the surface

11  of the concrete, but the surrounding concrete appears to be

12  original.  I do understand that when I was there that this

13  blacktop had been replaced since the accident and I did measure

14  to find out that it is an overlay of concrete and it is above

15  the level of the sidewalk.

16          So it does show that the sidewalks existed there

17  prior to this overlay of concrete or bituminous concrete I

18  should say.

19  Q    I interrupted you in your train of thought which was you

20  -- I forgot where you were at.

21  A    Okay, I think what I was talking about is I saw

22  photographs that showed that there was  snow on this side of

23  the building.  This side meaning the east side of the building

24  and the snow extended outward from the building.  It started

25  right at the building and extended out.  There was a pile of

1  snow and when I say pile I don't mean something that was three

2  or four feet high.  I mean, it was you know probably less than

3  a foot high but nonetheless it appeared to be the remnants of a

4  plow that went over the scale area and extended out into the

5  area of where the barrels are.

6  Q    With respect to the deposition summary -- deposition

7  testimony, Doctor, what information did you find relevant with

8  respect to rendering your opinions?

9  A    Well the information from the testimony of Mr. Fitzgerald

10 and from Mr. Leutbecher was that it seemed that the work on

11 that morning that was done with regards to the snow was

12 actually done on the west side of the building, the employee

13 side of the building.  Nothing was really done on the east side

14 of the building.  They opened the door for the drivers to come

15 in.  I understand there was another driver there that morning

16 with the Brognas to check in, but there was no work done on the

17 east side of the building to make it safe for passage in this

18 area.

19 Q    Why is it relevant that they did work on the other side,

20 the west side of the building?

21 A    Well the west side of the building is the employee's

22 entrance.  That's where Mr. Leutbecher and Mr. Fitzgerald

23 entered the building and as I sit here, I do forget who came

24 first but whoever came first did clear a way for the other

25 person to come into the building that way.  And there were

1    photographs that showed that shoveling had been done on the

2    west side of the building.

3           Photographs taken that morning of the east side of

4    the building where the drivers come in clearly showed that no

5    work was done and certainly not to the level of what was done

6    on the west side.  Photograph three shows the east side of the

7    building.  This is the driver's door.  This would be the scale

8    over here on the left side where the truck is located and you

9    can see that there is a pile of snow right here on the corner

10   that extends outward.  And this pile of snow does extend along

11   the front of the south side of the building.

12          There is no pathway in this area at all for drivers

13   to traverse the area from the truck to the driver's door.  Now

14   in photograph five this is a view of the west side of the

15   building.  This is the employee's side of the building.  As you

16   can see the ground surface here is clear and it is obvious that

17   at times the employees of this, the traffic and management

18   personnel, have to come out and --

19          MR. ORLOWSKI:  Objection, Your Honor.  This is not

20   the basis for expert testimony of the interpretation of the

21   photographs.

22          THE COURT:  Objection sustained.

23   Q    Doctor, what relevance -- what about the photographs did

24   you rely upon to render your opinion?

25   A    Is that the walkway on the west side of the building was

1  cleared for the personnel of the scale house and on the east

2  side of the building for drivers there was no clearing of the

3  walkway.

4          MR. ORLOWSKI:  Objection, Your Honor.  He's

5  interpreting the photographs.

6          THE COURT:  I'll allow it to the extent that it

7  informs his opinion.

8  Q    Doctor, with respect to Mr. Leutbecher's and Mr.

9  Fitzgerald's testimony and the rest of the deposition

10 testimony, anything else relevant with respect to how the scale

11 house was operating?

12 A    Well that was most important is the mode of operation.

13 Q    I'm going to stop you right there.  What do you mean mode

14 of operation?

15 A    Mode of operation is the procedure that's --

16         MR. ORLOWSKI:  Objection, Your Honor, beyond the

17 scope of the expert's expertise.

18         MR. CHAMAS:  Judge, he's explaining what mode of

19 operation is.  He's not getting into the testimony of --

20         THE COURT:  I'll allow it for his understanding.  You

21 can certainly cross examine on this record.

22 A    My understanding of the mode of operation is actually the

23 procedure that is followed at the scale house for drivers who

24 have their vehicles weighed.  It's evident from the set up of

25 the building that there is a driver's side to the building and

1   an employee side to the building that the drivers are

2   designated to use one portion of this building and also to use

3   the scale.  So that mode of operation, as I see, it requires

4   that the trucks that come in there have two drivers so

5   obviously --

6   Q    I'm sorry, Doctor, I want to interrupt you for a second.

7   A    Sure.

8   Q    You stated what the mode of operation but with regard to

9   the mode of operation, is this something that you were saying

10  were the proper procedures or is this the mode of operation

11  that the government had in place on that particular day?

12  A    Yes, it is their mode of operation.  It's what I've

13  gleaned from review of the documents as to how they operate

14  this area.

15  Q    All right, go ahead.

16  A    All right.  Based on that operation it was obvious from

17  their description that they do require that the drivers use

18  this east end of the building.  My understanding from review of

19  the documents is that the military requires that the drivers be

20  a team of drivers or two drivers and that yields that there is

21  going to be someone occupying the passenger's seat of the

22  tractor.  It is foreseeable that the person who is the

23  passenger is going to be the person who gets out of the tractor

24  --

25            MR. ORLOWSKI:  Objection, Your Honor.  It's beyond

1    the scope of his expertise.

2              THE COURT:  Sustained.

3              MR. CHAMAS:  Judge, he's talking about --

4              THE COURT:  I'm sustaining that.  He doesn't come

5    forward as an expert in the operation of the terminal.  Except

6    that it may go to his understanding, fine, but to the extent

7    that this is supposed expert opinion it is improper.

8              MR. CHAMAS:  Judge, it is not -- it is not -- what

9    Dr. Nolte is talking about deals with the foreseeability when

10   you are maintaining a piece of property, specifically if

11   somebody is going to be walking on a piece of property that is

12   what his expertise is in.  In this particular case, somebody

13   was going to be walking on the property and what he is saying

14   is if you have two people driving out of a truck, one of them

15   is going to get out and he's gained that information --

16             THE COURT:  He can certainly testify to that but as

17   far as the requirements and the like unless you can tie that in

18   there he's not going to opine on the military requirements, is

19   he?

20             MR. CHAMAS:  No, Your Honor.  And he's not saying

21   that it's a requirement.

22             THE COURT:  Well rephrase your question, all right.

23   Q    Doctor, you started to say that with respect to the

24   property and the maintenance of that property, what is relevant

25   with respect to their mode of operation and how the scale house

1  was run?

2  A    Typically in the maintenance of a piece of property you

3  have to look at how the property is actually used and for that

4  I look at their mode of operation.  I see that it is

5  foreseeable that a person who is in the passenger's seat of a

6  tractor which would have the passenger side closest to the

7  south wall of the building would get out.

8         MR. ORLOWSKI:  Objection, Your Honor.  The

9  foreseeability is a question of fact.

10        THE COURT:  To the extent that it goes to his

11 understanding, I'll allow it.  It's obviously not evidence.

12 A    A person would get out of the passenger side and walk

13 along the front wall of the building, that is the south wall of

14 the building, toward the east end and then enter the building

15 through the door on the east side.  So that is the passageway,

16 it is a foreseeable passageway.

17        THE COURT:  This is your interpretation, is that

18 right?

19        DR. NOLTE:  Yes, of what I gleaned from the documents

20 of how the facility is actually used.

21        THE COURT:  He's not testifying as to what the

22 requirements are there.  He's testifying as to his

23 understanding of the accident.  All right.  I'll allow it.

24 Q    Speaking of those documents, did you -- you indicated

25 earlier you had an opportunity to review Jay Ellis' testimony?

1  A     Yes.

2  Q     What was relevant with respect to Mr. Ellis' testimony?

3  A     Well Mr. Ellis confirmed exactly what the Brognas stated

4  that they were doing that morning.  He and his wife, that is

5  Mr. Ellis and his wife, were also drivers and he confirmed that

6  the procedure here was to go to the scale to have the truck

7  weighed, to use the driver's side door, to follow basically the

8  same procedure and pattern that the Brognas were following that

9  morning.  He found no difference.

10  Q     Continue, Doctor, with respect to the relevancy of the

11  mode of operation.  You talked about it being foreseeable that

12  somebody would get out of the passenger side, continue with

13  that.

14  A     Right.  And that's what leads to the opinion here is that

15  given how the facility was described in its used based on the

16  documents that I reviewed, the foreseeability that someone is

17  going to exit the tractor on the passenger side, which is

18  closest to the south wall of the building, there needs to be

19  clearing for them to actually get to the door located on the

20  east side of the building.  That clearing was not there.  Yet

21  on the west side of the building for the employees there was a

22  clearing.  The east side of the building for the drivers there

23  was no such clearing.

24  Q     Let's talk about Mr. Brogna and Mrs. Brogna's testimony.

25  What relevant parts of their testimony did you rely upon with

1  respect to this -- your opinion in this case?

2  A    Okay.  The important part of their testimony was that the

3  procedure of going to a scale house and having their vehicle

4  weighed was not an uncommon thing.  It is something that they

5  had done.  I don't know if they had done it here but they had

6  routinely done it, and their routine was that whoever was the

7  passenger would simply go to the scale house to get the

8  readings and get the data that they needed and then go back to

9  the truck.

10          Mrs. Brogna followed her normal procedures as I

11  understand that she explained it.  She went to the scale house,

12  she informed that she wanted the truck weighed.  She then had

13  the okay to weigh the truck.  Mr. Brogna then brought the truck

14  up onto the scale, the front wheels of the truck onto the

15  scale.  He was going to do it in a series of ways because the

16  scale was only 50 feet long and his trailer and tractor I

17  believe were 75 feet long.  So it required staging of the

18  weighing.

19          But when Mrs. Brogna went back in after the initial

20  weigh, she was informed just pull whole trailer onto the scale.

21  She went out and got into the truck and told her husband that,

22  you know, they were going to weigh the entire truck.  Then she

23  got out.  That's when the fall occurred.

24  Q    In your reviewing of the testimony, was there any

25  indication that Ms. Brogna was not allowed to out and tell her

1  husband to move onto the scale?

2  A    No.  There is no indication that she was told not to do

3  that.

4  Q    Dr. Nolte, I'd like to show you what's been marked as P-1

5  for identification and ask if you've seen that document

6  previously?

7  A    Yes, I have.

8  Q    And what is that document?

9  A    This is the traffic accident report.

10 Q    Is that -- is the traffic accident report something you

11 would normally and customarily rely upon in rendering opinions

12 in cases such as this?

13 A    Yes.

14 Q    What relevant portions or -- well what did you find

15 relevant with respect to P-1?

16        MR. ORLOWSKI:  Objection, Your Honor.  The document

17 contains hearsay, it's not in evidence.

18        THE COURT:  Well he can rely upon it, but to the

19 extent that it contains hearsay obviously it is not evidence.

20        MR. ORLOWSKI:  Then we'd object to him stating any of

21 the specific statements made by any of the people in the

22 report.

23        THE COURT:  All right, well that's a very interesting

24 one.  Do you intend to bring hearsay into evidence through

25 this?

1            MR. CHAMAS:   Judge, I intend on moving that document

2    into evidence so we can argue that --

3            THE COURT:   I don't think you can, can you?

4            MR. CHAMAS:   Your Honor, it's a statement by a party

5    opponent.  It is conducted in the business --

6            THE COURT:   Are you trying to get your own client's

7    hearsay in?

8            MR. CHAMAS:   No, no, no, Your Honor.  I'm sorry.

9    There is a statement contained in this report by the --

10           THE COURT:   You tried that once before and I said no.

11           MR. CHAMAS:   No, you didn't, Your Honor.

12           THE COURT:   I said you couldn't put your client's

13   hearsay in.

14           MR. CHAMAS:   No, I'm sorry, Your Honor.  I'm not

15   talking about my client right now.

16           THE COURT:   Okay.  I'm talking about a report

17   prepared by a defense investigator which contains various

18   statements attributed to individuals employed by the

19   government.  Is that right?  Is that what you are saying?  Let

20   me see the document.  Well there's a lot of redacted

21   information in here.  What portion of the report do you object

22   to, counsel?

23           MR. ORLOWSKI:   Your Honor, we object to any of the

24   statements of Mrs. Brogna and any of the statements of Mr.

25   Brogna and any --

 1            THE COURT:  He just said he wasn't going to offer
 2   those.   Correct?
 3            MR. ORLOWSKI:  Yes, Your Honor.
 4            MR. CHAMAS:  That's right.
 5            MR. ORLOWSKI:  And we would object also to the
 6   conclusions at the end that the -- that it was icy because we
 7   don't know what that's based on.  We don't know if that was a
 8   personal observation or whether that was based on the
 9   statements of Mr. and Mrs. Brogna which would make it
10   inherently unreliable.
11            THE COURT:  Who prepared this statement?
12            MR. CHAMAS:  The police officer from the -- an
13   employee of the defendant, Your Honor.
14            THE COURT:  It seems to me that this will come under
15   803.6.  However as far as statements by the party seeking to
16   offer it that would be hearsay and I'm not going to allow it.
17   Redact that and the rest will come in, all right?
18            MR. CHAMAS:  Thank you, Your Honor.
19   Q    Dr. Nolte, what I'd like you to do for right now or let's
20   ignore any portion of this report that refers to what Mr.
21   Brogna told the investigator, okay?
22   A    Okay.
23   Q    Counting that part out, what relevant portions of this --
24   what other part of this document did you find relevant with
25   respect to your opinion?

1  A    May I see the document again?

2  Q    I'm sorry.

3  A    It was the statement in here from Mr. Bullock and Mr.

4  Moyer about the very icy condition on the ground surface.

5  Q    And they were whom, please?

6  A    Fireman.

7  Q    Okay.

8  A    That was the important part of that because it confirms

9  the icy and snowy condition on the ground.

10 Q    Referring your attention to the investigator -- the author

11 of this report also made certain observations, correct?

12 A    That's correct, yes.

13 Q    What were those observations of the investigating officer?

14 A    The observation was that the walkway area of the scale

15 house was very icy on the driver's side and it was not safe for

16 walking.

17        THE COURT:  What is that document number?

18        MR. CHAMAS:  P-1, Your Honor.

19 Q    Doctor, did you review any statutes or code regulations

20 that were relevant with respect to your opinions in this case?

21 A    I did, yes.

22 Q    What did you review?

23 A    That was from the Township of Colts Neck where the naval

24 base is located and it is their property maintenance standard.

25 I used that to demonstrate that the township itself requires

1    that ice and snow be removed.  They refer to it as a hazardous

2    condition.

3    Q    Doctor, based on your inspection, your review of the

4    documents and the photographs of the scene that were taken that

5    day, did you reach an opinion within a reasonable degree of

6    engineering certainty?

7    A    I did, yes.

8    Q    What are those opinions, sir?

9    A    The opinions are that based upon my understanding of the

10   mode of operation of the facility from the documents reviewed

11   that the area where this accident occurred was a foreseeable

12   pathway for drivers and their passengers who were going to use

13   the scale house and the weigh station itself.  The surface

14   where Mrs. Brogna stepped out of the vehicle on the day of this

15   accident had not been treated in any way.  It had not been

16   shoveled, it had not been plowed, had not been treated with

17   salt or sand.  There was actually a remnant of snow from a

18   plowing operation where it appeared to be across the scale in

19   this area.

20        She had no traction whatsoever in that area to

21   prevent a slip and fall accident.  There were no signs in the

22   area to indicate to her that she should not get out of the

23   vehicle.  She was not informed verbally that she should not get

24   out of the vehicle.  She was given no indication that what she

25   did was against a procedure of some kind.  There just weren't

1 any procedures presented to her.

2 Q    What is your opinion within a reasonable degree of

3 engineering certainty as to what the naval base or the

4 employees of there should have done?

5 A    What needed to be done is for them to look at how the

6 drivers use the --

7         MR. ORLOWSKI:  Objection, Your Honor, beyond the

8 scope of his report.

9         THE COURT:  How is it beyond the scope of his report?

10 What does the report say?

11        MR. ORLOWSKI:  With respect to what the naval base

12 did or did not do with their procedures.

13        MR. CHAMAS:  The opinion, Your Honor, is that the

14 place was in a hazardous condition.  Now I'm asking, you know,

15 what should have been done?

16        THE COURT:  I'll allow it.

17 A    What should have been done is to clear a passage way

18 between the position of the tractors on the scale and the

19 driver's side door.  As I said before, it was a foreseeable

20 route that a passenger on a tractor would get out of the

21 passenger side, walk along the south side of the building and

22 walk toward the east side of the building in order to either

23 retrieve numbers or to get paperwork.  A foreseeable event.

24 That surface should have been shoveled.  It should have been

25 treated.  It should have been cleared so that there was a safe

1   passageway.  There clearly was not on the morning of this

2   accident.

3   Q    Doctor, let's assume for the sake of an argument there was

4   in fact an established pathway that went out on an angle as

5   indicated in some of the deposition testimony, that while it

6   wasn't cleared that day it had been previously cleared.  Could

7   that meet their obligation?

8   A    Well, I mean it is not consistent with the foreseeable use

9   of this building.  I mean it is not uncommon that people will

10  take the shortest route between two points.  Certainly when

11  there is bad weather or when there is snow on the ground.  Here

12  you have a concrete walkway that extends across the front south

13  side of this building and one that is tight against the east

14  side of the building that would provide a passageway to the

15  door on the east side.  The curbed path that you talked -- or

16  that angled path that you talked about coming out here was no

17  where near the east wall of the building or the south wall of

18  the building.  There is nothing in, as I'm looking at this

19  photograph, there is nothing in this photograph to show that a

20  person would be directed out to where it is claimed there was

21  an angled clear passageway.  There is nothing to prevent anyone

22  from taking the shortest route which would be along the two

23  walls of the building.

24  Q    And, Doctor, you indicated you reviewed -- I believe you

25  indicated you reviewed the report of Steven Rickard?

1  A     I did, yes.

2  Q     Do you disagree with any of the opinions of Mr. Rickard?

3  A     I do disagree with Mr. Rickard because I believe that this

4  accident was not the fault or the cause of the Brognas.   I

5  believe that he overlooked how this facility was being used and

6  failed to recognize that the naval base did not take into

7  consideration the safety of the drivers who had to use this

8  building.

9          There was -- there were no warnings out there to say

10 not to get out of the vehicle.  There were no instructional

11 signs as to where to walk to be safe.  You know, the Brognas

12 did what was foreseeable and reasonable and I think Mr. Rickard

13 overlooked that.

14 Q     Doctor, what is your opinion within a reasonable degree of

15 engineering certainty as to the cause of this accident?

16 A     The cause of this accident was not to clear the snow and

17 ice from a very foreseeable travel path given the mode of

18 operation of this facility.

19          MR. CHAMAS:  Thank you.  Nothing further.

20          THE COURT:  Cross examine.

21          MR. ORLOWSKI:  Thank you, Your Honor.

22                      CROSS EXAMINATION

23 BY MR. ORLOWSKI:

24 Q     Good morning, Mr. Nolte.

25 A     Good morning, sir.

1  Q     You graduated in 1975 with a degree in civil engineering

2  from NJIT, is that right?

3  A     That's correct.

4  Q     You've got a master's from NJIT in civil engineering in

5  1977.

6  A     That's correct.

7  Q     And then your doctorate you obtained in 19 --

8  A     80.

9  Q     80 in civil and mechanical engineering?

10  A     That's correct.

11  Q     Now with the master's degree you have a concentration in

12  structural engineering?

13  A     That's correct.

14  Q     That's basically building design, correct?

15  A     That's correct.

16  Q     Construction of the building.

17  A     Yes.

18  Q     And did you have any specialty with respect to your

19  doctorate?

20  A     Yes, the doctorate was actually the development of a

21  pressurized flow through system.  That's where the civil

22  engineering and mechanical engineering came into play.  It was

23  development of laboratory equipment.

24  Q     And that didn't have anything to do with commercial motor

25  vehicles, correct?

1  A     No.

2  Q     It didn't have anything to do with snow removal?

3  A     No.

4  Q     It didn't have anything to do with modes of operation of

5  scale houses or weigh stations?

6  A     Correct.

7  Q     From 1976 to 1980 you worked as a lecturer at NJIT?

8  A     I did, yes.

9  Q     You focused on civil and environmental engineering?

10  A     Well that's the name of the department, yes, but my

11  concentration was really in civil engineering, direct civil

12  engineering, structural engineering, applied mechanics, both in

13  civil and mechanical engineering.

14  Q     During that time you lectured, you didn't teach any

15  courses with respect to commercial motor vehicles, correct?

16  A     Only when I taught transportation.  Part of transportation

17  engineering is accident reconstruction and accident

18  reconstruction does take into consideration commercial vehicles

19  because they are articulating vehicles.

20  Q     Did that course teach you how commercial vehicles work?

21  A     Yes, but not to any great extent.  It was a course in

22  civil engineering as opposed to mechanical engineering and the

23  actual mechanics of the vehicle itself.  In civil engineering

24  we look at how the vehicle reacts in an accident because it is

25  an articulating vehicle.  What has to be taken into

1  consideration -- we do learn about the airbrake systems and the

2  gear systems of the vehicle but not in the same depth that you

3  would as a mechanical engineer.

4  Q    Now you worked from 1979 to 1981 in an administrative

5  position?

6  A    Yes, I was the director of applied research.

7  Q    And from 1981 to the present you have been self employed?

8  A    I have, yes.

9  Q    You've been self employed for what, about 30  or close to

10 30 years?

11 A    I guess it's getting -- let's not stretch it that much.

12 It's getting close.

13 Q    Twenty seven, 28?

14 A    Let's say 25 plus okay.

15 Q    Okay, that's fine.  Now your business focus on providing

16 services in vehicular accident reconstruction, fall down

17 accidents, site evaluations and building structurals.

18 A    That's correct, yes.

19 Q    And all of those fields are typically involved in

20 litigation?

21 A    Yes, they are, yes.

22 Q    Is it fair to say that the vast majority of the work you

23 do is in connection with litigation?

24 A    Present 100 percent of it is, yes.

25 Q    So you basically testify for a living?

1  A    I do, yes.

2  Q    And you testify primarily on behalf of plaintiffs, don't

3  you?

4  A    Well right now it's running about 70 percent plaintiffs,

5  30 percent defendants.

6  Q    How much are you being paid for your testimony here today?

7  A    My testimony is 2500.

8  Q    Now you have an office out of Hazlet, New Jersey?

9  A    Yes.

10  Q    And you both live and work here in New Jersey?

11  A    Yes.

12  Q    We get snow here, correct?

13  A    Unfortunately we do, yes.

14  Q    And you probably see your neighbors shoveling snow on

15  occasion?

16  A    No, actually I think they all have somebody plow their

17  snow.  I don't think I've seen them shovel.

18  Q    Do they shovel the sidewalks?

19  A    I don't have sidewalks where I live.  I'm in the office

20  complex I'm in it's a condo association so we do have a

21  service.

22  Q    And have you ever seen sidewalks shoveled in this area?

23  A    Oh, absolutely, absolutely.

24  Q    Now it doesn't take expert testimony to see a path has

25  been shoveled, does it?

1  A     No, I don't think so.

2  Q     Now when a sidewalk is snow covered you can't tell if the

3  sidewalk is there, can you?

4  A     Well that depends on where you are talking about.  When

5  you say like we're talking about houses, typically the sidewalk

6  is set back three feet from the curb line so you know kind of

7  have an idea of where the sidewalk is.  If you are referring to

8  here, on the east side of the scale house building  you may not

9  know where the concrete walkway is versus the blacktop that is

10  adjacent to it.

11  Q     It all looks alike because it is snow covered.

12  A     That's why it needs to be cleared so you can see it.

13  Q     In your report you claim that the government employees

14  were acting improperly by not clearing the pathway right up

15  along the side of the edge of the building.

16  A     That's correct, yes.

17  Q     So they didn't have to clear every inch of snow from all

18  around the scale house, did they?

19  A     You mean the four sides of it?

20  Q     The four sides of it.

21  A     Oh, no, no.  All I said is that what they needed to take

22  into consideration was the foreseeable path of drivers who were

23  going to use the scale house and provide them with a reasonably

24  safe passageway.

25  Q     In your opinion, all they would have to do is provide a

1  pathway that you could walk on, correct?

2  A    That's correct.

3  Q    They didn't have to clear areas of the scale house that

4  weren't on that pathway, did they?

5  A    No, I think that all they had to do was just take a look

6  at how the driver would use that scale house and clear that

7  portion of the property.

8  Q    They simply had to provide a safe means of ingress and

9  egress from the facility?

10  A    Exactly.

11  Q    Now you read the testimony of Ralph Leutbecher and Tom

12  Fitzgerald (phonetic) in conjunction with this report.

13  A    I did.

14  Q    And in conjunction with preparing that report -- I'm

15  sorry, withdraw that.  They testified that there was a path

16  cleared in the snow, didn't they?

17  A    I believe they said it was from a previous snow.  They

18  didn't clear it that morning, but it was from a previous snow

19  they claim that there was a path that angled out from the

20  building.

21  Q    Right.  Okay.  They testified that the pathway went out

22  diagonally?

23  A    Yes.

24  Q    It's your testimony here today that that diagonal pathway

25  wouldn't have been sufficient, correct?

1  A    Well that would not be sufficient for drivers who had to

2  -- drivers or their passengers who had to get out of the

3  vehicle while it was at the scale and go into the scale house

4  in order to get the numbers.  That part of the property was not

5  considered in a foreseeable passageway.

6  Q    And if the drivers didn't have to get out of their truck

7  to go into the scale house to get the numbers, they wouldn't

8  have had to have cleared the pathway along there.

9  A    I mean if they were informed that they didn't have to do

10 that and they were supposed to stay in their vehicles and never

11 come out of the vehicle, yes, then you wouldn't have to clear

12 that area.  But I don't see any signs here to say that they

13 couldn't do what Mrs. Brogna did that morning.  No one told her

14 she couldn't do it even after she went into the scale house.

15 Q    Is it your testimony that the scale house employees didn't

16 shovel the most direct route to the scale?

17 A    Well I'm not saying -- I don't think I used the word

18 direct route.  I think I used the word the shortest route

19 between two points.  But I think the key word here is the

20 foreseeable route and they didn't shovel a foreseeable route on

21 their property for drivers who had to use the east side of that

22 building.

23 Q    Now I'm going to direct your attention to what is known as

24 P-8, a picture of the driver's side door of the building.  Is

25 it your testimony here today that if the driver -- if the

1    employee shoveled a diagonal path from this door out to about

2    this area along the left side of the photograph that wouldn't

3    be sufficient to provide a safe ingress and egress?  Is that

4    your testimony here today?

5    A    For someone who is coming from the scale area, no it would

6    not be.

7    Q    What about for drivers that weren't coming to the scale

8    area?

9    A    Well for those who are coming from the street, it that

10   passageway went from the door all the way out to the street at

11   an angle and that was the only foreseeable path that drivers

12   were going to take, that would be okay.  But as I indicated

13   before is on the day of this accident that path was not even

14   cleared.  It had been cleared, according to Mr. Fitzgerald and

15   Mr. Leutbecher, the snowstorm before, about a week before.  But

16   it hadn't been cleared that morning.

17           But nonetheless is even if someone gets out of the

18   vehicle when it's on the scale as it was positioned with, I

19   believe, the passenger side window by the L-25 sign.  When they

20   come out of there they are still coming out onto a pile of

21   snow.  So even if the path had been cleared, as you say the

22   angle path had been cleared, in order for Mrs. Brogna to have

23   gotten to that path she still would have crossed the same area

24   where she slipped and fell.

25           The area that she crossed was not cleared so she

1   couldn't even get to a clear path if it existed that day.  It

2   just wasn't there for her.

3   Q    From the scale, only if she was walking from the scale.

4   A    From the scale, but no one told her that she couldn't do

5   that.  She had already been inside.  I mean I believe it was at

6   least twice that she had been inside and no one said to her

7   that you can't come in here or you can't do this or you must

8   follow this path.  No one gave her that -- there were no

9   instructions there whatsoever to tell her that she couldn't do

10  what she did so she did a foreseeable, reasonable thing.

11  Q    So it is your testimony here today, just to be clear, that

12  shoveling a diagonal pathway as opposed to a pathway along the

13  building, wouldn't have been sufficient on the day of the

14  accident?

15  A    That's correct.

16  Q    And the fact that there was a diagonal path wouldn't have

17  been instruction enough that Mrs. Brogna should have stayed on

18  the path.  That's your testimony, right?

19  A    That's correct because she would still have had to cross

20  the snow in order to get to that path.

21  Q    You weren't present on the day of the incident, were you?

22  A    I was not.

23  Q    So you did not personally observe whether or not there was

24  a clear path?

25  A    I personally did not see this.  I'm relying only on

1  photographs that were taken that day.

2  Q    Okay, and Mr. Leutbecher and Mr. Fitzgerald testified in

3  their deposition that they had a clearly visible path that was

4  going diagonal from the driver's door out to the scale area?

5  A    That's what they claim but I don't see it in these

6  photographs.

7  Q    But they testified to that in their depositions?

8  A    They testified that there was a path that had been cleared

9  from the snowstorm before which I believe was about a week

10 before, but they admitted that they didn't do anything on the

11 day of this accident.

12 Q    They indicated the path was still clearly visible on the

13 day of the accident?

14 A    That is what they claim but I relied upon the photographs

15 to show what is actually there.

16 Q    So you are not crediting their testimony, is that what you

17 are saying?

18 A    Well I don't credit -- I'm sorry, I didn't mean to cut you

19 off.

20 Q    Go ahead.

21 A    I don't give them credit for that testimony based on what

22 I see in these photographs.  I mean it is evident that there is

23 no clear passageway there.

24 Q    So you are relying on this photograph as opposed to the

25 testimony of the eyewitnesses that were present on the scene,

1  correct?

2  A    That's correct and there is also the fireman who indicated

3  that the area was icy and snow covered.  I believe in the

4  report here it also indicates that it is icy and snow covered

5  and someone shouldn't even walk on that.  So all those things

6  put together confirm what is shown in this photograph.

7  Q    You testified on direct that Mr. Moyer and Mr. Bullock

8  said that it was icy on the day of the incident?

9  A    Yes, I believe that's contained in the report.

10  Q    Looking at P-1, without attributing any of the statements

11  to Mrs. Brogna, can you tell me where in that report Mr. Moyer

12  and Mr. Bullock state that it is icy?

13  A    I'm sorry, what is P-1?

14  Q    P-1 is the accident report.

15  A    Oh the accident report.  Okay, that's this.  I'm sorry,

16  your question again.

17  Q    Without attributing any statements to Mrs. Brogna, please

18  tell us in that report where Mr. Moyer and Mr. Bullock stated

19  it is snowy and icy.

20         MR. CHAMAS:  Your Honor, may I just interrupt while

21  the doctor is looking at that?

22         THE COURT:  Pardon?

23         MR. CHAMAS:   May I interrupt while the doctor is

24  looking at that?

25         THE COURT:  Yes.

1           MR. CHAMAS:  I gave you my P-1.

2           THE COURT:  Oh, okay.

3           MR. CHAMAS:  And you have -- in your trial book if I

4    could.

5    A    I was actually looking at item number four and I do see

6    that it is a statement from the Brognas that Mr. --

7    Q    Okay, I'm going to stop you there.  So Mr. Moyer and Mr.

8    Bullock, in fact, did not conclude based on their personal

9    observations from this report that it was snowy and icy.  Is

10   that fair to say?

11   A    No, they were just repeating information that they

12   received.

13   Q    And you also indicated that the investigator said that it

14   was very icy and the driver's side entrance was not safe to be

15   walking on, correct?

16   A    Right.

17   Q    And the walkway area, he was referring to the walkway

18   area?

19   A    That's correct.

20   Q    You don't know what his conclusion is based on, correct?

21   A    I'm not sure I follow the question, but -- based, he

22   concluded that it was very icy.

23   Q    You don't know if that is based on statements from Mrs.

24   Brogna, do you?

25   A    I don't know because it doesn't say one way or the other.

1  But it -- other parts of the report give credit to the Brognas

2  when they made the statement, that particular line does not.

3  Q    It doesn't say here that it was based on his personal

4  observation, correct?

5  A    It does not say my personal observation.

6  Q    You indicate in your report that Mrs. Brogna walked on the

7  pathway ice twice before the accident, correct?

8  A    Yes.

9  Q    I'm sorry, I just want to go back to P-1 again.

10 A    Okay.

11 Q    The statement made by Ms. Kiernan, the walkway area by the

12 scale house was very icy.  It doesn't indicate which walkway

13 that refers to, does it?

14 A    You are referring to which item on here, number four?

15 Q    I'm referring to the statement on the last page on page

16 four of four the top sentence.  The walkway area by the scale

17 house area was very icy.

18 A    Correct.

19 Q    Do you know which walkway Ms. Kiernan was referring to?

20         MR. CHAMAS:  Judge, he only read half of the sentence

21 there.

22         THE COURT:  Walkway area by the what?

23         MR. ORLOWSKI:  We're only talking about one walkway.

24         THE COURT:  The walkway by the scale house was very

25 icy and the driver side entrance was not safe to walk on.

 1 That's what the statement says.

 2          DR. NOLTE:  Right.

 3 Q    Now the walkway area, it doesn't specify whether it was

 4 the walkway along the building or the diagonal walkway,

 5 correct?

 6 A    No, it doesn't qualify it as either the one parallel to

 7 the east side or the diagonal but it just says the walkway was

 8 very icy and that the area leading to the entrance on the

 9 driver's side was not safe to walk on.

10 Q    So now you have indicated that there should have been a

11 walkway along the building, correct?

12 A    Yes, absolutely.

13 Q    And Mr. Leutbecher and Mr. Fitzgerald indicated there was

14 a diagonal pathway coming at a diagonal from the driver's side

15 door, correct?

16 A    That's what they claim.

17 Q    So based on that testimony from Mr. Fitzgerald and Mr.

18 Leutbecher, based on your opinion here today, it's not entirely

19 clear what Ms. Kiernan is referring to when she says the

20 walkway, is it?

21 A    Well no, we don't know if it's the walkway tight against

22 the east wall of the building or the diagonal walkway.  But if

23 it was the diagonal walkway they are also saying that it wasn't

24 safe to walk on.

25 Q    We don't know whether it was the diagonal walkway or the

1  walkway along the building.

2  A    We don't know.  We only know that what was ever there and

3  what was ever claimed to be clear was not safe to walk on.

4  Q    Again we don't know what that conclusion is based on,

5  correct?

6  A    Well I can only say it is based on observation.

7  Q    It doesn't say it's based on observation.

8  A    Well, how else --

9  Q    Mrs. Brogna made statements to the investigator, didn't

10 she?

11 A    Yes.

12 Q    So the investigator could have relied on those statements

13 in reaching the conclusions as opposed to a personal

14 observation.

15 A    I guess that is possible.

16 Q    Now isn't it a fact that Mrs. Brogna walked on the snow

17 and ice that we see here in P-8 at least five times?

18 A    At least five times, I didn't count them.  I know it was

19 -- it was maybe two or three times.

20 Q    Okay.  Let's walk through.  The first time they arrived at

21 the scale house in the morning before they picked up the truck.

22 A    Right.

23 Q    Mrs. Brogna walked into the scale house, correct?

24 A    Yes.

25 Q    That would have been one time.  Then she exited the scale

1  house and went back to her truck.  That would have been twice.

2  A    Right, right, okay.

3  Q    They then came back to the scale house.  They parked

4  across the street.  Mrs. Brogna if you credit her testimony she

5  walked into the scale house again.

6  A    Right.

7  Q    She asked if she could be weighed and then she exited the

8  vehicle and came back out, correct?

9  A    Correct.

10  Q    Okay.  Then she waived Mr. Brogna up.

11  A    Yes.

12  Q    That's her testimony if you credit her, correct?

13  A    Correct.

14  Q    Now we're at four.

15  A    That's correct.

16  Q    Then Mrs. Brogna, if you believe her, went into the --

17  went back into the scale house, correct?

18  A    Yes.

19  Q    So she was walking through this area for the fifth time.

20  A    Yes, yes.

21  Q    Then she came back out of the scale house and went to this

22  area here where Mr. Brogna's truck is.  That would have been

23  the sixth time she walked over to the scale house.

24  A    Could be, yes, that's correct.

25  Q    You indicate in your report that Mrs. Brogna didn't

1  experience the icy conditions before she fell.  Is that your

2  testimony?

3  A    That's correct.

4  Q    But she walked over that area six times.

5  A    But my problem is when you say that area, I'm not sure

6  that she walked over the exact area where she slipped and fell.

7  She may have walked over that general area but I'm not sure

8  that she actually went over the exact area where she slipped

9  and fell all of those times.  I understand that she crossed the

10 area where the accident occurred prior to her accident, but it

11 doesn't appear that it was all six times.

12 Q    Well you read Mrs. Brogna's testimony.

13 A    I did, yes.

14 Q    And she testified at least twice she walked along side the

15 building, right along this area, didn't she?

16 A    Yes, yes, she went to the east side of the building.

17 That's correct.

18 Q    And you conclude based on that that she didn't experience

19 the icy conditions until she fell, correct?

20 A    That's right.  She experienced the icy condition when she

21 fell.  But again, as I say, it's not certain that she walked on

22 the very area where her accident took place all of those six

23 times.

24 Q    And Mrs. Brogna wasn't on the diagonal walkway when she

25 fell, correct?

1    A    That's correct.

2    Q    Isn't it a fact that she wasn't even on the area adjacent

3    to the building here in P-8 when she fell, right?

4    A    No, she was on the side adjacent to the south side of the

5    building.

6    Q    Right, she was on the scale area over here, correct?

7    A    Right.  There is a small concrete area between the

8    building and the scale.  That's where she walked and that's

9    where the snow pile was.

10   Q    She was actually between the scale house and the truck

11   when she fell, wasn't she?

12   A    That's correct.

13   Q    I'm going to show you what's been marked I believe it's P-

14   8.

15   A    P-9.

16   Q    P-9.  It's a picture of the truck next to the building.

17   This is a picture of the truck on the day of the incident where

18   the truck -- with the truck parked at the scale.  Do you see

19   the area in between the truck and the building?

20   A    I do.

21   Q    And you see the piles of snow?

22   A    Yes.

23   Q    Beside the building.  Now based on your expert opinion, is

24   this a safe area to be walking on if the truck was going to

25   move?

1  A    It's not a safe area to be walking on because of the

2  ground condition.

3  Q    But even if there was no snow or ice in this small area

4  between the truck and the building, would it have been safe to

5  have been walking if the truck was going to move?

6  A    I don't see any problem with it.  It's wide enough for

7  someone to walk in that area.  And if they are aware of the

8  truck moving there is no problem.  They are not in the travel

9  path of the vehicle.

10 Q    So you have no problem with someone standing in this area

11 between the truck and the building?

12 A    As the truck moves, no.  No, so long as they know that the

13 truck is moving there is no problem with that.

14        THE COURT:  What is the distance between the truck

15 and the building, about two feet?

16        DR. NOLTE:  It's about two and a half feet.

17 Q    Mrs. Brogna worked for about five years as a truck driver,

18 correct?

19 A    I think so, yes.

20 Q    Is it fair to say she was an experienced truck driver?

21 A    I would say so.

22 Q    Is it fair to say that she knew how tractor trailers

23 worked?

24 A    I'm sure she did.

25 Q    And she would also know the dangers of those vehicles,

1  right?

2  A     Yes.

3  Q     She undoubtedly encountered snow during her cross country

4  trip.

5  A     I can only make an assumption on that and say I would

6  assume so.

7  Q     Is that a reasonable assumption?

8  A     I think so.

9  Q     Now when she got into the vehicle the last time she told

10  her husband to pull the truck forward, right?

11  A     Yes.

12  Q     And then she stepped in this area between the truck and

13  the building, right?

14  A     That's correct.

15  Q     Onto the pile of snow that she knew was there, right?

16  A     Yes, yes.

17  Q     And she knew her husband was going to move the truck

18  immediately, right?

19  A     Well she knew that he was going to move the truck.  I

20  don't know if it's immediate, the instant she opens the door to

21  get out.  But she knew that the truck was going to be moved

22  onto the scale, yes.

23  Q     Is it a reasonable assumption that when she said go ahead

24  and move the truck and got out, that the was going to then move

25  the truck?

1   A     Well eventually he was, yes.

2   Q     And she was between the truck and the building when she

3   fell, correct?

4   A     Yes.

5   Q     Standing on the piles of ice?

6   A     Before the fall, she was standing on the ice or walking on

7   the ice.

8         THE COURT:  Your testimony is that the property owner

9   should have cleared this ice you see here in this two and a

10  half foot area between the building and the truck.  Is that

11  right?

12        DR. NOLTE:  I'm sorry, Your Honor.  I couldn't see.

13  Yes, yes, that's correct. Yes.

14  Q     It was your testimony that the employees should have

15  shoveled that whole area?

16  A     Yes.

17        THE COURT:  The two and a half foot area between the

18  scale there and building that's where the ice is you are saying

19  they should have removed?

20        DR. NOLTE:  Right, because I see that as a

21  foreseeable passageway for someone who is going to go into the

22  driver's side of the scale house building.

23  Q     You don't know whether Mrs. Brogna was authorized to be on

24  the scale or on that pathway, do you?

25  A     There was no indication whether she was or was not.  No

1  one said that she couldn't do what she did.

2  Q    And you have no expertise in weigh stations, correct?

3  A    Right.

4  Q    You've never weighed a truck before?

5  A    I've not weighed a truck.

6  Q    So you don't know whether or not somebody is authorized to

7  be on the scale or in that area, correct?

8  A    Well I don't know what the procedure here is as far as if

9  there is any regulations preventing that.  It was, she did it

10 that day, no one told her she couldn't do it that day.  It was

11 foreseeable since that you -- since you have two drivers in the

12 vehicle that one would get out on the passenger side and use

13 that portion of the property.  If they weren't supposed to do

14 that, that should have been posted that they should not leave

15 the vehicle.

16 Q    Now you don't know what the standards of the trucking

17 industry are with respect to procedures around weigh stations,

18 correct?

19 A    Correct.

20 Q    And you don't know whether or not an individual is

21 permitted to be on or around the scale at a weigh station,

22 correct?

23 A    Yes.  I don't know and I don't know what it was here.

24 Q    So you don't know whether that was a permissible walkway,

25 correct?

1  A     As I -- I don't know what the regulations are.  I only see

2  if that is a foreseeable passageway and I know that no one told

3  her that day that she could not use that area.

4  Q     You are not familiar with the particular procedures at a

5  naval weigh station or to weigh a truck, are you?

6  A     That's correct.

7  Q     So you don't know whether Mrs. Brogna was authorized to be

8  on or around the scale?

9  A     I don't know what the regulation is, even if there is one

10 for that.

11 Q     And you -- I withdraw that.  Isn't it a fact that it is

12 dangerous to be on a scale near a moving truck?

13 A     Well if you are in the path of the vehicle, I would say

14 yes.  Here, if you are between the truck and the building and

15 you are going into the building to retrieve numbers I don't see

16 where that's a problem.

17 Q     Now Mrs. Brogan could have stayed in the truck when Mr.

18 Brogna pulled onto the scale, couldn't she have?

19 A     She could have stayed home too, yeah, that's true.  That's

20 one thing she could have done but that's not what happened.

21 Q     And she could have also walked around to the driver's side

22 door to tell her husband to move the truck forward, couldn't

23 she have?

24 A     All those things are possible.

25 Q     Are you aware that the driver and the passenger in the

1  truck are weighed when the truck is weighed.

2  A    That's my understanding.

3  Q    So isn't it a fact that Mrs. Brogna should have been in

4  the truck getting weighed when the truck was on the scale?

5  A    Well, yeah, I think that's what they desire but I think it

6  was Mr. Ellis who said that it's not all the time that that

7  happens.

8  Q    Wouldn't that be the safest procedure especially in snowy

9  conditions for everyone to be in the truck and have the scale

10 house employees direct Mr. Brogna onto the scale?

11 A    Well, sure, if they had done that.  If they had directed

12 her to stay in the vehicle and came out and directed the

13 movement of this vehicle, this absolutely wouldn't have

14 happened.  That's exactly what they should have done.

15 Q    Is it fair to say that a truck driver is responsible for

16 his cargo and passengers?

17 A    Yes.

18 Q    Is it also fair to say a truck driver has a duty when

19 around pedestrians or knowing somebody is around the truck to

20 make sure they are not in the path of that truck?

21 A    Yes.

22 Q    Wouldn't you agree that Mr. Brogna had a duty to know that

23 his wife had cleared the side of the truck before he moved

24 over?

25 A    Yes.

1    Q    And he should have watched her in the mirrors clear the

2    truck and go around the corner of the building, shouldn't he

3    have?

4    A    Should have.

5    Q    Based on your testimony, he didn't do that did he?

6    A    Well that's not my understanding of his testimony is he

7    did check his mirrors and he didn't see anyone and he

8    determined from not seeing anyone that the area was clear.  He

9    knew that the truck was positioned near the southeast corner of

10   that building and only a short distance from the east side.  So

11   after his wife got out he checked in the mirror, the door had

12   to be closed in order for him to check if they were in proper

13   position.  Then he looked, he didn't see his wife and the

14   reasonable assumption here is that she was so close to the

15   corner that she turned the corner.  So he cleared the area

16   before he moved the vehicle.  He just didn't know that she

17   slipped under the vehicle.

18   Q    Now he's got a duty to make sure that those passages are

19   clear, right?

20   A    Yes.

21   Q    And Mrs. Brogna was not clear, right?

22   A    Well evidently she was not clear.  That's the bottom line.

23   She was not clear to be able -- but where he looked it appeared

24   that she had cleared the vehicle.

25   Q    Based on the testimony of Mr. Brogna, it's pretty clear

1  that the employees at the scale house were very strict about

2  their procedures, isn't it?

3  A    I would disagree with you on that.

4  Q    That Mr. Brogna did not say that?

5  A    Well, yeah, I mean he indicated that they were strict but

6  I disagreed with them actually being strict.

7  Q    Mr. Brogna testified that you don't move the truck until

8  they tell you.

9  A    Yes, yes, that he did say, yes.

10 Q    Mr. Brogna moved the truck in this instance, didn't he?

11 A    Yes.

12 Q    And he was not specifically directed by the government

13 employee was he?

14 A    No, but his wife was told to have him move the truck

15 forward and she was just communicating that information.  So he

16 did receive communication from the scale house people to move

17 the truck.

18 Q    So he relied on his wife, correct?

19 A    Well because she was given the communication to move the

20 truck.  So he was only relying on her to transmit the message

21 to him from the scale house people.  Had they done what should

22 have been done, they would have come out of the scale house and

23 directed him directly.

24 Q    I'll stop you there.  So he relied on his wife, correct?

25 A    He relied on the communication his wife received from the

1  scale house people.

2  Q    He relied on his wife?

3             MR. CHAMAS:  Objection, Your Honor.

4             THE COURT:  Overruled.  Answer the question.

5  A    He took the information from his wife.

6  Q    He didn't actually verify that information with the

7  government employees.

8  A    No, he did not.

9  Q    And in fact Mr. Brogna thought it was strange that he had

10 to pull the whole truck on the scale, didn't he?

11 A    Yes, he did.

12 Q    It's your testimony here today that the Brognas bear

13 absolutely no responsibility for the injuries that were caused

14 to Mrs. Brogna?

15 A    That is my opinion.

16            MR. ORLOWSKI:  One moment, Your Honor.

17            THE COURT:  Sure.

18            MR. ORLOWSKI:  That's all I have, Your Honor.

19            THE COURT:  Any redirect?

20            MR. CHAMAS:  Yes, Your Honor.

21            THE COURT:  Okay.

22                      REDIRECT EXAMINATION

23 BY MR. CHAMAS:

24  Q    Dr. Nolte, you were provided with Commander Treddle's

25 testimony?

1  A    Yes.

2  Q    Commander Treddle is in charge of the scale house?

3  A    Yes.

4  Q    Commander Treddle was aware that the employees of the

5  scale house told Ms. Brogna to go ahead and tell your husband

6  to move the truck on?

7  A    Yes.

8        MR. ORLOWSKI:  Objection, Your Honor.  Beyond the

9  scope of his expertise.

10       THE COURT:  Overruled.

11 Q    I'm sorry, so you were aware that Commander Treddle was

12 told that -- sorry, forgot my question -- that Commander

13 Treddle was told by the scale house employees that they told

14 him that they -- that it was okay for her to move it -- to move

15 the tractor onto the scale house?

16 A    That's correct.

17 Q    And Commander Treddle said that was perfectly okay?

18 A    Yes.

19 Q    So while -- so when counsel is asking about whether she

20 was in -- the communication from Mrs. Brogna to Mr. Brogna was

21 not directly from the employee, the Commander of the ordinance

22 department didn't have a problem with that, did he?

23 A    He did not have a problem with that.  It was fine.

24 Q    Now counsel was cross examining you regarding regulations.

25 Are you basing your opinion on the way the scale house was

1  actually operated?

2  A    Yes, its mode of operation, sure.

3  Q    The -- this pathway that supposedly was made in P-8,

4  photograph three, your opinion is that they hadn't cleared the

5  foreseeable area where somebody would be walking?

6  A    That's correct.

7  Q    All right, so the fact that they have or they may not have

8  cleared a path on a diagonal doesn't matter in this particular

9  case?

10  A    In her accident, no.

11  Q    Let me -- take this building, take a mall.  Is the

12  obligation of the owner of the building or the mall only to

13  make one pathway that leads in a safe area to walk in and walk

14  out of?

15          MR. ORLOWSKI:  Objection, Your Honor.  He didn't give

16  this opinion in his report.  Beyond the scope.

17          MR. CHAMAS:  Your Honor, it's dealing with his cross

18  examination of counsel saying well they made a path.  If they

19  made a pathway, isn't that good enough.

20          THE COURT:  I'll allow it.  Overruled.

21  Q    If they make one pathway, is that good -- I mean if I'm a

22  mall operator and I say okay well here's my parking lot.  I'm

23  going to go out and I'll shovel a four foot path from the

24  parking lot to the building, is that good enough?

25  A    No, that's not good enough unless you funnel people into

1   that one area and make sure they are not going to go into the

2   other foreseeable paths.

3   Q    So if I'm a business owner or I'm running a piece of

4   property and I've got to anticipate where people are going to

5   be walking to.

6   A    Exactly.  Property maintenance codes simply say you must

7   provide a hazard free environment, that's it.  You have the

8   obligation to look at how is your property actually used and

9   provide the hazard free environment.

10  Q    Counsel asked you about Fireman Bullock's testimony and

11  the traffic accident report and you realized it wasn't a

12  statement from him.  You read Fireman Bullock's deposition

13  transcript, correct?

14  A    Yes.

15  Q    And in his deposition he said it was snowy and icy,

16  correct?

17  A    That's correct.  That's exactly what he stated.

18  Q    The investigator, counsel was asking you whether that was

19  a direct observation.  I want to point your attention to P-1 to

20  the very last, the third page, very bottom.  The very last

21  thing typed there, investigator notes.

22  A    Yes.

23  Q    So the investigator's statement about the walkway area and

24  the scale house was very icy and the driver's side entrance was

25  not safe to walk on.  That was based on her notes or

1  conclusions in this, correct?

2  A    That's correct.

3  Q    Now, the investigation report also came -- attached to the

4  investigator report were also these ten photographs we have.

5  A    Yes.

6  Q    The investigator took a photograph of this corner.

7  A    Yes.

8  Q    What does that tell you?

9  A    That's where the accident occurred.

10          MR. ORLOWSKI:  Objection, Your Honor.

11          THE COURT:  Sustained.

12 Q    The direct object -- taking the photograph -- someone

13 taking a photograph of an area would give them direct

14 observation, correct?

15 A    Yes.

16          MR. ORLOWSKI:  Objection, Your Honor.  A photograph

17 is not a direct observation.

18          THE COURT:  The person who took the photograph could

19 see through the viewfinder.  As far as the mental processes,

20 I'll sustain the objection.

21 Q    What did the person taking that photograph see?  What were

22 they looking at?  What is depicted in that photograph?

23 A    There was certainly an opportunity to see that condition.

24 Q    Counsel was asking your opinion regarding the fact that

25 you didn't credit Mr. Leutbecher and Mr. Fitzgerald's testimony

1  that there was an established pathway.  You read Mr. Ellis's

2  deposition -- I'm sorry, trial testimony, correct?

3  A    Yes.

4  Q    Did Mr. Ellis discuss any issues with respect to that side

5  of the building what it appeared?  What it looked like?

6  A    That side meaning the driver's side.

7  Q    Yes, the driver's side.

8  A    Yes, it was icy and snow covered.

9  Q    Did he say he observed any path?

10  A    No.

11         MR. ORLOWSKI:  Objection, Your Honor.

12         THE COURT:  Overruled.  I'll allow that for his

13  understanding.

14         MR. ORLOWSKI:  Your Honor, he was never asked the

15  question in his testimony.  So reaching a conclusion -- it's

16  obvious they are trying to reach the conclusion that there

17  wasn't a pathway because Mr. Ellis didn't say there was a

18  pathway.  He was never asked the question.

19         THE COURT:  I understood the question that he said

20  that Mr. Ellis said there was no pathway.  Is that what you are

21  saying, counsel?

22         MR. ORLOWSKI:  I'm saying he's trying to --

23         THE COURT:  Well maybe you should refer to the

24  testimony.  There is a difference between not being asked the

25  question and affirmatively saying there was no pathway.

1            MR. ORLOWSKI:  Right.  He was never asked the

2  question.

3            THE COURT:  The adversary says he was.  Now the

4  adversary will point out where he said it was.  Can you find

5  where Mr. Ellis was asked that question?

6            MR. CHAMAS:  I'm just looking at that, Your Honor.

7            MR. ORLOWSKI:  It's my error, Your Honor.  It's on

8  page 11.

9            THE COURT:  Unfortunately I left that transcript in

10  my desk.

11                          (Pause)

12            THE COURT: Okay, I have page 11, line 15.  "Was there

13  any path cleared through the snow to get to the driver's door.

14  Answer, no, there was not.  There was just footsteps from the

15  other drivers."  Is that what we are referring to?

16            MR. CHAMAS:  Yes, Your Honor.

17            THE COURT:  Very well.  What's the objection, Mr.

18  Orlowski?

19            MR. ORLOWSKI:  I'll withdraw it, Your Honor.

20            THE COURT:  All right.  Very well.  Anything else,

21  Mr. Chamas?

22            MR. CHAMAS:  Yes.

23  Q    Staying with Mr. Ellis's testimony for a moment, did he

24  also talk about how his wife would get out of the vehicle and

25  go inside and get the numbers and then come back out and tell

1   her husband what they were and proceed in that fashion, in the

2   same regard?

3           MR. ORLOWSKI:  Objection, Your Honor.  Not relevant

4   beyond the scope of the expert testimony.

5           THE COURT:  I'll allow it.

6   A    He did, yes.

7   Q    Now with respect to Mrs. Brogna when she got out of the

8   truck and counsel was asking you well was it safe for her to be

9   standing out while the truck is moving.  Was Mrs. Brogna

10  planning on standing there while the truck was moving?

11          MR. ORLOWSKI:  Objection, Your Honor.  Speculation.

12          THE COURT:  I'll sustain.

13          MR. CHAMAS:  I'll withdraw, Your Honor.  I'll

14  rephrase it.

15  Q    What is your understanding of what Mrs. Brogna was going

16  to be doing when she got out of the truck?

17          MR. ORLOWSKI: Objection, Your Honor.  Speculation.

18          MR. CHAMAS:  It's in the testimony and deposition.

19          THE COURT:  From the testimony.

20  A    That she was going into the scale house through the

21  driver's door located on the east side of the building.

22          THE COURT:  What was your understanding of where the

23  truck was when she got out?

24          DR. NOLTE:  The truck was positioned with it's front

25  steer axle, the very first set of wheels, near the first window

1   on the east side of the south wall of the building and the

2   passenger side door and window were in line with the blue L-25

3   scale house sign that is located on the south wall of the

4   building.   The one you see in photograph three is actually on

5   the east wall but there is a similar sign just around the

6   corner from that on the south wall at that same location.

7            THE COURT:  So the passenger's door was, in your

8   understanding, positioned --

9            DR. NOLTE:  There we go, P-33.

10           THE COURT:  Let me see if I understand your

11  understanding.  Your understanding is that the tractor was here

12  somewhere and the wheel, steering wheel was there somewhere.

13           DR. NOLTE:  That's --

14           THE COURT:  And the door was there?

15           DR. NOLTE:  The window for the passenger side door

16  was in this location here.

17           THE COURT:  Right.  So in other words in P-33 you see

18  a sign there on the scale side of the scale house. It says L-25

19  scale house.   Your understanding is that the driver's side,

20  the driver's door, was somewhere right by that sign, is that

21  right?

22           DR. NOLTE:  Yes, that's correct, Your Honor.

23           THE COURT:  Okay.

24  Q   The photograph I referred to earlier on P-8, photograph

25  six, that would be that general area right there?

1  A    I'm sorry.  I lost that.

2  Q    Let me pull it up.  Photograph 6 would be that general

3  area just from a different angle?

4  A    Yes.

5  Q    Counsel asked you about the operator of the vehicle and

6  watching mirrors.  Did Mr. Brogna have to watch Mrs. Brogna the

7  entire time or just look to make sure she was clear before he

8  moved the truck?

9          MR. ORLOWSKI:  Objection, Your Honor.

10          THE COURT:  I'll allow it for his understanding.

11 A    My understanding is before he moved the truck, he had to

12 make sure that he was clear and that's what he did.

13          THE COURT:  So you are saying he had an obligation

14 before he moved the truck to make sure that it was clear.

15 There was no one who would be injured or hit by his truck and

16 nobody near the wheels?

17          DR. NOLTE:  To look at his mirror and to see that the

18 area that is shown in his mirrors that the truck was clear and

19 the sides of his --

20          THE COURT:  Especially if he knew somebody had just

21 gotten out of his truck.

22          DR. NOLTE:  Right.  To know that he was clear and

23 obviously the observation he made was that she was clear

24 because the truck was so close positioned to the corner of the

25 building.

1          THE COURT:  Is it your understanding that he actually

2    saw that she was clear, saw her leave and go towards the

3    building?

4          DR. NOLTE:  No, I didn't say that and it's not my

5    understanding.  My understanding is that he checked to see that

6    the side of the trailer was clear.

7          THE COURT:  And didn't see her.

8          DR. NOLTE:  And didn't see her at all knowing that

9    his passenger door was very near the corner of the building.

10         THE COURT:  Okay.

11   Q    One final thing, counsel was talking about the position of

12   the vehicle and so forth and the space between the truck and

13   the wall.  When Mr. Leutbecher came out of the scale house, did

14   he open -- which door did he open in the truck to tell Mr.

15   Brogna to stop?

16   A    The employee side which would have been the west side of

17   the building.

18   Q    Which door did he open with respect -- I'm sorry, with

19   respect to the truck?  When he came out to tell Mr. Brogna --

20         THE COURT:  Which side of the truck?

21   A    Oh, the truck.  The -- I believe it was the driver's side.

22   Q    If I told you that he testified and said he came out the

23   passenger side --

24         MR. ORLOWSKI:  Objection, Your Honor.

25         THE COURT:  Sustained.

 1          MR. CHAMAS:  I'll find it.   Just trying to move it

 2 along.

 3          THE COURT:  Mr. Leutbecher will testify.   The

 4 question is his understanding and basis for his opinion and

 5 he's already told us that.

 6          MR. CHAMAS:  All right.  I'll withdraw it.  I'm done.

 7 No further questions, Your Honor.

 8          THE COURT:  Okay.  I Have a couple of questions.

 9          MR. CHAMAS:  I'm sorry, Your Honor.  All right.  No

10 further questions.

11          THE COURT:  On redirect I understood your testimony

12 to say that the landowner must clear all foreseeable paths.  Is

13 that correct?

14          DR. NOLTE:  Yes.

15          THE COURT:  And you also said the property code says

16 that the landowner must provide a hazard free environment.  Is

17 that correct?

18          DR. NOLTE:  That's correct.

19          THE COURT:  Okay.  Anything else?

20          MR. CHAMAS:  No, Your Honor.

21          MR. ORLOWSKI:  No, Your Honor.  Thank you.

22          THE COURT:  Okay, you may step down.

23          DR. NOLTE:  Thank you.

24          THE COURT:  Any further witnesses or evidence by the

25 plaintiff?

1           MR. CHAMAS:  Yes, Your Honor.  The plaintiff would

2    move P-1 into evidence with the exception of obviously the

3    portion that Your Honor already ruled would not be admissible.

4           THE COURT:  All right.  And your objection will stand

5    and I will overrule it.

6           MR. ORLOWSKI:  Thank you, Your Honor.

7           MR. CHAMAS: And also the medical records, Your Honor.

8           THE COURT:  All right.  Any objection to the medical

9    records?  Which exhibits are they for the record?

10          MR. CHAMAS:  P-58, P-59, P-60, P-61, 62, 63 and 64.

11          THE COURT:  Okay.  P-58 through 64.  Any objections?

12          MR. ORLOWSKI:  No objection, Your Honor.

13          THE COURT:  Okay, in evidence.  Any other evidence

14   for the plaintiff?

15          MR. CHAMAS:  No, I do not believe so, Your Honor.

16          THE COURT:  All right.  Plaintiff rests and I believe

17   the defense said you had two witnesses today, Mr. Leutbecher

18   and Mr. Fitzgerald.  Is that right?

19          MR. ORLOWSKI:  Yes, Your Honor.  Prior to calling the

20   witnesses, I would make the motion for judgment on partial

21   findings under Rule 52C at this point. The plaintiff has not

22   established a prima facie case.  They haven't established the

23   United States breached any duty.  There was testimony listed

24   through the expert that Mr. Leutbecher and Mr. Fitzgerald

25   testified that they cleared a pathway.  Their duty was to clear

1  a pathway to provide for safe ingress and egress which they

2  did, not to ensure that every inch of the snow was clear.

3          In addition, the injuries were caused by Mrs.

4  Brogna's contributory negligence.  She placed herself in a

5  dangerous position.  She is an experienced truck driver.  She

6  should have known of the risks.  She knew it was slippery and

7  she walked over that area at least six times from our count.

8  She got out of the truck knowing her husband would move

9  immediately and stepped out to a knowing pile of snow and ice

10 when she got out of the truck that was not on any walkway.  She

11 was between the building and a moving truck in a dangerous

12 position and she knew or should have known the dangers.

13         There has also been no proximate cause established by

14 the plaintiff.  It's been established by Mrs. Brogna's

15 testimony that all of her injuries that she is complaining of

16 in this case were caused by the truck running over her and not

17 by the fall.  That constitutes an intervening event which

18 caused her injuries, thus breaking a chain of causation and

19 establishes the United States was not the proximate cause of

20 her injuries.

21         Finally, her husband was a significant contributing

22 factor to this, to her injuries.  He pulled up to an area he

23 knew was piled with snow and ice.  He had a duty to watch for

24 passengers from his truck.  He clearly breached that duty

25 because he didn't watch her clear the vehicle before he moved

1  it forward knowing that she was going to be in about a two foot

2  area between the truck and the building and could have slipped

3  on the snow and ice.  And he didn't get out of the truck or

4  otherwise make sure that she was clear.  In addition, he

5  shouldn't have been on the scale in the first place.  Thank

6  you very much.

7          THE COURT:  I'm going to reserve on that motion, I

8  think, until the conclusion of all evidence.  All right.

9          MR. CHAMAS:  Thank you., Your Honor.

10          THE COURT:  Very well.  Let's move on.  Defense call

11  your first witness.

12          MR. ORLOWSKI:  Your Honor, the United States calls

13  Ralph Leutbecher.

14          THE COURT:  Okay.

15          THE CLERK:  Step up please.

16  R A L P H   L E U T B E C H E R, WITNESS, SWORN

17          THE CLERK:  Please state your full name for the

18  record and spell your last.

19          THE WITNESS:  My name is Ralph Leutbecher, it's

20  spelled L-e-u-t-b-e-c-h-e-r.

21          THE COURT:  Proceed.

22                      DIRECT EXAMINATION

23  BY MR. ORLOWSKI:

24  Q    Good morning, Mr. Leutbecher.

25  A    Good morning.

 1  Q     Who do you work for?

 2  A     United States Navy.

 3  Q     In what capacity?

 4  A     Traffic management specialist.

 5  Q     How long have you worked there?

 6  A     Currently or -- well on the base, the entire time about 14

 7  years.

 8  Q     And how long have you worked specifically for the navy on

 9  that base?

10  A     You mean as a federal employee?

11  Q     As a federal employee.

12  A     Now six and a half years.

13  Q     What are the duties of a traffic management specialist?

14  A     Well the shipping and the receiving of ordinance and

15  ordinance related materials for the United States Navy.

16  Q     Do you process paperwork?

17  A     Quite a bit, yes.

18  Q     Do you have to do any work with commercial motor vehicles,

19  trucks?

20  A     Yes, inbound trucks.  We inspect them prior to loading.

21  Trucks that come in off the road to pick up loads, they have to

22  be inspected prior to taking a load.  And once they have hooked

23  to their load, they have to be inspected again before they can

24  leave the base.

25  Q     Do you also weigh trucks?

1  A    Yes.

2  Q    Did you receive any training to be a traffic management

3  specialist?

4  A    Yes.

5  Q    What training did you receive?

6  A    There are -- in the beginning when you start the course

7  there -- or excuse me, start the job, there are several courses

8  you have to take first.  Some online, several classroom type

9  courses where you actually have to -- one was a two week course

10  just to do all the paperwork and the other one was a one week

11  course to do the scale part of it, the inspecting, truck

12  inspector's course.

13  Q    And in those classes did they talk about safety

14  procedures?

15  A    Throughout the navy everything is safety.  There is safety

16  meetings, there is classroom, each truck inspector's course,

17  yes, had safety portions to it.

18  Q    Now on January 26, 2004 what was your duty station?

19  A    L-25, the scale house building of the, you know, weapons

20  station Earle.

21  Q    I'm going to show you what's been marked for

22  identification as D-46.  I'll show this to you.

23           MR. ORLOWSKI:  May I approach, Your Honor?

24           THE COURT:  Yes.

25  Q    Do you recognize that?

1  A    Yes, it's upside down but that's the layout of our scale

2  house.

3  Q    Okay.  How do you recognize it to be that?

4  A    Because I work there everyday and I know the layout of our

5  scale house.

6              MR. ORLOWSKI:  At this time, Your Honor --

7              THE COURT:  What's the document number?

8              MR. ORLOWSKI:  D-46.

9              THE COURT:  D-46.

10              MR. ORLOWSKI:  I'm sorry, It's D-16A.  At this time I

11  would offer D-16 into evidence as D-16 in evidence.

12              THE COURT:  All right.  Objection.

13              MR. CHAMAS:  Your Honor, I would just like -- I

14  wasn't provided with this until the day of Mr. Commander

15  Treddle's deposition.

16              THE COURT:  When was that deposition?

17              MR. CHAMAS:  A week and a half ago.

18              THE COURT:  Okay, all right.

19              MR. CHAMAS:  I don't have any objection with the

20  witness using it.

21              THE COURT:  Okay, D-16A in evidence, layout of the

22  scale house.

23  Q    Now are there any differences between D-16 in evidence and

24  D-16 the way it was on the date of the scale house -- the way

25  it was on the date of the incident?

1   A     I don't understand the question.  You are asking me if

2   that diagram is any different from the building?

3           THE COURT:  Was it accurate as of the time of the

4   accident?

5           MR. LEUTBECHER:  No, there's a missing room.

6   Q     Where is the missing room?

7   A     It's basically the center of the building.  There's a --

8   see where the two restrooms are in the upper left quadrant of

9   that picture.  Before, there is actually almost like -- the far

10  room is the women's or the truck driver's bathroom and that has

11  almost like a little hallway to it because there is a small

12  room in the front.  It's the mechanical room where the, you

13  know, where the water heater and the pump for the well water

14  come through there.  So it's just a little room.

15          MR. CHAMAS:  Judge, I want to interrupt.

16          THE COURT:  Fine.

17          MR. CHAMAS:  Well I said I didn't object to it, I

18  just -- my associate pointed out this is document one of two.

19  I'd like to see the first page or the second page whichever it

20  is since I've only been shown this for the first time a week

21  and a half ago.

22          THE COURT:  Counsel, do we have another page of this,

23  it is one of two?

24          MR. ORLOWSKI:  Your Honor, I think this is the only

25  page.  I don't know -- I only have one page.

 1          THE COURT:  The question is whether it is an accurate

 2  representation of the scale house.  You can sit down and you

 3  can draw it right now on the easel if you wanted.

 4          MR. LEUTBECHER:  Right and I would draw it the same

 5  way except I would just draw that little mechanical room with a

 6  --

 7          THE COURT:  Where is the little mechanical room?

 8          MR. LEUTBECHER:  Want me to point to it?

 9          THE COURT:  Yes, point to where the room is.

10          MR. ORLOWSKI:  Your Honor, if I can, can I have Mr.

11  Leutbecher --

12          THE COURT:  I don't know if it's relevant.

13          MR. ORLOWSKI:  I don't see how it would be.  It's

14  just a little.

15          THE COURT:  So in other words, when we are looking at

16  the walls and everything, we look, the exterior dimensions are

17  correct, would you say?

18          MR. LEUTBECHER:  Yes.

19          THE COURT:  We have two restrooms here on the upper

20  left side and somewhere around here there is not shown a wall,

21  but there is an area in this room here where you have basically

22  heating and all that stuff.

23          MR. LEUTBECHER:  Yes.

24          THE COURT:  Okay.  So this is basically accurate

25  except that right here is actually a wall or some sort of

1  structure?

2          MR. LEUTBECHER:  Yes, this almost has like a little -

3  - this almost has a little hallway.

4          THE COURT:  So there is actually a wall there with

5  the heater and --

6          MR. LEUTBECHER:  It's the water heater and the pump.

7          THE COURT:  The pump would be right here, right.

8  Okay, so that would be right in that section there.  Okay.

9          MR. LEUTBECHER:  If you want, I can draw it.

10          THE COURT:  I don't know that it's relevant.  Does it

11  have any purpose as to where the water heater was?

12          MR. LEUTBECHER:  Not that I'm aware of.

13          THE COURT:  Okay, everybody agrees that somewhere in

14  the upper left corner of this building to the right of the

15  bathrooms is a water heater and a well pump.

16          MR. CHAMAS:  Your Honor, if I may.  Did he indicate

17  that there was bathrooms somewhere?

18          MR. LEUTBECHER:  That's the truck driver bathroom and

19  that's the employee's bathroom.  That opens just the far side.

20          THE COURT:  We have basically the lower portion here

21  is the employee's section around there.  That's the area that

22  the scale is right to the bottom.

23          MR. LEUTBECHER:  Correct, the scale would be right

24  here.

25          THE COURT:  The trucker's area is here on the upper

 1  portion.  And as we go to the left of the upper portion there

 2  is a bathroom.

 3            MR. LEUTBECHER:  Correct.

 4            THE COURT:  That bathroom is used by the truckers.

 5            MR. LEUTBECHER:  Truck drivers only.

 6            THE COURT:  Along there is another bathroom which is

 7  used by the employees.

 8            MR. LEUTBECHER:  Correct.

 9            MR. CHAMAS: Then, Judge, I think I do have an

10  objection in this diagram.

11            THE COURT:  What's that?

12            MR. CHAMAS:  The photographs of the building -- if

13  this is -- the scale is down here.

14            MR. LEUTBECHER:  The scale is down here.

15            MR. CHAMAS:  This is the employee entrance?

16            MR. LEUTBECHER:  Correct, yes.

17            MR. CHAMAS:  The street is out here.

18            THE COURT:  The employee entrance there, trucker's

19  entrance there.

20            MR. CHAMAS:  Okay.

21            THE COURT:  In the photographs that's the windows.

22            MR. LEUTBECHER: One of the windows.

23            THE COURT:  One of the windows that we saw there.

24            MR. CHAMAS:  But that's the employee's side.

25            THE COURT:  It's not, it's the trucker's side, okay.

1          MR. CHAMAS:  Okay.  I'm sorry.

2          THE COURT:  The employee's entrance is over here to

3    the left of this diagram.  The trucker's entrance is to the

4    right of the diagram there.  In the photographs we saw that

5    there was a barrier or a railing.

6          MR. LEUTBECHER:  Exactly right.  There is a railing

7    and a pay phone right here.

8          THE COURT:  A pay phone right there.  There's a sign,

9    scale house there.

10         MR. LEUTBECHER:  L-25.

11         THE COURT:  Scale house there looking at the right

12   hand side of each wall.  Correct?

13         MR. LEUTBECHER:  Correct.

14         THE COURT:  Now we are oriented, the scale itself is

15   right about there.  Everybody understand that?

16         MR. CHAMAS:  Yes, Your Honor.

17         MR. ORLOWSKI:  Your Honor, can I have him remain down

18   here.

19         THE COURT:  Sure.

20         MR. ORLOWSKI:  I want to insert some things on there.

21   Q   Mr. Leutbecher, is this area where the employees are, is

22   that a completely open area?

23   A   There's no walls in there.

24         THE COURT:  No partitions or barriers?

25         MR. LEUTBECHER:  Well there's just our desks which

1  have like little cabinet things in the front of them, but

2  there's no like partitions or anything else.

3  Q    And who do you work with there?

4  A    Tom Fitzgerald.

5  Q    And do both you and Mr. Fitzgerald have a desk?

6  A    Yes.

7  Q    Could you mark them?

8  A    We have two desks each.

9  Q    Okay, could you mark on the diagram your desks and Mr.

10 Fitzgerald's desks and label them with your desks with RL and

11 Mr. Fitzgerald's desks with TF?

12 A    Okay.  I don't know how accurate my drawings will be, but

13 --

14        THE COURT:  Can we have something with a little more

15 ink in it?  That seems to be running out.  Try this one.

16 A    This would be Tom Fitzgerald's first desk.  This would be

17 Tom's second desk. This would be my first desk and then my

18 other desk would be here.

19        THE COURT:  So you put TF on the two desks that

20 Fitzgerald had and RL on the desk that -- two desks that you

21 had.

22 A    Right.  Then up here is a small table that had the copier

23 on it.  Along here are tables, they are like filing cabinets,

24 long filing cabinets that have our radio on it that we

25 communicate with the rest of the transportation employees and

1  here is the printer, the network printer.  Then over here on

2  the end -- should I keep --

3  Q    No, no, keep going.

4  A    On the wall here, there's two wall lockers here and then

5  on the end here is the scale readout and next to the readout is

6  the printer, ticket printer.

7  Q    If you could label that with TP for ticket printer.  Now

8  is there a counter where the drivers are limited to walking?

9  Is there an area there?

10  A    Yes.  Right here is, I don't know of the exact dimensions,

11  but I'm going to say being that that closet is here.  Can I

12  draw the closet in?

13          THE COURT:  Yes, sure.  Absolutely.  Draw the closet

14  in there wherever it is.

15  A    It would be there so then basically a couple of feet from

16  the end of that is the counter.  This counter is a cut out in

17  the wall, you know, maybe a two foot deep counter so we can

18  stand on this side and underneath here we have shelves with all

19  our paperwork and then on this side, they come up and you know

20  bring us their paperwork, their licenses, bills, bills of

21  lading if they were bringing truckloads in.  In this case, they

22  would have just brought us their license and their medical

23  cards, their truck route.  Usually a lot of them carry a binder

24  that has all that stuff in it.

25  Q    And now there is an employee door and a driver door,

1  correct?

2  A    Correct.

3  Q    Could you label the driver door with DD and the employee

4  door with ED?

5  A    Okay.  This one and employee door is this one.

6  Q    You also indicated there is a railing outside the driver's

7  door?

8  A    Yes.

9  Q    Please draw that in.

10  A    There's a railing right here near the door. It buts up

11  against, there's a little pay phone here and then this used to

12  be -- there's a railing that goes like this here too.  This

13  used to be like a handicapped ramp.  That's where they paved.

14  Q    Now the areas along the bottom here, it looks like there's

15  areas with three lines along the bottom.  Those are along the

16  south wall.  What are those?

17  A    Those are windows.

18  Q    Could you mark each of those with Ws to show where the

19  windows are along the south side of the building?

20          THE COURT:  I don't think we need to do that, do we?

21  Maybe.  I think a window is pretty well known on a scale.

22  Q    Than you.

23          THE COURT:  Anything else?

24  Q    Mr. Leutbecher, I am also going to show you at this point

25  what's been marked for identification as D-46.  Do you

1  recognize this picture?

2  A     Yes.

3  Q     What do you recognize that to be?

4  A     That's the actual scale house, the way we leave it pretty

5  much every day.

6  Q     Does that document -- does the picture fairly and

7  accurately represent the way the scale house looked in January

8  2004?

9  A     Excuse me, aside from the -- those two orange cone barrel

10 things there, the rest of it does, yes.

11 Q     Okay.  Are there any other differences in the picture?

12 A     Well, yes.  There was at the time, there was a curb and

13 they re-paved the scale top area and gave more room for

14 turnarounds.  So they kind of paved a little bit to the right

15 of that where you see the grass to the right.  That was --

16 there was gravel and dirt there that was getting, it turned

17 into mud a lot so we asked them to have it paved.  When they

18 re-paved to pave that as well.  So they took down a curb and

19 re-paved it.

20         THE COURT:  Where was the curb before?

21         MR. LEUTBECHER:  See the separation between the old

22 pavement and the new pavement?

23         THE COURT:  Yes.

24         MR. LEUTBECHER:  Right along that seem.

25         THE COURT:  There?

1          MR. LEUTBECHER:  Yes, right there.  There was a curb

2 there and the curb was, I don't know, ten inches high so it

3 was, in my opinion, unnecessary and almost like a tripping

4 hazard.

5 Q    Other than the differences you've listed in the picture,

6 does this picture fairly and accurately represent the way the

7 scale house looked in January 2004?

8 A    Absolutely.

9          MR. ORLOWSKI:  At this time, Your Honor, I would

10 offer what's been marked as D-46 for identification as D-46 in

11 evidence.

12          THE COURT:  Any objections?

13          MR. CHAMAS: I'm sorry, what did he say?

14          MR. ORLOWSKI:  P-46.

15          MR. CHAMAS:  No objection.

16          THE COURT:  In evidence.

17 Q    Now looking at D-46, can you see it?

18 A    Yes.

19 Q    Can you see the scale in the picture?

20 A    Yes, you can see where our pickup truck is parked at one

21 end of it.

22 Q    How long is the scale?

23 A    Fifty foot.

24 Q    Now when you worked with the scale, did you have regular

25 hours?

1  A     Um-hum.

2  Q     And what time did you typically start work?

3  A     At the time we were working seven to 3:30.  I don't think

4  we were on a compressed schedule yet, so it was either, yes, it

5  would have to be seven to 3:30.

6  Q     And what would you do when you arrived at the scale house

7  on a typical day?

8  A     Typically we would -- I would -- most of the time I came

9  in first and I would come in and turn on lights and unlock the

10 doors and leave the driver's door locked until we were ready to

11 let them in to do business.  But, you know, go in and turn on

12 the printers, get things ready for the day, print out a daily

13 schedule and that kind of thing.

14 Q     And you testified earlier that you are involved with

15 weighing trucks, correct?

16 A     Correct.

17 Q     Do you have a set procedure for weighing the trucks?

18 A     Yes.

19 Q     Who makes up that procedure?

20 A     Who makes it up?  It's -- I don't know, it's just kind of

21 the known procedure.  I mean, there's a set way to weigh a

22 truck when the scale is a certain size.

23 Q     And in your training as a traffic management specialist

24 did you learn about the different ways that you can weigh a

25 truck?

1  A    No, actually you learn that on the job.  I learned that

2  from Tom.

3  Q    Typically how are trucks weighed at your scale house?

4  A    At our scale house you have to -- we call it axle them

5  out.  You have to weigh them by axle because a truck, a typical

6  truck, a tractor trailer is anywhere from 65 to 70 something

7  odd feet long and we have a 50 foot long scale.  So you have to

8  weigh it by axle and do some math to figure out the entire

9  weight.

10 Q    Are there also other reasons to axle out a truck?

11 A    Are there other reasons to axle out a truck?  Well to make

12 -- just to verify weights on each axle.

13 Q    And are there -- is it your understanding there is

14 requirements or there is weight limits for each axle?

15 A    Yes, sir.  There is a weight limit for the entire truck

16 and then there's a weight limit for the front axle.

17 Q    Now when you are weighing a truck, what gets weighed with

18 the truck?

19 A    Everything.  Everything that will be on the road with the

20 truck has to be weighed with the truck.

21 Q    Okay, does that include the driver?

22 A    It includes the driver, their dogs, anything they have

23 with them, yes.

24 Q    Now would you be able to demonstrate the weighing process?

25 A    I guess, yeah.

1  Q    Okay, I have a toy truck for you to use.

2  A    Right.  The tristate truck.

3            MR. ORLOWSKI:  May I approach, Your Honor?

4            THE COURT:  Yes, certainly.

5  Q    I'm going to use an eight and a half by 11 inch piece of

6  paper to represent the scale.  Sideways -- I got a toy truck

7  for you.  Is that truck generally what kind of truck the

8  plaintiffs had on the day of the incident?

9  A    Yes.  Definitely type of truck.  It happens to be the same

10 company's truck, same color and everything.

11 Q    Are there any differences between that truck and the truck

12 the plaintiffs were driving?

13 A    Yes, I don't know if it's exactly the same manufacturer of

14 truck.  It is a toy representation so I don't know if like fuel

15 tanks are off a little bit as opposed to theirs.  I think the

16 fuel tanks here are behind the step where in their particular

17 case, and in most cases, today's trucks the side step to get in

18 the cab is actually connected to the top of the fuel tank

19 unless they have enlarged tanks and they did not.

20 Q    Okay, so there might have been an area under the fuel tank

21 that was open as opposed to --

22 A    Yeah, where the fuel tank is now would be open because the

23 fuel tank would have been forward underneath the steps.

24 Q    Okay.  Now is this -- is using the short side of the eight

25 and a half by 11 inch piece of paper and the toy truck, is that

1  pretty close to a scale representation?

2  A    Yes, it's a fair representation.

3             MR. CHAMAS:  I'm going to object to that, Your Honor,

4  I mean --

5             THE COURT:  Well it's not to scale I assume.

6             MR. LEUTBECHER:  Yes, I can't assume it's to scale

7  but it's definitely the paper is less --

8             THE COURT:  The scale is shorter than the tractor

9  trailer.

10            MR. LEUTBECHER:  The scale is shorter than the truck,

11 exactly.

12            MR. CHAMAS:  I have no problem with that.  He was

13 saying is it to scale.

14            MR. LEUTBECHER:  He said is it fair, and it's fair.

15            THE COURT:  Fifty foot scale, 70 foot approximately

16 tractor trailer combination.

17            MR. LEUTBECHER:  Right.

18            THE COURT:  So, therefore, it's obvious you can't get

19 the entire vehicle on the scale.

20            MR. LEUTBECHER:  Correct.

21 Q    And now in scaling the truck what is the first procedure

22 that is done to scale the truck?

23 A    The absolute first procedure to scale anything on that

24 scale whether it is something that fit on the scale or not is

25 you have to zero out the scale.

1  Q     Why do you do that?

2  A     Because the scale is -- the scale is a calibrated piece of

3  equipment and everything can affect the weight that is

4  represented on the digital read out.  A windy day can register

5  20 pounds of weight.  So you have to go and check the meter and

6  see what the meter says and then hit zero if it doesn't already

7  register zero.  You hit a little button that says zero.

8          THE COURT:  So before a vehicle is on the scale, you

9  must make sure it that it is zero.

10          MR. LEUTBECHER:  I have to make sure it is

11  registering zero, yes, sir.

12          THE COURT:  Okay, I understand.

13  Q     And if there is snow or debris on the scale would that

14  affect the weight of the scale?

15  A     Absolutely it was sensitive to 20 pounds.

16          THE COURT:  So if there were dirt or gravel or snow

17  or something on the scale it would have a reading and be off a

18  few pounds.

19          MR. LEUTBECHER:  Absolutely.  It could say 110 pounds

20  on it before a truck even gets on it.  I mean rain actually

21  will register 20 pounds.

22          THE COURT:  Really?

23          MR. LEUTBECHER:  Yes.

24  Q     Now at the naval weapon station, after you zero the scale,

25  what is the next procedure to axle out a truck using that --

1  A    I step outside the door and wave the truck on  and the

2  truck pulls ahead and I stop them when the first axle hits, you

3  know, passes onto the scale.

4  Q    Okay, so you direct the truck onto the scale?

5  A    Yes, you have to.

6           THE COURT:  You step out, you said.  How do you step

7  out?

8           MR. LEUTBECHER:  Out of the driver door one there or

9  whatever the DD or excuse me, not DD, ED, employee door.

10          THE COURT:  So in other words -- let me see if I

11 understand this.  Your testimony is that over here is where

12 your scale meter is?

13          MR. LEUTBECHER:  Yeah, it's the furthest thing from

14 the opposite end of the --

15          THE COURT:  Indicating the lower left hand side

16 building.

17          MR. LEUTBECHER:  As it's drawing, yes.

18          THE COURT:  You zero out your scale.

19          MR. LEUTBECHER:  I have to walk from my desk to that

20 meter and actually press a button that says zero if it doesn't

21 already read zero.

22          THE COURT:  Then you say your procedure is to go out

23 this employee door marked ED and wave the truck forward?

24          MR. LEUTBECHER:  Exactly.  I'll walk to that corner

25 and I'll give them the, you know, the come forward sign or I'll

1   wave them forward.

2           THE COURT:  All right.  I understand, thank you.

3   Q    And you typically, did you have tandem teams at the naval

4   weapons station Earle, tandem team drivers?

5   A    On the base we have single drivers.  They don't go out on

6   the road so they are not required a dual driver team.

7   Q    Okay.  The Tri-state motor drivers were they generally

8   single drivers or tandem team drivers?

9   A    If they come on the base to deliver or to pickup

10  explosives or any kind of hazmat they are required to be tandem

11  teams.

12  Q    And when you wave the truck to put the first axle on the

13  scale, are the driver and the passenger typically inside the

14  vehicle?

15  A    Typically, yes.  I'm, you know, being the new employee and

16  just learning the business I would have made sure that both

17  drivers were in the truck to weigh because I tell them all the

18  time, you know, I can't weigh it -- I can't give you an

19  official weight, I can't sign any kind of a weight ticket if

20  the full representation of your weight is not in the truck.

21  Q    Now after the first, the first axle is called the steering

22  axle, correct?

23  A    Um-hum.

24  Q    After the steering axle is on the scale, what do you do?

25  A    I go inside the, back inside the building and hit print on

1  the small printer, the label or what do you call it, the

2  scale's printer.

3  Q    Okay, and why do you do that?

4  A    Well because we want to -- typically you would want a

5  printout of the weight ticket so that they can see what their

6  weights were and you can do the math.  You need the numbers to

7  do the math and you don't always remember the number.

8  Q    Okay, so that -- when you hit print, it will print a

9  ticket containing the weight of the steering axle.

10 A    It's actually a, like an eight and half by five and a half

11 piece of paper that we slide into the little printer and you

12 feed it a little bit and it pulls it in a little bit and then,

13 yeah, I've hit zero, I typically hit print to print zero first

14 and then I'll go out and wave them on.  They will pull on the

15 steer axle.  I'll halt them.  I'll go back in the building and

16 hit print.

17        THE COURT:  So the first time you are weighing what,

18 just the steer axle or the drivers?

19        MR. LEUTBECHER:  The first time I'm weighing zero.

20 I'm weighing nothing.

21        THE COURT:  Zero, okay.  And then when you wave them

22 on, what are you weighing?

23        MR. LEUTBECHER:  The steer axle.  The weight on the

24 steer axle.

25        THE COURT:  Not the drivers?

1          MR. LEUTBECHER:  Not yet, no.

2          THE COURT:  Okay.

3          MR. LEUTBECHER:  The first thing I'm weighing is the

4    steer axle, yes, sir.

5    Q    Okay, and do you at that point provide the printed weight

6    to the driver or the passenger before you pull the other axles

7    on?

8    A    No.

9    Q    Okay, after you -- you can use the demonstration.  After

10   you have printed the ticket for the steer axle, you then come

11   out the employee door?

12   A    Come right back out the same employee door and wave them

13   on the next and then they pull forward to get their drive axles

14   on and then I would halt them again.

15   Q    And now by drive axles are you referring to the next two

16   axles of the truck?

17   A    The rear two axles of the tractor are the drive axles,

18   yes.

19   Q    And is there a term for the steering axle and the drive

20   axles?

21   A    The tractor weight.

22   Q    Is that called the tongue weight?

23   A    Well the weight that is on the -- you still have to do

24   some more math but yes that will be the tongue weight.

25   Q    Okay.  And then after the first two axles are on the

1   truck?

2   A     I go back inside and I hit print.

3   Q     To obtain the weight of those three axles?

4   A     That's to get the weight of the entire tractor including

5   the weight on the tongue, right.

6   Q     And then what do you do?

7   A     Then I will, again I was inside the building, I hit print

8   and then I go back out again and I wave them forward and they

9   would actually pull past me and then once I get the drive axles

10  off the scale, I'll halt them in their rearview mirror, excuse

11  me, and then I'll walk back inside the building again and hit

12  print for the rear axle.

13  Q     Using the toy truck, you then pulled the first three axles

14  off of the scale and the last axle onto the scale and then --

15  is that correct?

16  A     That is correct.

17        THE COURT:  So now all you are doing is weighing the

18  rear axles which are on the trailer?

19        MR. LEUTBECHER:  Correct.

20        THE COURT:  So it's a three step operation?

21        MR. LEUTBECHER:  Yes.

22        THE COURT:  Steer axle, drive axles and then rear

23  axles?

24        MR. LEUTBECHER:  Drive axles, correct.

25  Q     Now the ticket machine that you print the tickets from,

1  that's located in the bottom?

2  A    Bottom left corner of the picture, it's the second box

3  over, yes.

4  Q    Okay, and how big is the printing on the printing ticket?

5  A    How big is the print?  Typical typewriter print.  It's a

6  ribbon printer.  You know what I mean, like, it has just tiny

7  print.  I don't know how else to say it.

8  Q    Is it similar to what the font would be in a book?

9  A    Yes, yes.

10  Q    Similar to that?

11  A    Yes, exactly.

12  Q    Okay.  And how far away is that ticket printing machine

13  from the counter where the drivers are allowed to be?

14  A    Oh, I don't know, 20 feet.  I never measured it to be

15  honest with you.

16        MR. CHAMAS:  I'm sorry, I didn't hear that question.

17        THE COURT:  He said he's never measured it.  It's

18  maybe 20 feet from the counter.

19        MR. LEUTBECHER:  I've never measured how far the

20  ticket printer is from the counter.

21  Q    Is there a readout on the scale meter?

22  A    Yes, there is.

23  Q    How big is the --

24  A    It's a blue font and it's, I don't know, three quarter of

25  an inch, maybe half an inch, three quarter of an inch tall.

1  Q    And is the, either the printing on the ticket printer or

2  the meter on the scale readable from where the drivers stand?

3  A    I highly doubt it.  You'd have to have some really good

4  eye sight from there.  It's the reason I have to walk all the

5  way to it.  I can't read it from my desk and my desk is closer

6  than the printer, or the counter.

7  Q    Prior to -- I'll withdraw that.  After you obtain the

8  three weights, what do you do with the weights?

9  A    Well I'll typically walk to the counter, take the

10 calculator and subtract the steer axle weight from the drive

11 axle weight and have it ready for when the drivers walk in and

12 then I'll show it to them and they can take the ticket if they

13 want and we'll sign it if they need it.  But in most cases they

14 just wanted to know what their weights were and they don't ask

15 to keep the ticket.  Some do, some don't.

16 Q    At any time prior to doing that calculation do you give

17 the weights to the drivers?

18 A    Not until they come back in the building.  You know,

19 because if there is an issue if the weights are off or if

20 something is too heavy, if the load needs to be shifted then

21 we'd have to contact the people that loaded the truck, you

22 know, the other part of the base where they loaded the truck

23 and have them bring the trailer back to them and they'd have to

24 shift the load, redunnage the load.  So, no, not until they

25 come back in.  I don't tell them while they are out in their

1  truck.

2  Q    Now who is responsible for plowing the snow at the scale

3  house?

4  A    Public works.

5  Q    And who typically removes the snow and ice from the

6  walkway at the scale house?

7  A    It's kind of a rule of thumb, you know, just clean your

8  own walkways.  So whoever -- whomever is working that building

9  would clean up, you know, just enough to keep the snow out of

10  the building.  It's not really a requirement.

11  Q    Is it fair to say that you would, either you or Tom or the

12  other employees of the scale house would shovel the walkways if

13  they need shoveling?

14  A    Yeah, if they need shoveling, yeah.

15  Q    I'm going to direct your attention to January 26, 2004.

16  Do you remember that day?

17  A    Yeah.

18  Q    Do you recall what day it was, what day of the week?

19  A    It was a Monday.

20  Q    Do you recall whether it snowed over the weekend?

21  A    It did.

22  Q    And what was the weather like the day or night before?

23  A    That's when it was snowing and it wasn't really, it wasn't

24  heavy snow or anything.  It was, you know, just like a flurry

25  through the night, I mean, late night.  It wasn't snowing when

1  I went to bed.

2  Q    Approximately what time did you arrive to work on that

3  day?

4  A    About seven o'clock.

5  Q    Was anyone else present when you arrived there?

6  A    There were trucks in the street.

7  Q    Was Tom Fitzgerald there?

8  A    No. Tom wasn't there yet.  He typically comes a few

9  minutes behind me.  I'm always early.

10 Q    What did you first do when you arrived at work?

11 A    Pull my truck in, get out of my truck, unlock the door, go

12 inside the building, turn the lights on.  That particular day I

13 grabbed a shovel and moved a little bit of snow from our door

14 to the pickup on the scale and then a little bit more towards

15 the parking area just to throw it to the side.

16 Q    Why did you do that?

17 A    Just to keep the snow from tracking in the building.

18 Q    And did you typically dig out all of the parking area or

19 just the area around the outside of the employee building?

20 A    Typically it would depend on the amount of snow.  I mean,

21 that day, is that what you are asking me?

22 Q    Yes.

23 A    No, just dug a little snow, you know, out towards where we

24 park and then, you know, the path -- just a shovel widths path

25 to the pickup truck.

1  Q    Now on other days when it was snowing did either you or

2  tom put down ice melt or sand or salt?

3  A    Yes, provided we had ice melt, that's -- we would

4  definitely take a coffee can scoop full and take some outside

5  the driver's door and some outside our door and throw a little

6  on the scale.

7  Q    Now had it snowed -- withdraw that.  How much snow was on

8  the ground from the previous days snow fall?

9  A    I want to say probably four, four or five inches of snow.

10 Q    And had you previously shoveled the path through that

11 snow?

12 A    Um-hum.

13 Q    How much snow would you say was on the ground, fresh snow

14 on the day of the incident?

15 A    I'd say less than an inch.

16 Q    Do you remember Mrs. Brogna coming into the scale house in

17 the morning of the incident?

18 A    Yup.

19 Q    And what time was it?

20 A    It was just after we opened the doors.  It was just after

21 7:15ish or between seven and 7:15.

22 Q    Do you know where her truck was parked the first time she

23 came in?

24 A    I can only speculate because --

25         MR. CHAMAS: I'm going to object, Your Honor.

 1          THE COURT:  No speculation.  Did you -- do you know

 2  where it was?

 3          MR. LEUTBECHER:  When I pulled up I knew where -- it

 4  was in the street.

 5          THE COURT:  In the street, okay.

 6          MR. LEUTBECHER:  Right.

 7  Q    What did you do when she came in to the scale house for

 8  the first time?

 9  A    Started the process of, you know, discussing her load,

10  what she was there to pickup.

11  Q    Did you process any paperwork at that point?

12  A    I did.

13  Q    Did you provide her with directions --

14  A    Yes, every driver that comes to pick up a load at that

15  point gets a, it's a truck log and map.  It's like a folder

16  that has a map taped to it that's got like a plastic sheet over

17  it so it can be drawn on or what have you.

18  Q    Now you said that you indicated that you shoveled the

19  walkway on the driver's side door?

20  A    No, on the employee's side.

21  Q    Okay.

22  A    Oh, from previous snowfall, yes.

23  Q    Did you shovel that walkway that morning?

24  A    No.

25  Q    Why didn't you do that?

1  A    I hadn't gotten a chance to yet and honestly there just

2  wasn't that much snow to really you know worry about it.

3  Q    Did you see whether or not Mrs. Brogna came in using the

4  walkway on the driver's side?

5          MR. CHAMAS:  Judge, I want to object to the leading

6  nature of counsel's question.

7          THE COURT:  Let's find out first if he was able to

8  see Mrs. Brogna as she came in.

9          MR. LEUTBECHER:  I saw her walk in the door.  I don't

10 know which way she walked, no.

11 Q    Was the walkway you shoveled still visible?

12 A    I would say it was visible but I hadn't been out that door

13 so I can't tell you that morning.

14 Q    I'm going to show you what's been marked as P-8.  Does

15 that picture represent the way the scale house was on the

16 morning of the incident?

17 A    That is a photograph from the day of, yes.

18 Q    Can you see the pathway that you shoveled in that

19 photograph?

20 A    It's a little difficult to decipher because of the blown

21 up picture, but yeah you can see it.

22 Q    I'm going to -- now, was the pathway shoveled --

23          MR. CHAMAS:  Objection, Your Honor.

24          THE COURT:  Let me hear the question.

25          MR. CHAMAS:  He's asked, okay.

1        MR. ORLOWSKI:  I'll rephrase.

2   Q    Where was the pathway shoveled?

3   A    Coming out the driver's -- that's the driver's side door

4   so coming out of the driver's side door, around the railing and

5   out towards the street.

6        THE COURT:  Can you show us where it was?

7        MR. LEUTBECHER:  Sure.

8        MR. ORLOWSKI: I can have him draw it in.

9   Q    Can you draw it in for us?

10  A    It would be -- it would be coming around this railing and

11  it would be coming down like this.

12       THE COURT:  So it would be in front of that pile of

13  snow that we see here?

14       MR. LEUTBECHER:  This pile of snow, yes, absolutely.

15  It would come out something like that.

16       THE COURT:  Okay.

17       MR. ORLOWSKI: I'd like to introduce and offer into

18  evidence, it's already been offered into evidence, the original

19  photographs of that day.

20       MR. LEUTBECHER:  Do you want me to sit back up here?

21       THE COURT:  Yes, please.

22       MR. ORLOWSKI:  P-7, 8 and 9, Your Honor.

23       THE COURT:  Okay.

24       MR. ORLOWSKI:  I'm going to show this to Mr.

25  Leutbecher and the Court.

1  Q    I'm going to ask you to look at Picture Number 3 of the

2  photo log.

3  A    Okay.

4  Q    Can you see the pathway a little bit better in the

5  original Polaroid photograph --

6  A    Yeah, you --

7  Q    -- than you can on that?

8  A    Yes, you can see it a little bit more clearly.

9            THE COURT:  I see it.

10 Q    Now, why didn't you shovel a pathway right alongside the

11 building?

12 A    Because that's not a walkway.  There's no reason to be

13 walking up alongside the building.

14 Q    Now, was there a curb outside on the street?

15 A    Yeah, there was a curb outside the street.  You can't see

16 it in that particular picture.  Actually, I don't see it really

17 in any of the pictures.

18            MR. ORLOWSKI:  Pull up P-33.

19            MR. CHAMAS:  P-33?  It wouldn't be in that one

20 either.

21            MR. ORLOWSKI:   What's that?

22            MR. CHAMAS:  It's not going to be in here either.

23 It's already -- it's post-accident.

24            MR. ORLOWSKI:  No, I know.

25 Q    Now, that's showing -- P-33 is showing the south side of

1  the scale house, correct?

2  A    Correct.

3  Q    Can you see the area where the curb would be --

4  A    Yes.

5  Q    -- in P-33?

6  A    Yeah.  You can see just in the difference -- the different

7  colors of the blacktop.

8           THE COURT:  As I understand it, you're talking about

9  this area between the dark blacktop and the lighter blacktop,

10  that area there, is that --

11          THE WITNESS:  Right there where you pen is would have

12  been about a 10-inch high curb, yes, sir.

13          THE COURT:  Okay.  And that was -- that curb was

14  there at the time in question?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.

17  Q    And now, was there a depression in that curb so that

18  trucks could pull onto the scale, the curb cut?

19  A    To -- well, it didn't go around the whole thing.  It was

20  just there in that section of the street.

21  Q    Okay.  Where did the curbs -- did the curbs stop somewhere

22  along the right edge of P-33?

23  A    Just about where the -- yes, just about where the picture

24  actually ends is about where the curb would have stopped.  It

25  was just longer than the scale, basically, just --

1  Q    Okay.  So, looking at the picture, it would be past this

2  orange cone?

3  A    Right about even with it, I'd say.  Right about there

4  where your pen is.

5  Q    About here is where the curb would stop?

6  A    Sure, yeah.

7         THE COURT:  And where would it stop on the other

8  side?

9         THE WITNESS:  About even -- probably about even with

10  the rear tire of the truck.  It covered -- it was -- I don't

11  know if they had a particular number in mind, but it was a few

12  feet past either side of the scale.

13        THE COURT:  Okay.

14  Q    Now, did you -- how far out did you make the pathway?  How

15  far out into the --

16  A    The initial time that I dug the pathway out, I dug it

17  past -- over the scale apron, if you want to call it, out into

18  the street, and I would dig it to the street because we'd have

19  to -- I'd, out of a courtesy to the driver's, I would dig

20  through the plow, you know, like when the plow would make their

21  mounds, I would dig through the plow mound so that they'd have

22  a walkway.

23  Q    Now, did you, when you shoveled the path, did you shovel

24  the path to where the curb ended or where there was still a

25  curb?

1  A    No, beyond the curb.  I wouldn't want anybody to trip over

2  the curb.

3  Q    Now, the morning of the incident, had plows come yet?

4  A    That morning, no.

5  Q    Now, do the plows typically plow the scale area?

6  A    Yes.

7  Q    And do the plows typically push snow to either side?

8  A    They usually push snow to the -- well, depending on which

9  way they come across the scale, they push it away from the

10 scale house.

11 Q    Okay.  Does snow also get piled along the edge of the

12 scale house, on the south side of the scale house?

13 A    Not against the building itself.  But what they do is they

14 come -- they will plow in a circle right up to the edge of the

15 building and then I'd usually stop them.  They'd raise their

16 plow to avoid -- there's a rubber seal that goes around there.

17 We try to keep them from destroying the rubber seal.  So, at

18 that point, they turn -- they shift their plow the other way so

19 that they can direct snow off the other side.

20 Q    Okay.  And can you see in this picture that we've marked

21 where the pile of snow is?

22 A    Yes.

23 Q    And where is it?

24 A    On either side of my drawn path there.

25 Q    Okay.  So, is this where the -- looking at the picture

1  along the left side, about six or eight inches up, is that the

2  pile of snow you're talking about?

3  A    That is a pile of snow from the plows, yes.

4  Q    Okay.  And I'm also going to show you P-8 in evidence.  Do

5  you recognize this --

6  A    I do.

7  Q    -- picture?

8  A    Mm-mm.

9  Q    And what is that a picture of?

10  A    That's a picture of the area in question, I guess, where

11  Ms. Brogna fell.

12  Q    Okay.  And is there any pile of snow or ice in that

13  picture?

14  A    Yes, that's a frozen mound right in the center of the

15  picture.

16  Q    And what is that?  Is that from the plows, as well?

17  A    It's from the plows and the runoff, the melt, you know,

18  melting snow from the top of the building and all kind of comes

19  together right there.

20  Q    Now, did you shovel along the corner of that building?

21  A    Along the corner, no.

22  Q    Why not?

23  A    Again, it's not a walkway.  There's no -- you know,

24  it's -- there's piles of snow and runoff from the building.

25  That's just where more snow gets thrown.  We don't walk there.

1  It's not a walkway.

2  Q    Is there any reason for truckers to be on or around the

3  scale?

4  A    Not unless they're in their truck, truthfully.

5  Q    Are they permitted to be walking on or around the scale?

6  A    Only if they have to cross it to get to their vehicle.

7  No, if there's a truck on the scale, the only way they should

8  be on the scale is if they're inside the truck.

9  Q    Now, looking at D-46, do you see the area right next to

10 the scale here in front of that --

11 A    I do.

12 Q    -- raised concrete?

13 A    Mm-mm.

14 Q    Is that a walkway area for truckers?

15 A    No.

16 Q    Are they permitted to be in that area?

17 A    Again, see, sometimes they'll come to the wrong door and

18 they'll, you know, they'll walk up that way to go to the --

19 when we tell them they have to go around, they'll cut through

20 there and -- but it's not a designated walkway, no.

21 Q    When there's a truck on the scale, are they permitted to

22 be in that walkway?

23 A    No, there's very little room there.  When there's a truck

24 on the scale, I don't think anybody would walk there on

25 purpose, as you can see in that picture how close the truck is

1  to the building.

2  Q    Now, going back to the incident with Ms. Brogna.  After

3  you provided her with instructions to the trailer, what

4  happened then?

5  A    She would leave the building and get back in her truck

6  with her co-driver, in this case her husband.  They would

7  follow my instructions to go up the hill and around to the

8  truck holding yards, identify and find and hook up to their

9  trailer and then bring it back to the scale house.

10 Q    And did she, in fact, come back to the scale house?

11 A    She did.

12 Q    Approximately how long after she left the first time did

13 she come back?

14 A    It had to be about an hour.

15 Q    Now, what happened when she came back in the scale house

16 the second time?

17 A    She came back to the scale house.  She came into the

18 building and asked if we could weigh the truck.

19 Q    And what did you say?

20 A    I said that's what the scale is for, yes.

21 Q    And what did you mean when you said that?

22 A    I was just telling her that, yes, we could weigh the

23 truck.  That's what a scale is for.

24 Q    Were you authorizing her, at that point, to pull the truck

25 up to the scale?

1   A    No, I hadn't gotten up yet to zero the scale out, so, no.

2   Q    Did Ms. Brogna say anything else to you that morning, at

3   that point?

4   A    No.  She turned around and walked out of the building.

5   Q    Did she ask you for permission to pull the truck onto the

6   scale?

7   A    No, not verbally, no.

8   Q    Did you think at that point that she was going to have her

9   husband pull the truck on the scale?

10  A    No, I did not.  I expected her to do like any other truck

11  driver would wait until we got out and, you know, waived them

12  forward.

13  Q    Did you say anything else to her at that point?

14  A    No, I didn't have a chance.  She turned around and walked

15  out.

16  Q    And do you know where her truck was when she came in the

17  second time?

18  A    Her truck was -- the nose was already up on the scale.

19  Q    How do you know that?

20  A    Because when I sat up -- when I stood up, I could see it

21  right out the window, right out Tom's window.

22  Q    Okay.  Now, I'm going to direct your attention to the

23  floor plan (indiscernible).  Now, you've labeled RL where your

24  desk --

25  A    Correct.

1  Q    -- correct?  Where were you when she came in the second

2  time?

3  A    I was sitting at my desk.

4  Q    Which way were you facing?

5  A    I was facing Tom's direction.

6  Q    Okay.  So you were facing towards the driver's door --

7  A    Correct.

8  Q    -- of the building?

9  A    Mm-mm.

10  Q    From where you were sitting at your desk, could you see

11  out any of the windows?

12  A    I could see out my window if I leaned back, yes.

13  Q    And which window -- would that be the second --

14  A    The second window in, correct.

15  Q    Could you see out the first window?

16  A    Not until I stood up, no.

17  Q    At what point did you see the truck on the scale?

18  A    Well, you could hear the truck on the scale at that point,

19  but I had leaned back and I could see the truck's headlight

20  through my window.  And once I'd answered her question and I

21  stood up, I could see the whole nose of the trailer through

22  Tom's window.

23  Q    Okay.  So you initially saw the truck through -- the

24  headlights of the truck through your window?

25  A    Mm-mm.

1   Q     The second window?

2   A     Right.

3   Q     And what did you do then?

4   A     At that point, I had, like I said, I was just getting up,

5   so --

6            THE COURT:  Let me see if I understand this.  She

7   came in the second time, asked if you could weigh the truck,

8   you said that's what a scale is for, she left?

9            THE WITNESS:  Correct.

10           THE COURT:  At that time, the tractor was already on

11  the scale?

12           THE WITNESS:  Yeah, they had the nose of the tractor

13  -- it was nosed up on the scale.  So whether they had the

14  steering axle right on the scene there.

15           THE COURT:  Before she came in to ask you if she

16  could do it, she already had the nose of the tractor on the

17  scale?

18           THE WITNESS:  Correct.

19           THE COURT:  So you couldn't zero the scale out?

20           THE WITNESS:  Correct.

21           THE COURT:  Okay.

22           THE WITNESS:  In that particular case, if that had

23  happened, what I would have done would back them off the scale

24  so I could zero it out, but I hadn't had the chance.

25  Q     And where was Tom at this point?

1  A    Sitting at his desk pointed -- facing toward me reading

2  from his computer screen.

3  Q    And after Ms. Brogna left, what happened then?

4  A    Well, we heard the truck go into gear and, you know,

5  proceed forward.  So, when it started to move, Tom said, you

6  know, what's he doing and then we started to hear like a

7  screeching sound which was Ms. Brogna screaming.

8  Q    And what did you do after you heard the screeching sound?

9  A    Well, Tom first assumed that they were hitting the -- he

10 said he's hitting our building, he's hitting the gutters.  And

11 it took a second for it register that it wasn't that

12 screeching, it wasn't the metal screeching.  I heard a woman's

13 voice and I said, no, he's hitting her.  And I got up -- at

14 that point, I ran out the back door.

15 Q    Which door did you run out?

16 A    I ran out the employee door.

17 Q    And what did you do after you ran out the employee door?

18 A    I ran out the employee door, stood on the scale and put my

19 hands in the air to stop him, to have him stop his truck.

20 Q    Okay.  And, at that point, did you speak -- do you know

21 who the driver of the truck was at that point?

22 A    It was Mr. Brogna.

23 Q    Okay.  And did you say anything to him at that point?

24 A    Well, I was yelling to stop.  So I wasn't speaking to him

25 directly, but I was yelling at the truck, basically, to, you

1  know, stop the truck.

2  Q    Okay.  And what did he do?

3  A    He stopped the truck.  He hit his brakes, but he didn't

4  apply the air brake.  He just stopped.

5  Q    And what did you do at that point?

6  A    At that point, I had proceeded to the passenger side of

7  the door -- passenger side of the truck because he had, at that

8  point, he had, I assume, shifted into reverse because he had --

9  I had heard the gears grinding, again, and I assumed he was

10  just trying to back off of, you know, seeing that I was

11  directing him to stop, so he was probably going to back up.

12  But that's -- I can't be sure of that.  I just know he was

13  putting it back into gear.

14  Q    And --

15  A    So I had opened his door and told him to shut his -- I

16  used an expletive.  I told him to shut his f'ing truck off.

17  Q    And based on your observations of Mr. Brogna, did he have

18  any idea what was happening at that point?

19  A    Not at the moment, no.

20  Q    And what did -- what -- did you say anything to Mr.

21  Brogna?

22  A    I did.  I told him to shut his f'ing truck off and then I

23  said your wife's underneath the truck.

24  Q    What did Mr. Brogna say to you?

25  A    He popped his air brake and said, "Oh, my God" about forty

1  times, at least.

2  Q    What did you do after the -- after you said that to Mr.

3  Brogna?

4  A    I dove underneath the truck to be with his wife.

5  Q    When you dove under the truck, which direction was Ms.

6  Brogna (indiscernible)?

7  A    She was facing the front end of the truck.

8  Q    Was she on her stomach or her back?

9  A    She was on her belly.

10 Q    Describe for the Court the scene that you saw under the

11 truck.

12 A    Well, I dove underneath the truck and I kind of grabbed

13 her hands and asked her if she was okay.  I wanted to see if

14 she could talk.  I kind of went up on my hands so I could see

15 over her to see what kind of damage I could see, you know, what

16 of her would have been hurt or injured, and what I saw was her

17 ankle turned between the two truck tires.  There was some

18 bleeding at her knee through the denim and I saw the spring

19 hanger bolts were kind of -- I don't know how to say it -- but

20 they were like dug into her backside.

21 Q    And did it appear at that point that she had been dragged?

22 A    Yes, it did.

23 Q    About how far would you say she was dragged from where she

24 was initially (indiscernible)?

25 A    Seven or eight feet.

1  Q    And how do you know that it was seven or eight feet?

2  A    Well, from the drag marks later on and from the edge of

3  the scale where it started to -- about the point where it

4  stopped, it was only about seven or eight feet.

5            THE COURT:  So where was she when you went out?  Let

6  me just see if I can understand this looking at this model

7  truck here.  The truck itself was on the scale --

8            THE WITNESS:  At this point --

9            THE COURT:  -- like that.  Okay.

10           THE WITNESS:  Right.

11           THE COURT:  The building is right up here.

12           THE WITNESS:  Right up along side of it.  Yes, sir.

13           THE COURT:  Okay.

14           THE WITNESS:  And I would say at this point the drive

15  axles were probably on the scale.

16           THE COURT:  Drive axles are on the scale?  Okay.

17  Steer axle, drive axle on the scale, building here?

18           THE WITNESS:  Correct.

19           THE COURT:  So building ends a little bit beyond the

20  scale, right?

21           THE WITNESS:  Correct.

22           THE COURT:  Now, where is Ms. Brogna when you first

23  see her?

24           THE WITNESS:  She's underneath the truck here.

25           THE COURT:  So you went to the door here, the

1    passenger's door of the truck, right?

2              THE WITNESS:  Correct.

3              THE COURT:  And you told him to shut the bleeping

4    truck off?  Okay.

5              THE WITNESS:  Correct.

6              THE COURT:  You then went to Ms. Brogna who was

7    located somewhere near the drive axles?  Where?

8              THE WITNESS:  Yes, underneath the center of the

9    truck, her -- I don't have a little -- yeah, that'll work.

10             THE COURT:  Okay.

11             THE WITNESS:  Thank you.  Her body was, if I could

12   lift the truck, her body was like this underneath the truck.

13             THE COURT:  Between the two drive axles?

14             THE WITNESS:  Well, at that point, just her legs

15   were -- like one of her legs was between the two drive axles.

16             THE COURT:  (Indiscernible).

17             THE WITNESS:  So she was forward of the drive axles

18   slightly.  Thank you.

19             THE COURT:  Okay.  So she was forward of the drive

20   axles with her leg under the first drive axle on the right-hand

21   side?

22             THE WITNESS:  Between them, yeah.  It had already

23   driven over her legs.

24             THE COURT:  Okay.  Thanks, that blue model truck is

25   helpful.

1          THE WITNESS:  Yeah.

2   Q    About where do you think she was dragged from?

3   A    From the corner of the scale forward, you know, under --

4   to I'd say roughly my window.

5   Q    So the drag marks started around the edge --

6   A    Right around the edge of the scale, yeah.

7          THE COURT:  So, again, to try to understand this.

8   Looking at P-33, the edge of the scale is right there under the

9   sign that says L-25?

10          THE WITNESS:  Correct.

11          THE COURT:  Your window is the second window left of

12   there right about there?

13          THE WITNESS:  Yeah, she didn't make it quite to my

14   window.  I'd say between the two windows.  Right in there.

15          THE COURT:  Right about there?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Between the two windows on the right-hand

18   side.  Okay.

19   Q    Did there come a time when other persons responded to the

20   scene?

21   A    Oh, yeah.  The first responders were there in a few

22   minutes.

23   Q    And what did they do?

24   A    At that point, they pulled me out of there and, you know,

25   the police had taken us -- the Navy Police had taken us back

1  into the building and the first responders worked on Ms.

2  Brogna.

3  Q    Did you give a statement to the police?

4  A    We did.  We were taken inside and given paper and told to

5  write down what happened.

6  Q    And prior to the first responders arriving on the scene,

7  was the truck moved at all?

8  A    No.

9  Q    When was the truck moved?

10 A    After everybody had cleared out, after the first

11 responders had gotten Ms. Brogna loaded up into an ambulance

12 and the police and everybody had departed, they -- we had

13 another truck driving team on the station.  They were down at

14 the blocking and bracing shop working on their truck, tarping a

15 flat bed load, and we had gone down there and brought one of

16 their drivers back to move the Tri-State truck.

17         THE COURT:  I've got one question.  Say it wasn't

18 moved until the first responders and the police arrive.  I

19 believe you testified that Ms. Brogna was under -- her leg was

20 under one of the drive wheels.

21         THE WITNESS:  Between the drive wheels.

22         THE COURT:  Oh, between the drive wheels.

23         THE WITNESS:  Yes.

24         THE COURT:  So they could remove her without moving

25 the truck?

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  Thanks.  Go ahead.

3  Q    Now, did you survey the scene after Ms. Brogna -- after

4  the incident?

5  A    Directly that day, I mean, in the afternoon, yeah, we

6  looked at it, you know, later on in the day.

7  Q    Did you look at the area where she might have been

8  walking?

9  A    Yeah.  But, I mean, at that point, we had a lot of police

10  and people taking pictures and -- but, yeah, we looked there.

11  Q    Did you see any footprints in the snow?

12  A    Yes, we did.

13  Q    And where did you see footprints?

14  A    Well, coming down the edge of the, you know, alongside

15  that building there.

16  Q    Do you know who those footprints were from?

17          MR. CHAMAS:  Objection.

18  A    I didn't.

19          MR. CHAMAS:  Never mind.

20          MR. ORLOWSKI:  Thank you.  That's all I have.

21          THE COURT:  Cross examine?

22          MR. CHAMAS:  I do, Judge, but can we take a -- just

23  a --

24          THE COURT:  Sure.  Okay.  We'll take a short break

25  then.

1          MR. CHAMAS:  I just want to run to the men's room.

2          THE COURT:  Okay.  Fine.  We have one more witness to

3    get through, is that right?

4          MR. CHAMAS:  That's correct.

5          MR. ORLOWSKI:  Yes, Your Honor.

6          THE COURT:  How long will that witness take?

7          MR. ORLOWSKI:  I think he's going to be shorter.

8          THE COURT:  All right.  Well, if we can get them both

9    done by 1:00, I can get you folks out of here because otherwise

10   I can't get back to you until about three.  So why don't we

11   take a short break now.

12         MR. CHAMAS:  All right.

13         MR. ORLOWSKI:  Okay.  Sure.

14                          (Recess)

15         THE COURT:  All right.  Let's proceed.

16         MR. CHAMAS:  Thank you, Your Honor.

17                     CROSS EXAMINATION

18   BY MR. CHAMAS:

19   Q    Good afternoon, Mr. Leutbecher.

20   A    Hi, how are you?

21   Q    Good.  How are you doing?  You were only working at the

22   scale house about six months or so when this accident occurred?

23   A    Yeah.

24   Q    And you said your training dealing with how to weigh a

25   truck was kind of on the job?

1  A    Right.  Every truck inspector job there's one thing that

2  you're trained on that's universal, but every place you work

3  has a different type of scale, whether they have a scale or

4  not.  We happen to have a scale, so you learn on the job how to

5  use it.

6  Q    All right.  So at different places, different facilities

7  would have different procedures --

8  A    Sure.

9  Q    Now, you got there to the scale house that morning you

10  said it was a little before seven?

11  A    Right.

12  Q    And when you got there, there was a couple trucks in the

13  parking lot?

14  A    In the street, right.

15  Q    And they were just waiting for you guys?  Yes?

16  A    Correct, yes.

17  Q    You got out, you went into the building, you got a shovel,

18  you came out and you shoveled your side of the walkway, right?

19  A    Yeah, along the edge of the building to the -- just to

20  where our pickup truck was on the scale.

21  Q    And that's a walkway, that edge of the building that you

22  shoveled?

23  A    It's just the direct path, it's not a walkway.  There's no

24  walkways around that building.

25  Q    So, if there's no walkways, then anybody can walk

1  anywhere, basically, just to enter the building?

2  A    There's an apron at each door and that's pretty much it.

3  The driver's side has a railing because, like I said, at one

4  point before they had backfilled that area which was well

5  before my time there, there used to be a handicap ramp on that

6  side of the building.

7  Q    Okay.  But you're saying there's an apron on either side

8  and on the employee's side, the west side, that apron you

9  shoveled, correct?

10 A    Yeah, a portion of it.  Just, like I said, just a shovel's

11 width to the door of the -- just off -- you can see the same

12 place we always park the pickup truck is right there where

13 you're looking at it on the picture, on your P-33 picture.

14 Q    And then you shoveled back to where your truck was parked

15 and where Mr. Fitzgerald was going to ultimately park, correct?

16 A    Not quite that far, just a little bit, you know, just

17 until I hit like the dirt there and that would have been about

18 it, just off the apron.

19 Q    Okay.  And you did that to clear a path for walking,

20 correct?

21 A    Just -- not so much to clear a path, just to kind of keep

22 the inside of the building from getting all that snow tracked

23 into it.

24 Q    So you weren't concerned with anybody falling when you

25 shoveled, you were just concerned about the building getting

1  dirty?

2  A    Correct.

3  Q    It was your responsibility, yours and Mr. Fitzgerald's, to

4  clean around that building, correct?

5  A    I guess.  It wasn't really a written responsibility

6  anywhere.  It's just kind of a rule of thumb, you know, you

7  clean up your own area.

8  Q    Your -- the commander, the person in charge of the orders

9  department at that scale was at the time Commander Treddle?

10  A    Correct.

11  Q    And Commander Treddle testified in this case that you and

12  Mr. Fitzgerald were responsible for cleaning around the scale

13  house, for the snow and ice removal around the scale house.

14  You wouldn't disagree with that, would you?

15  A    No, I wouldn't disagree with that.

16  Q    But on that particular day, you were just concerned with

17  keeping snow out of the building?

18  A    There wasn't enough snow on the ground really.  I mean,

19  you know, prior snows we had already shoveled and cleared a

20  path and I made a path all the way to the street which the

21  drivers would have come up on.

22  Q    Well, how much did it snow?

23  A    Maybe an inch.

24  Q    All right, because earlier you testified it was a flurry.

25  So was it an inch, a flurry?

1  A    Overnight, yeah, it would have been flurrying overnight

2  and it would have been less than an inch of snow on the ground.

3  Q    Well --

4  A    I'm not a weather man.  I can't say how much snow is in a

5  flurry, but there was a little bit of snow.

6  Q    If the weather records for Freehold for that area show

7  that about two inches fell, you'd disagree with that?

8  A    I can show you in the pictures how much snow there is on

9  the ground and I can tell you that it was definitely under two

10  inches.  It was, I would have said, less than an inch.  Perfect

11  picture, Number 1.  Look at these pictures.  Look at Picture

12  Number 1.  You can see the depth of the snow with the tire

13  track.

14  Q    And you're saying that that's less than an inch, that's

15  just a flurry?

16  A    Yup.

17  Q    Now, this --

18  A    It's not even the depth of the tread on the tire.  I mean,

19  that's very little snow.

20  Q    What's not the depth of the tread on the tire?

21  A    The snow.  The snow is barely covering the tread at the

22  bottom of the tire there.  The tire still looks round.  You

23  follow what I'm saying?  It's not hidden in snow.

24  Q    Well, let's take a look at --

25          UNIDENTIFIED SPEAKER:  Oh, okay.

1   Q     This area back here, this is --

2   A     Okay.

3   Q     -- that's fresh snow, isn't it?

4   A     Yup.

5   Q     Okay.  So you're saying that that --

6              THE COURT:  Which area, by the tire?

7              THE WITNESS:  He's looking on the inside, yeah --

8              MR. CHAMAS:  Behind the tire.

9              THE WITNESS:  -- behind the tire.

10             THE COURT:  Yes, I see it.

11  Q     So it shows the truck tires which crushed the stone,

12  compacted the snow as it drove through and then we have that

13  snow area right there?

14  A     Right.

15  Q     Now, the week before, you said it snowed about four or

16  five inches?

17  A     Correct.

18  Q     And it was very cold that -- actually the whole January

19  was, correct?

20  A     It was cold.

21  Q     All right.  So the week before we were in the teens, maybe

22  getting out of the twenties?

23  A     I would have to look back.  I don't know.  It was cold.  I

24  mean, it was the winter.

25  Q     And the week before you said you shoveled a path on the

1  driver's door?

2  A     Right.

3  Q     Driver's side?

4  A     Mm-mm.

5  Q     And that path, you indicated, went --

6  A     Out at an angle, avoiding the curb, out to the street.

7  Q     All -- so, and just as opposed to going back, all the way

8  from the driver's door, all the way out --

9  A     To about there.

10 Q     -- to where the new pavement begins or ends, I should say?

11 A     That's correct.

12 Q     And that path is shown in Photograph 3 of P-8?

13 A     Right.

14 Q     So your path, as you indicated earlier and you drew us, it

15 would have came all the way out here and continued --

16 A     Well, you're out a little bit further.

17 Q     Okay.

18 A     Right in there.  Yup.

19 Q     Right in there.  And that path continued all the way?

20 A     Right.  Beyond the other side of the scale and down onto

21 the street.  Correct.

22 Q     Okay.  And what was the purpose of shoveling a path that

23 day?

24 A     When there was four or five inches of snow?

25 Q     Yeah.

1    A    To -- just to make a pathway so that the truck drivers

2    didn't have to trudge through, you know, five -- four, five

3    inches of snow.  Plus, at that point, you know, snow plows had

4    gone through and piled up even higher at the points where the,

5    you know, where the plow pushes the snow off.  So we, right

6    there at that curb, I would have dug through it.

7    Q    Well, you had the --

8    A    A mound --

9    Q    -- plow also made a mound across here, correct?

10   A    Correct.  And that's why you see that indentation there

11   because I had cut through that the week prior.

12   Q    Where is there an indentation?

13   A    Put your pointer back up there.  Right there is the

14   beginning of the mound and to the left is the other side of it.

15   Right there.  That's it.  Yup, you just traced it.

16   Q    Okay.  So you're saying that that mound ends there and

17   there's some kind of path that goes through?

18   A    Correct.  Right there, yes.  Right where you were tracing

19   with your pointer.

20   Q    And so anybody who went to that building from that side --

21   A    From the street.

22   Q    -- was required to go down that path?

23   A    Required as in -- you know, there weren't police lines.

24   But, I mean, if you were coming in off the street, you're going

25   to take the route of least resistance that would have been it.

 1  Yes.

 2                       (Pause)

 3  Q    After the accident, did you speak to Commander Treddle?

 4  A    I can't say whether I've spoken to him directly or not.

 5  Yeah, I'm sure we had spoken to him at the time, yeah.

 6  Q    Do you recall telling him that day that you shoveled a

 7  path on the driver's side --

 8  A    No.

 9  Q    -- that morning?

10  A    I wouldn't have done that.

11  Q    Do you know if Mr. Fitzgerald told Commander Treddle that

12  morning you shoveled the driver's side?

13  A    I don't believe so, but you'd have to ask Tom that to be

14  sure.

15  Q    This area here, before the time of accident, the snow

16  wasn't there, this would all be grass area?

17  A    No, it was gravel and there was grass there.  Yeah, grass

18  and gravel and --

19  Q    There wasn't a concrete slab that came out on an angle,

20  was there?

21  A    No, not really.  There was an apron which -- the apron

22  didn't change.  So if you put up a picture like that one there,

23  that apron hadn't changed.

24  Q    Okay.

25  A    That apron -- that cement -- they didn't do any cement

 1  work --

 2          THE COURT:  (Indiscernible) a cement apron around the

 3  door?

 4          THE WITNESS:  Around the driver's side door area?

 5          THE COURT:  Yes.

 6          THE WITNESS:  Yeah, they didn't do any cement work

 7  when they re-paved.  They just re-paved that.

 8          THE COURT:  Okay.

 9          THE WITNESS:  So that cement stayed the same.

10              (Attorney/attorney conversation)

11  Q    Showing you what's been marked as P-28 for identification.

12  A    Okay.

13  Q    Do you recognize that photograph?

14  A    I recognize the building, yeah.

15  Q    Does it clearly and accurately depict the building as it

16  existed back in January of '04?

17  A    Yup.

18  Q    And does it, aside from the new pavement, it clearly

19  represents that area?

20  A    Yes.

21          MR. CHAMAS:  All right.  Your Honor, I'd like to move

22  P-28 into evidence.

23          THE COURT:  All right.  Any objection?

24          MR. ORLOWSKI:  No, objection, Your Honor.

25          THE COURT:  In evidence.

1  Q    All right.  So what you were just telling us is that the

2  apron never changed?

3  A    Correct.

4  Q    So we have this pad here that went around and you believe

5  that as for handicapped --

6  A    Yeah, it was.

7  Q    And --

8  A    And Tom can speak more of that because he had been there

9  longer than I.

10  Q    And then you had this apron here that along the building,

11  which is the little --

12  A    It's just a -- yeah, the cement drip line of the building.

13  Q    All right.  So -- well, it's about four feet, a little

14  over four feet out from the building?

15  A    No.

16  Q    It's not?

17  A    No.

18  Q    How far -- how wide is it?

19  A    I've never measured it, but I -- it's not four feet.

20  Q    So if an engineer was out there and measured it to be four

21  feet, seven inches wide, you're saying that's wrong?

22  A    I would have to go out and measure it myself, but I would

23  definitely not think that that was four feet, seven inches

24  wide.  That's pretty wide.  You're telling me that that's --

25  no.

1  Q    Well, does -- is it wider than the hand rail that's along

2  this door?

3  A    No.

4  Q    It's not?

5  A    It's about the same, probably.  It's probably about the

6  same.  So, I was -- I would have guessed three feet, but maybe

7  it's four.

8  Q    All right.  Well, let's see if we can get a shot of --

9  A    But, being that there's a handrail blocking it, why would

10  that make it a walkway?

11          THE COURT:  Listen to the questions and answer the

12  questions --

13          THE WITNESS:  Yes, sir.

14          THE COURT:  -- and you can ask questions later if you

15  want to.

16          THE WITNESS:  Okay.

17  A    May -- I see in the picture it does look like it's wider

18  than the --

19  Q    I'm sorry?

20  A    I'm looking at the picture that you gave me, the P-28

21  picture, and it does look like it's just a tad wider than the

22  railing, which is probably a four foot railing.  So you're

23  probably right.  Probably four and a half feet.

24  Q    Okay.  The -- while we have P-20 up there, these two

25  cones, they weren't there at the time of the accident, right,

1  those orange cones?

2  A    No, sir.  They were not.

3  Q    And none of these blocks were there at the time of the

4  accident?

5  A    No.

6  Q    None of those wooden blocks were there?

7  A    Yeah, those are chocks.  No, they weren't there at the

8  time.

9  Q    Now, you didn't work weekends, right?

10 A    No, sir, we did not.

11 Q    So when you left on Friday, there was still the area

12 looked the way it did in those photographs with the exception

13 of the new snow that had fallen?

14 A    Correct.

15 Q    Now, earlier you said you shoveled out to the roadway --

16 to the curb, I'm sorry, because the curb was a tripping hazard?

17 A    Correct.

18 Q    You didn't want people to trip over it?

19 A    Right.

20 Q    Because you knew people were walking across that area to

21 get into the building?

22 A    Correct.

23 Q    And you also said that truck -- you know, when you were

24 asked about people being on the scale, you said that, well, the

25 only, you know, truckers walking across it outside of that,

1  correct?

2  A    If they came in the wrong way, which does happen

3  sometimes, they come in the employee door and we tell them you

4  have to go around and use the other door.  There's signs on

5  every window that points.  And so we'll redirect them, and then

6  they'll leave and walk across the scale, but they're not --

7  Q    Didn't you testify on direct testimony that people when

8  they leave the scale house if they're going to their truck,

9  they'll walk across the scale?

10 A    They do now because there's no curb there, yeah.

11 Q    So before --

12 A    Everybody will take the most direct route to their

13 vehicle.

14 Q    Okay.  What, I'm sorry, say that again?

15 A    Everybody would take the most direct route to their

16 vehicle.

17 Q    Okay.  Going back to Photograph 3, the snow in this area,

18 all the snow --

19 A    Right.

20 Q    -- in the area of the drivers, so that was very hard at

21 that point because, with the exception of the falling snow from

22 the night before, really hard because of the cold temperature,

23 correct?

24 A    I would say so, yeah.

25 Q    And then we had that new snow which looks anywhere from,

1  as you say, less than an inch to two inches on the ground?

2  A     Okay.

3                        (Pause)

4  Q     The -- I want to take -- you have the original photographs

5  up there?

6  A     I do.

7  Q     All right.  Now, when you left work on Friday, that path

8  that you shoveled out to the street, was that clear?  In other

9  words, could you see pavement or concrete or whatever was

10  underneath it?

11  A     Yes.

12  Q     Okay.  Take a look at Photograph Number 3.

13  A     Okay.

14  Q     All right.  What's that yellow thing in the middle of the

15  pole area?

16  A     It's -- that pole is to protect the well head.  It's to

17  keep trucks from driving up too close to it and a tire crushing

18  the head of the well which is very near it.  I believe it's

19  right behind it.

20  Q     And why would trucks be coming over there?

21  A     Because trucks would turn around all different kinds of

22  ways down there.

23  Q     So you have drivers coming from all different angles?

24  A     Well, at times, some drivers, you know, would turn harder

25  than others and some would pull up there and back up and then

1  try to get onto the scale that way.

2  Q    I mean, you were aware that drivers would be parking in

3  various areas along the parking lot area.  I don't want to call

4  it a road.

5  A    It's a road.  It's the street area and there's no real

6  parking per se.  They -- it's like pulling off the side of the

7  road is really all they do.

8  Q    Okay.  Now, I want to turn your attention now to

9  Photograph 6 and you pointed out to counsel on the record this

10  is the area where Ms. Brogna fell, correct?

11  A    Yes.

12  Q    And this right here, this yellow tape is caution tape?

13  A    Mm-mm.

14  Q    Yes?

15  A    Yeah.

16  Q    All right.  Going back to Photograph 3, there's a caution

17  tape on that pole there, too, right?

18  A    Correct.

19  Q    Now, that caution tape, it ran from that pole to that side

20  of the building before you left work on Friday, didn't it?

21  A    Negative.

22  Q    No?

23  A    No, that's accident tape.  That was done by the police.

24  Q    So it was done after the fact?

25  A    Correct.  We never had caution tape.  We wouldn't have any

1 use or -- we don't have it on hand.  It's not something that we

2 are given for work.

3 Q    Well, why would the police -- why did they caution off

4 this area?

5           MR. ORLOWSKI:  Objection, Your Honor, speculation.

6           THE COURT:  Sustained.

7 A    I wouldn't know, yeah.

8           THE COURT:  I sustained the objection.  You don't

9 need to speculate.

10 Q    The morning Ms. Brogna came in, there was another driver

11 at the same time?  You -- yeah, is that a yes?

12 A    Yes, I'm sorry.

13 Q    You testified on direct that you didn't get a chance to do

14 the other side?

15 A    Correct.

16 Q    All right.  Why was that?  And I when I say do the other

17 side, you didn't get a chance to shovel the other side?

18 A    Right.  I just hadn't -- normally, when -- in the morning

19 time, when we open the door, the drivers are there ready to

20 come in.  So you open the door and they just kind of come

21 floating in.

22 Q    Okay.  Well, how big was the flood this morning?

23 A    Two drivers.

24 Q    Okay.  Now, you also testified on direct that you get into

25 work, you go into the employee's --

1  A    Door.

2  Q    -- door and then you go -- and you keep the driver's door

3  locked until you're ready to start work, correct?

4  A    Correct.

5  Q    So you could have kept that door locked until you cleared

6  the other side, correct?

7  A    Not really.  I'd have to walk out that door which would

8  unlock it.

9  Q    Or you could have walked out that door and told the

10  drivers you're not ready, correct?  They would have had to have

11  listened to you?

12  A    I -- maybe I could have, yeah, sure.

13                         (Pause)

14  Q    When Mr. Brogna -- you said that Mr. Brogna pulled the

15  truck, the front of his truck came up by the first window on

16  the left there?  I'm sorry, on the right?

17  A    On the right?

18  Q    Correct?

19  A    Yes.

20  Q    Which would have put the driver's door right around here?

21  A    But the front end of a truck's a little longer than that,

22  probably a little bit further back, but, yeah.  Right around

23  the corner of the building.

24  Q    Okay.  Right around that area where Photograph 6 was taken

25  of?

1  A    Correct.  In Photograph 6, you can see the mud flap from

2  those.

3            THE COURT:  So the mud flap would be from --

4            THE WITNESS:  The front wheel.  It would have been

5  hanging off this -- the hood.

6            THE COURT:  From the drive axle?

7            THE WITNESS:  The steer axle.

8            THE COURT:  Steer axle, okay.

9            THE WITNESS:  Though, in this particular picture,

10  that would have been after the incident.  So, yeah, it would

11  have been from the back.

12            THE COURT:  Okay.  I understand.

13  Q    It would have been the back mud flap?

14  A    Yeah, that would have been -- yeah, because those pictures

15  were taken after the -- obviously, after the accident.

16  Q    All right.  You didn't see Ms. Brogna walk into the

17  building at any point?

18  A    I didn't see her until she came through the door, right.

19  Q    And you didn't see her leave after she left on the

20  different occasions, correct?

21  A    Correct.

22  Q    Did Mr. Brogna come into the building that morning?

23  A    Not that I recall.

24  Q    Do you know who Jay Ellis is?

25  A    Jay Ellis.  Not off the top of my head.  I believe it was

1  the other driver that relocated the truck after the incident.

2  Q    The driver, Mr. Ellis, worked for Land -- strike that.

3  Are you familiar with a company called LandStar?

4  A    Mm-mm.

5  Q    Yes?

6  A    Yes, LandStar Ranger.

7  Q    They deliver for the military, as well?

8  A    They do.

9  Q    Okay.  Now, Mr. Ellis testified that when he would weigh

10 his truck on the scale, his wife would actually come in and out

11 of the scale house getting the numbers from the employees

12 inside.  Do you recall him doing that at all?

13 A    No, I do not.

14 Q    Are you saying that Mr. Ellis is wrong, he's never -- that

15 his wife never did that?

16 A    I'm telling you the way -- I can tell you the way I weigh

17 a truck.  And, as I testified before, I would direct them on

18 the scale, I zero out the meter first.  I steer them on for

19 each axle, printing out in between each one.  I wouldn't give

20 them -- I wouldn't give a driver a set of weights for one axle

21 at a time.  It's doesn't make sense.  It would make it take

22 that much longer.  I would let them weigh the entire truck,

23 both drivers in the truck.  When they're done, they can come

24 inside and they get the scale ticket.

25 Q    Well, were you busy the morning of this accident?

1  A    Every morning at the scale house is a little bit busy when

2  you get the drivers waiting for you and you open the door and

3  it was a little bit busy.  Was it super busy?  No.

4  Q    And it was a little busy and it was cold out?

5  A    Right.

6  Q    So Ms. Brogna comes in and -- the second time and asks can

7  we weigh the truck?

8  A    Correct.

9  Q    And you said yes?

10 A    I said that's what the scale is for.

11 Q    That's what you said the scale is for, right.

12 A    Right.

13 Q    Basically, telling her, yes, you can weigh it, go ahead

14 and get on the scale, right?

15         MR. ORLOWSKI:  Objection, Your Honor.

16 A    I never said she could get on the scale.

17 Q    You didn't tell her she couldn't get on the scale, right?

18 A    No, I did not.

19 Q    Did you tell her what the procedure was?

20 A    No.

21 Q    Did you tell her that you got to wait until I go outside?

22 A    No.

23 Q    How would she have known that, then, if you didn't tell

24 her?

25 A    Probably -- I mean, that's --

1          MR. ORLOWSKI:  Objection, Your Honor, speculation.

2          THE COURT:  Sustained, speculative.

3          THE WITNESS:  Okay.

4          THE COURT:  So you said that's what the scale is for?

5          THE WITNESS:  All I told her was that's what the

6   scale was for and I would have gotten up at that point to zero

7   out the scale.

8   Q    Well, when you got -- when Ms. Brogna -- let's take a step

9   back.  Let's go to the very first time Ms. Brogna came into the

10  building.

11  A    Okay.

12  Q    You saw her parked along the side of the fence area,

13  correct?

14  A    Okay.  Right.

15  Q    And she came in and you processed her paperwork?

16  A    Correct.

17  Q    And how long did that take?

18  A    Usually paperwork takes 15, 20 minutes --

19  Q    All right.

20  A    -- at most.

21  Q    And, at that point, you gave her the paperwork and she

22  left?

23  A    Yup, you give her back their portion of the paperwork and

24  the map, the envelope with the map on it, and they go -- yeah,

25  they go up the road to go get their load, their trailer.

1  Q    They get their load and then they come back with the load?

2  A    Correct.

3  Q    All right.  But that wasn't the proper procedure, was it?

4  In other words, you weren't supposed to let her go and get the

5  load yet, were you?

6  A    Sure.

7  Q    Well, didn't you testify in deposition that the proper

8  procedure is to first check the headlights and the satellite --

9  A    Correct.

10  Q    -- and start the 626 before she leaves?

11  A    Correct.

12  Q    And she -- and you didn't do that on this occasion?

13  A    No, we did not.

14  Q    Okay.  So you just tell her -- and you didn't do it

15  because it's cold out and you figure I'll just do it when they

16  get back?

17  A    We'll do it when they get back and get the whole load

18  together, yeah.

19  Q    Okay.  Now, she comes back and you say that they pulled

20  right onto the scale, correct?

21  A    They came along that same route and they turned the truck

22  around and nosed onto the scale.

23  Q    Okay.  And you knew their nose was on the scale because

24  you could hear --

25  A    I could hear the truck.

1  Q     -- the tractor right outside your window?

2  A     Correct.

3  Q     If the nose was on the scale, you couldn't get a weight

4  for that first axle, right?

5  A     I couldn't be sure it was zeroed out.  I couldn't get a

6  proper weight, no.

7  Q     All right.  So if Ms. Brogna says that she came in -- if

8  Ms. Brogna's testimony is accurate that she came in and either

9  you or Mr. Fitzgerald gave her the weight on that first axle,

10 you would have had already to have zeroed out that scale before

11 she got on, correct?

12 A     Correct.

13 Q     Okay.  Now, you're in the building, you're sitting there,

14 you hear a tractor pull up next to your window and you know

15 it's on the scale.  The next thing you know is a woman walks in

16 the door and says can we weigh the scale and you say that's

17 what it's there for?

18 A     Correct.

19 Q     And she walks out.  And you just don't turn around and

20 say, well, wait a second, your nose of your tractor's on the

21 scale, we can't weigh it?

22 A     I would check that when I got up to zero out the scale.  I

23 would have noticed --

24 Q     But you already knew it was on the scale, didn't you?

25 A     I don't know exactly where the tires stopped.  Like I

1  said, I could see the headlights and I would have, you know --

2  she turned right around and walked out of the building.  I

3  wouldn't have had a chance to talk to the, you know, to --

4  Q    There was no chance to say anything in response except for

5  that's what the scale is for?

6  A    You mean could I have been politer?

7  Q    No.  Could you have said that's what the scale is for, but

8  you're on the scale, you got to get off it?

9  A    Yeah, I guess I could have said that, but I didn't --

10          THE COURT:  How do you know she was on the scale at

11  the time you said that?

12          THE WITNESS:  I -- like I said, I leaned back and I

13  could see the headlights of truck on the front of the scale.

14  Not every truck is the same.  I wouldn't have known exactly

15  where the front tires had stopped, but the nose of the truck

16  was forward, so --

17  Q    And you believed it to be on the scale?

18  A    I believed it to be on the scale, yes.

19  Q    But you just let her walk out anyway?

20  A    Right.  I'm not going to stop the truck driver from, you

21  know, from leaving the building.  I would have gone out of the

22  building and I wouldn't have given her a proper weight.  I

23  would have just came out, saw that the tires were on the scale

24  and backed her off.  I would have had to say you're going to

25  have to back up so that I can zero out the scale.

```
 1            THE COURT:  How would you do that?  You'd walk out --
 2            THE WITNESS:  I'd walk out the same door.
 3            THE COURT:  -- and tell the truck to go back?
 4            THE WITNESS:  Exactly.  Yes, sir.
 5    Q    Okay.  So you're inside, you're sitting there, a tractor
 6    pulls up, it pulls on what you believe at least to be on the
 7    scale.  A few seconds later somebody comes in.  How long after
 8    that tractor pulled onto that scale did she walk in?
 9    A    I don't know.  A few seconds.
10    Q    All right.  So a few seconds later a person walks into the
11    building and you knew it was from that tractor, right, I
12    mean --
13    A    Yup
14    Q    Okay.  So now you know --
15    A    Yeah, at that point the only tractor there, yes.
16    Q    It was the only tractor there.  So now you know that
17    there's a tractor on your scale.
18    A    Mm-mm.
19    Q    You're sitting at your desk.  A few seconds later a woman
20    comes in that came from that tractor and she would have had to
21    have walked right through the area where you say that it's not
22    a walkway, correct?
23    A    Correct.
24    Q    Okay.  So now she's inside.  She says to you can I weigh
25    the scale, can we weigh the truck?  You turn around and say
```

1  that's what it's there for and then you just let her leave?  So

2  you let her leave.  You didn't tell her you got to get off the

3  scale because it ain't going to be able to weigh it?  You

4  didn't tell her, by the way, don't walk across that area

5  because it's not safe to walk on, correct?

6  A    Correct.

7  Q    There's no warning sign telling people this is not a

8  walkway?

9  A    No.

10 Q    Okay.  There's no procedures written down anywhere that

11 says where you're supposed to walk and where you're not

12 supposed to walk, right?

13 A    Correct.

14 Q    Okay.  Now, she leaves the scale house, she gets back in

15 the truck, and the next thing you know they're moving forward?

16 A    I don't know that she got back in the truck.

17 Q    I'm sorry.  Okay.  She leaves the scale house --

18 A    And then I hear the truck go into gear.

19 Q    -- and then you hear the truck moving forward?

20 A    Correct.

21 Q    What other reason would that truck move forward on that

22 scale unless it was going to get another weight?

23        MR. ORLOWSKI:  Objection, Your Honor, speculation.

24        THE COURT:  Sustained.

25        MR. CHAMAS:  I'm asking what are the reasons it could

1  be from this witness, Judge.

2           THE WITNESS:  It would have been incorrect.

3           MR. CHAMAS:  Okay.

4           THE COURT:  It sounds speculative as to what was on

5  the mind of the driver.  I'll sustain the objection.

6  Q    Well, let's take your scenario.  The front of the truck is

7  on the scale, the driver comes in -- the passenger comes in and

8  asks if they can weigh the scale, the passenger -- you tell

9  her, that's what it's there for, the passenger leaves.  The

10 next thing you know the tractor is moving forward.  He couldn't

11 have gotten any kind of weight on that scale at that point,

12 could he?

13 A    No.

14 Q    All right.  So there would be absolutely no reason in the

15 world for that man to move that truck forward, would there --

16 A    No.

17 Q    -- unless somebody told him to move it forward?

18 A    Correct.

19 Q    Okay.  The actual weighing of the vehicle has got nothing

20 to do with the Government.  In other words, you guys can care

21 less if they weigh the truck or not, right?

22 A    We have -- we can't -- we're responsible to make sure that

23 the load leaving us isn't too heavy for the road.  We do have

24 DOT rules and regulations.  CFR 49 requires us to make sure

25 that the truck is under, you know, within legal limits before

1   it leaves with our load.

2   Q    But you don't -- in other words, the only time you guys

3   will weigh a truck is if the truck driver asks?

4   A    It's a courtesy, yes.

5   Q    Okay.  So you don't care one way or the other if they

6   don't ask you to weigh their load?

7   A    Right.

8   Q    In other words, if a driver comes in and you're processing

9   the paperwork, you're checking everything else, his headlights,

10  his brakes, et cetera, but he doesn't ask you to weigh the

11  load, you're not going to say, wait a second, you got to weigh

12  the load, right?

13  A    Right.

14  Q    Okay.  So that's just up to them.

15  A    Correct.  It's a courtesy.

16  Q    It's a courtesy.  And on this particular day, somebody was

17  asking to weigh the load on a very cold day, correct?

18  A    Correct.

19  Q    Now, after the accident, you -- after the accident, the

20  emergency personnel came, correct?

21  A    Correct.

22  Q    There was people all over the place walking around?

23  A    Right.

24  Q    You gave a statement to the investigating officers,

25  correct?

1  A    I did.

2  Q    Now, the statement you gave --

3            MR. CHAMAS:  And I'm referring to P-1, Your Honor,

4  P-1.

5            THE COURT:  P-1.  All right.

6            MR. CHAMAS:  Page 3 of 4.

7            THE COURT:  Okay.

8            MR. CHAMAS:  Your Honor, P-1 is in evidence with the

9  exception of, obviously, this statement concerning my client.

10            THE COURT:  All right.

11  Q    Now, when -- the statement you gave to the investigating

12  officer was that at approximately 8:15 V. Brogna, meaning

13  Victim Brogna, came inside the scale house driver's door to ask

14  if they could weigh the -- could get weighed, I'm sorry.

15  Witness Leutbecher -- that would be you, correct --

16  A    Okay.

17  Q    -- said he told Victim Brogna, yes, and she went back

18  outside to let Witness Brogna know to move the trailer onto the

19  scale, correct?  That's what you said?

20  A    That's not -- that's my statement you're reading?

21  Q    I'm reading from the investigative report.

22            THE COURT:  Well, this is --

23            THE WITNESS:  Oh --

24            THE COURT:  -- what the investigator --

25            THE WITNESS:  -- okay.

1          THE COURT:  -- said she said.  This isn't what you

2    said.  This is what the investigative report says.

3          THE WITNESS:  Okay.

4    Q    That's what you told the investigating officer?

5    A    I told him that he -- that she had left the building to

6    tell her husband to move the trailer?

7    Q    Yes.

8          THE COURT:  Do you remember saying that to the

9    investigator?

10         THE WITNESS:  I don't remember saying that in those

11   words, no.  I wouldn't -- again, that's --

12         THE COURT:  Okay.

13         THE WITNESS:  -- incorrect.  I wouldn't have them

14   move the trailer until I'm out there.

15   Q    So what the investigator wrote down that you told her you

16   said is wrong?

17   A    If -- could you read it, again?

18   Q    Sure.  Witness Leutbecher stated at approximately 8:15

19   Victim Brogna came inside the scale house driver's door to ask

20   if their trailer could get weighed.  Witness Leutbecher said he

21   told Victim Brogna yes and she went back outside to let Witness

22   Brogna know to move the trailer on the scale.  You're saying

23   you didn't tell that to the investigating officer?

24   A    I'm saying that they added to it because I didn't tell

25   them that they -- that I told her to go out and tell her

1  co-driver to move that truck onto the scale.  That's maybe an

2  assumption that they're making.

3                          (Pause)

4  Q    Now, you also testified on direct that you had Ice Melt in

5  the building?

6  A    Mm-mm.

7  Q    And that you would use a coffee can and you would go out

8  and you'd throw the coffee can -- you would use the coffee can

9  to spread Ice Melt on the driver's door, the passenger's -- I'm

10 sorry, the driver's door, the employee's door and the scale,

11 correct?

12 A    Right.  Correct.

13 Q    All right.  And you're throwing ice on the scale because

14 there's going to be people walking in that area at some point,

15 correct?

16 A    Yeah, we'll it's -- usually it's -- on the scale itself

17 it's not so much for pedestrian traffic, it's to get the ice

18 and snow off the scale so it's giving me a more accurate

19 reading.

20 Q    Well, you're saying mostly, but you're aware that people

21 are going to be walking on that scale and you're throwing ice

22 down there to make sure that --

23 A    Ice Melt, right.

24 Q    -- they can walk safely, correct, because you don't want

25 anyone to fall, do you?

1  A     No, of course not.

2  Q     On direct you said that the curb went a few feet past the

3  end of the scale on either side?

4  A     Correct.

5  Q     All right.  So that curb was -- I just want to -- I'm not

6  -- I just want to make sure what we're talking about.  So the

7  scale ends right around the tire --

8  A     Correct.

9  Q     -- the back tire of the truck in P-33?

10  A     Mm-mm.

11  Q     So it would be a couple feet that way, and then it ends

12  here so it would be a couple feet this way?

13  A     Right.

14  Q     And then the end of the scale to the building is about two

15  feet, correct, a couple feet?

16  A     If you're telling me that, I, you know, I don't know.  I'd

17  say less, but a foot or two, yeah.

18                          (Pause)

19  Q     I just want to turn to this.  You said that this four-foot

20  slab -- this four-foot -- I'm going to call it a walkway.

21  A     Okay.

22  Q     But four-foot piece of concrete that goes along the side

23  of the building up into the driver's door, you're saying that's

24  not a designated walkway?

25  A     No, it's not.

1   Q    Is there any sign that says it's not a designated walkway?

2   A    No.

3   Q    I mean, if I were coming there for the first time, is

4   there any reason why I wouldn't think that I can walk on there?

5   A    You'd be walking into a railing, number one.

6   Q    Well, the railing doesn't come all the way out, correct?

7   A    The railing is the -- is just shy of the width of that

8   walk, judging by the picture.  And at that particular time when

9   it was snowing, you wouldn't have seen the walkway anyway.

10  Q    Right.

11  A    There was snow on the ground.

12  Q    Right.  But if you had shoveled that piece of concrete

13  there and cleared it off, you would actually have seen it,

14  correct?

15  A    If I would have shoveled it and it would have been a

16  walkway, but I didn't.

17                        (Pause)

18  Q    The -- you came out after you heard the screaming,

19  correct?

20  A    Correct.

21  Q    And waved your arms?

22  A    I did.

23  Q    And it appeared to you that the driver of that truck was

24  putting it in reverse --

25  A    Correct.

1  Q    -- because he was doing what you wanted him to do, right?

2  A    Well, I was directing him to stop and he would -- I can

3  only guess what he was thinking.  I can't tell you.

4  Q    But he appeared to put it in reverse and then you opened

5  the -- you went around the passenger side, you opened the door

6  and told him to shut off the truck?

7  A    Correct.

8  Q    When you got underneath the truck, you observed that Ms.

9  Brogna's rear end was actually hooked to a bolt, the u-bolt?

10  A    Hanger bolts, right.

11  Q    Hanger bolt?

12  A    Right.

13  Q    She was actually hanging by there?

14  A    I don't know if she was hanging by it so much, but it was

15  kind of dug into her, you know what I mean.

16  Q    I think you described to the investigating officers you

17  saw meat and --

18  A    Yes, flesh and --

19  Q    Flesh?

20  A    Right.

21  Q    She was in a lot of pain at that point?

22  A    I would assume so, yeah.

23                          (Pause)

24  Q    If, in fact, Ms. Brogna's testimony is correct that when

25  she came in someone had given her the weight of that front

1  axle, the next step would have been to move that truck forward,

2  correct?

3  A    Correct.

4        MR. CHAMAS:  One second, Your Honor.

5                    (Pause)

6  Q    Is it your understanding that the ice and snow was what

7  caused Ms. Brogna to fall?

8        MR. ORLOWSKI:  Objection, Your Honor, speculation.

9        THE COURT:  Sustained.

10 Q    You indicated earlier that on the record you never walked

11 out that side that morning so you were saying that you did the

12 path the week before, but you have no idea what it looked like

13 that morning --

14 A    Right.

15 Q    -- when you got to work, right?

16 A    Right.

17 Q    You never walked through that door or around the

18 employee's door, down the front of the building to that side of

19 the building at all at any of the area where the drivers would

20 enter, correct?

21 A    Right.

22        MR. CHAMAS:  Nothing further, Your Honor.

23        THE COURT:  All right.  Any redirect?

24        MR. ORLOWSKI:  No redirect, Your Honor.

25        THE COURT:  You may step down.  Thank you.  Call your

1   next witness, please.

2           MR. ORLOWSKI:  Your Honor, United States calls Tom

3   Fitzgerald.

4                           (Pause)

5           THE COURT:  Mr. Fitzgerald, come forward.

6           THE CLERK:  Step up, please.  Left hand on the Bible,

7   raise your right.

8           THOMAS FITZGERALD, DEFENDANT'S WITNESS, SWORN

9           THE CLERK:  Please state your full name for the

10  record and spell your last.

11          THE WITNESS:  Thomas Fitzgerald, F-i-t-z-g-e-r-a-l-d.

12          THE COURT:  All right.  Mr. Orlowski, proceed.

13          MR. ORLOWSKI:  Thank you, Your Honor.

14                      DIRECT EXAMINATION

15  BY MR. ORLOWSKI:

16  Q    Good afternoon, Mr. Fitzgerald.

17  A    How are you -- hello.

18  Q    Who do you work for?

19  A    Naval Weapons Station Earle, Colts Neck, New Jersey, the

20  Navy, Department of Defense.

21  Q    Okay.  What's your position there?

22  A    Traffic management specialist.

23  Q    Okay.  Now, how long have you been a traffic management

24  specialist?

25  A    Be 20 years this August.

1  Q    Have you always been in that position at Naval Weapons

2  Station Earle?

3  A    Yeah, I've been in the same position, but it's had

4  different titles.  It's changed titles, but same job.

5  Q    So directing your attention to January 2004, you were a

6  traffic management specialist at the scale house that day?

7  A    Correct.

8  Q    Now, do you receive training to be a traffic management

9  specialist?

10  A    Yes.

11  Q    What kind of training did you receive?

12  A    We receive training in hazardous material handling.  We

13  have some safety training on base.  We have shipment -- air

14  shipment type training for sending shipments overseas.  And the

15  basic truck inspection school we go to.

16  Q    Now, you worked at the scale house on January 26, 2004,

17  correct?

18  A    Yeah.

19  Q    What time did you typically start work there?

20  A    6:30 to 7:00, you know, 6:30, quarter to seven.

21  Q    Okay.  Who did you work with at the scale house?

22  A    Well, a couple of people in the traffic management, but

23  that day I was working with Ralph.

24  Q    He was the only other employee that day?

25  A    That day, yeah.

1  Q    Now, that day, do you remember if there was snow on the
2  ground at all?
3  A    Oh, yeah, there was fresh snow.
4  Q    Okay.  Had it also snowed the week prior?
5  A    A few times.
6  Q    And when you say fresh snow, do you recall when it was
7  snowing?
8  A    That was a Monday morning.  I believe it snowed Sunday
9  night about an inch.
10 Q    And on that particular day, what time did you arrive at
11 work?
12 A    I don't really watch my time in and out, but I'd probably
13 say I was in the quarter to, 20 minutes to seven.
14 Q    Was anyone present when you arrived at work?
15 A    Ralph was there.
16 Q    Okay.  Did you typically arrive before or after Ralph?
17 A    Usually he's there.  He's early.
18 Q    Now, what did you first do when arrived at the scale
19 house?
20 A    I went inside.  You know, I parked my car in my normal
21 spot and I went inside.  I turned on -- I probably turned on my
22 computer and started checking my e-mails, basically.
23 Q    At any point did you open the driver's door?
24 A    I think I did, yeah.  I think we opened it up to let the
25 drivers to come in.

1  Q    Okay.  What did you do when you opened the driver's door?

2  A    Probably just opened it.  I think I opened it and cleared

3  the snow because the door is level at that area, so when you

4  open the door, you -- if you don't clear the snow that's in the

5  immediate area, the door won't shut.  So I probably just

6  cleared that area.  I think I put some salt down and went back

7  inside the building.

8  Q    Now, do you know if a path was shoveled from the driver's

9  door out to the street from the previously fallen snow?

10 A    Yeah, I do.

11           MR. CHAMAS:  Judge, objection.

12           THE COURT:  Yes?

13           MR. CHAMAS:  Leading the witness.  I mean, like --

14           THE COURT:  Well, do you have any knowledge

15 concerning the path on the driver's side (indiscernible)?

16           THE WITNESS:  Do I have knowledge of a path?

17           THE COURT:  Yes.

18           THE WITNESS:  Yes, there was an established walkway

19 we had been using from the previous snows.

20 Q    Do you recall who shoveled that path?

21 A    It was done as needed.  You know, it wasn't necessarily

22 any one person.

23 Q    I'm going to show you P-8 in evidence.  Does that picture

24 represent the way the scale house looked on the day of the

25 incident other than the markings we made on it?

Fitzgerald - Direct                      162

1  A    Yeah.  Yes, it -- yeah.

2  Q    Now, do you see the markings that appear to have been made

3  in pen from the --

4  A    Right.

5  Q    -- right side?

6  A    Right.

7  Q    Is that the approximate area of where the path was on the

8  day of the incident?

9  A    Approximately.  I would say it was more away from the

10  scale house.  The area they have, like, where it comes down I

11  would say it sloped out further.

12  Q    Okay.  So you're saying that more of an angle, more --

13  A    More -- yeah, more down towards the bottom.

14  Q    Rounded or is it --

15  A    No, it was basically straight.  It was more of a straight

16  -- in other words, where it starts up there at the top and then

17  it curves off, it didn't curve off.  It would have went

18  straight out.

19  Q    Okay.  Now, was there any freshly fallen snow on that path

20  on the day of the incident?

21  A    Yes.

22  Q    How much snow would you say there was?

23  A    Approximately an inch, I would say.

24  Q    Was the path still clearly visible?

25  A    Yeah.

1  Q     You could tell there was a path there?

2  A     Yes.

3  Q     Now, do you know Ms. Brogna's truck was the first time she

4  came into the scale house?  Do you know where it was parked?

5  A     In the street, obviously, but I'm not sure if it was

6  across the street or on this side of the street.

7  Q     Did you see where she walked when she came in?

8  A     No.

9  Q     Do you know if she used the path?

10 A     I can't be sure.

11 Q     Now, the pathway on that picture appears to come out at an

12 angle, correct?

13 A     Right.

14 Q     What is your --

15        MR. CHAMAS:  I'm sorry.  Which pathway are we

16 referring to?

17        MR. ORLOWSKI:  The pathway that's -- the marked

18 pathway -- the one that's --

19        THE COURT:  The marked path, the marked.

20        MR. ORLOWSKI:  -- been marked on the picture.

21        MR. CHAMAS:  Okay.

22 Q     And it appears to come out at an angle, right?

23 A     Right.

24 Q     What is your understanding of why it comes out at an

25 angle?

1   A    Well, during the winter when they plow the scale, they

2   would build snow mounds on both sides and then they would push

3   the snow off towards this yellow pole which would be a snow

4   mound and that would be the lowest part in the mound where we

5   could get a path through it.  So that's where we would

6   establish our path as if closer to the building it was --

7   Q    Now, looking at the path, and the edge of the pathway as

8   it comes out from the building to where the scale would be.

9   Approximately how far would you estimate from the corner of the

10  building the, I guess, the western edge of this pathway would

11  have been?

12          MR. CHAMAS:  Your Honor, I just note my objection.

13  He's pointing to an area in the photograph saying this pathway,

14  but the witness already testified that that's not where the

15  pathway was.

16          THE COURT:  Well, let's let the witness tell us.  Ask

17  the question and let the witness tell us.

18  Q    You testified that there was a pathway through the snow

19  and --

20  A    Right.

21  Q    -- correct?  How far did the west -- how far was it

22  approximately from the edge of the building to the western edge

23  of the pathway?

24  A    I would say from where I'm sitting to the edge of the

25  judge's desk area here.  Probably what would that be, 20 feet,

1 | 25 feet maybe?

2 | Q    You would note that -- you're saying to the edge of the

3 | judge's desk?

4 | A    To this other corner here to where, yeah.

5 | Q    So I would estimate --

6 |            THE COURT:  That corner there?

7 |            THE WITNESS:  That -- right.  How far would that be,

8 | 25 feet from -- I'm saying -- I'm trying to imagine myself --

9 |            THE COURT:  (Indiscernible).

10 |            THE WITNESS:  You know, I'm trying to imagine myself

11 | standing in the doorway and you would come out.  A little

12 | short, yeah.  What is this, 20 feet?

13 |            THE COURT:  I guess we can measure it.  Do we want to

14 | measure it?

15 |            UNIDENTIFIED ATTORNEY:  Can we agree how wide that

16 | is?

17 |            THE COURT:  Well, maybe some --

18 |            UNIDENTIFIED ATTORNEY:  I would say it's --

19 |            THE WITNESS:  It's hard to judge the distance, but --

20 |            THE COURT:  Right.  But I would think so.  I mean,

21 | maybe she can measure it because it doesn't look like 20 feet

22 | to me.  I mean, a bench is not that big.

23 |            THE WITNESS:  Maybe from here to there, whatever that

24 | distance would be.

25 |            UNIDENTIFIED ATTORNEY:  Here to -- I'm sorry, here to

1  where?

2            THE WITNESS:  It's difficult to judge that.

3            THE COURT:  I'll measure it if you want to.

4            MR. ORLOWSKI:  Yes, Your Honor, is we could.

5            THE COURT:  It looks to me like about 10 or 12 feet.

6            MR. ORLOWSKI:  If we could.

7            THE COURT:  Let's measure it then, okay?  If I've got

8  a 20-foot bench, I'd like to know about it.

9            THE WITNESS:  Well, it's 15 feet, whatever that

10 distance is.

11                         (Tape off)

12           THE COURT:  It's about, let's see, the bench is about

13 10 feet, so --

14           THE WITNESS:  That's all?

15           THE COURT:  That's all it is, yeah.  So, I mean, I

16 don't know if that helps anybody.  This wide here is 10 feet.

17           THE WITNESS:  So then I'd say about 12 to 15 feet

18 then.

19           THE COURT:  Okay.

20           THE WITNESS:  It seemed longer, wider.

21 Q    Mr. Fitzgerald, do you recall when Ms. Brogna came back

22 into the scale house after she picked up her trailer?

23 A    After she -- yeah.  Yes, I do.  Yeah.

24 Q    And what happened when she came back into the scale house?

25 A    She came in and she asked if she could have her tractor

1  trailer weighed.

2  Q    And did you respond at that point?

3  A    No.

4  Q    Did somebody else respond?

5  A    Ralph did.

6  Q    What did Ralph say?

7  A    Ralph said that's what it's there for or yes, that's what

8  it's for, something along those lines.

9  Q    Did Ms. Brogna say anything else to you or Ralph at that

10 point?

11 A    No.

12 Q    Did she ask for permission to pull the truck on the scale?

13 A    It was already on.  The front of the truck was already on

14 the scale.

15 Q    Okay.  Did you say anything back to her at that point?

16 A    No.

17 Q    How did you know that her truck was on the scale?

18 A    My window is right there and I could see outside my window

19 and that's where it was.  It was right there.

20 Q    And what did she do then?

21 A    She left the building and went outside.

22 Q    And when she left the building, what did you do?

23 A    I started to get up.  I clicked off the site I was on.  I

24 started to get up because I was going to go to the other side

25 of the building where you would have to go to weigh a truck,

1  and a couple seconds, maybe 15 to 20 seconds, the truck was

2  moving.

3  Q    Okay.  And what happened when -- what did you do when the

4  truck started moving?

5  A    Well, I heard this noise and if the Court -- if you look

6  at the photograph, you can see how close a tractor trailer will

7  come to that corner.

8           THE COURT:  Yes, I see it.

9  A    And I thought that she was actually -- that the driver was

10  actually tearing that aluminum off the side of the building

11  because it happened before.  So I yelled --

12           THE COURT:  You've got a gutter there, I see --

13           THE WITNESS:  Right.

14           THE COURT:  -- on the building which would be

15  aluminum --

16           THE WITNESS:  Right.

17           THE COURT:  -- and I guess the truck is higher than

18  the gutter?

19           THE WITNESS:  Right.  And it clears it by about a

20  foot.

21           THE COURT:  (Indiscernible).

22           THE WITNESS:  Yeah.

23           THE COURT:  Okay.

24           THE WITNESS:  Yeah.  If you're too far over, you'll

25  take that down.  So I heard this noise that sounded like a

1  screeching to me.  So I thought that's what it was.  And I said

2  to Ralph, I says he's hitting the building.  First I said,

3  what's he doing and then I heard the noise because he was

4  moving.  And then I heard the screeching noise and I said I

5  think he's hitting the damn building.  And Ralph said, no, he's

6  hitting her.  That's when we both realized what was going on.

7  We ran out the opposite side of the building to try to stop him

8  from driving any further.

9  Q    And after you ran outside the -- which door did you --

10 A    The opposite side of what you're looking at here.

11 Q    So you ran out the employee door?

12 A    Right.

13 Q    And what did you do then?

14 A    We used visual signs, you know, to stop driving.  Well,

15 stop your truck.

16 Q    And did Ralph go to the driver --

17        MR. CHAMAS:  Objection, leading, Your Honor.

18        THE COURT:  What did Ralph do?

19 Q    What did Ralph do?

20 A    Ralph did -- first, when he did stop, he seemed like he --

21 he misunderstood us.  He was going to -- he looked like he

22 shifted to go back and that's when Ralph ran over and opened

23 his door and started yelling at him to shut his truck off.  His

24 wife was under the truck.

25 Q    And what did you do at that point?

 1  A     At that time, I was standing in the front of the truck,

 2  basically frozen, but watching her and watching what was going

 3  on.

 4  Q     And did you go anywhere at any point after that?

 5  A     Well, once I saw what the situation was, I went back

 6  inside the building and started making phone calls.  I knew I

 7  had to get somebody over to help us.

 8  Q     Okay.  Who did you call?

 9  A     First thing I called was the fire department.  Well, it's

10  the -- to 911 and they told him -- I told him get everybody

11  over here.  We got a problem.

12  Q     Did first responders come to the scene at some point?

13  A     Immediately, yeah.

14  Q     Approximately how long after you made the 911 call would

15  you say they responded to the scene?

16  A     Five to ten minutes.

17  Q     At any point did you survey the scene after the first

18  responders got there?

19  A     What do you mean?

20  Q     Did you look under the truck at any point?

21  A     Yeah, basically.  Well, the phone calls were coming pretty

22  fast and furious after that.  I went back out to make -- see if

23  there was anything that I could do and then the phone was

24  ringing.  I went back inside.  By the time they came, we

25  stepped aside.  No, I stepped aside and let them -- it was

 1  pretty crowded under there.

 2  Q    Did you look under the truck to see if Ms. Brogna had been

 3  dragged?

 4           MR. CHAMAS:  Object to the leading nature, Your

 5  Honor.

 6           THE COURT:  Did you look under the truck?

 7           THE WITNESS:  Not at that time when -- after they

 8  cleared it up I noticed how it had happened.

 9           THE COURT:  Okay.

10  Q    When you looked under the truck, were you able to tell

11  how far, if at all, Ms. Brogna had been dragged?

12           MR. CHAMAS:  Your Honor --

13           THE COURT:  When you looked under the truck, what did

14  you see?

15           THE WITNESS:  You could see the scrape marks on the

16  snow.  You could see, basically, footprints entering the area

17  where she would have been if she got in that area and where she

18  had stopped.  There was some blood stains, too.

19           THE COURT:  You saw scape marks, you say.  How long

20  were the scrape marks?

21           THE WITNESS:  Again, the distance of probably what

22  your desk is, probably a little less this time.  Maybe about --

23  if that's 15 --

24           THE COURT:  We know that's about ten feet.

25           THE WITNESS:  -- I would say maybe ten to eight feet.

1             THE COURT:  Okay.

2  Q    And where did the scrape marks start?

3  A    Practically at the corner of the building, a little bit

4  further -- a little bit -- well, if you're looking at the

5  picture, a little east.  That would be east coming this way.  A

6  little east of that.

7             THE COURT:  Well, let's see.  Here we got the

8  building.

9             THE WITNESS:  Okay.

10            THE COURT:  And where do you say the scrape marks

11 were?  I mean here -- this is the end of the building

12 directly --

13            THE WITNESS:  Right.  I would -- back where the

14 asphalt starts, Your Honor, a little bit further back.  No, to

15 your right.

16            THE COURT:  Here?

17            THE WITNESS:  A little more to your right.

18            THE COURT:  Okay.

19            THE WITNESS:  More.  A little more even.

20            THE COURT:  Right there at the corner of the

21 building?

22            THE WITNESS:  Maybe in that general area.  In that --

23 within a foot or two one way or the other in that -- by that

24 corner.

25            THE COURT:  Right by the corner of the building?

1            THE WITNESS:  Maybe even a little bit more to the

2   right.

3            THE COURT:  Okay.  And where did they end?

4            THE WITNESS:  Excuse me?

5            THE COURT:  Where did they end?

6            THE WITNESS:  Approximately under that first window

7   to the right, the right side of that window, approximately

8   there.

9            THE COURT:  The first window?

10           THE WITNESS:  About, yeah, about eight feet from

11  where it started.  The first window, yes.

12           THE COURT:  Okay.

13           THE WITNESS:  About three to four feet onto the

14  scale.

15           THE COURT:  All right.

16           MR. ORLOWSKI:  That's all I have.  Thank you.

17           THE COURT:  Okay.  Anything else?

18           MR. CHAMAS:  Yeah, cross, Your Honor.

19                         CROSS EXAMINATION

20  BY MR. CHAMAS:

21  Q   Mr. Leutbecher -- I'm sorry -- Mr. Fitzgerald, sorry about

22  that.  Good afternoon.  You've worked at the Earle Weapons

23  Station base for 20 years, you said?

24  A   Yeah, 20 years August.

25  Q   And how long have you worked in that scale house?

1  A    I worked -- that's -- that building is a new building, but

2  I worked in that area at the scale, it's a different building,

3  all that time.

4  Q    Drivers come in.  You're, basically, telling them what to

5  do and what not to do, correct?

6  A    Correct.

7  Q    They have to listen to you?

8  A    Yeah.

9  Q    If they don't listen to you, they don't come back on the

10 base?

11 A    No, I wouldn't necessarily say that, no.

12 Q    But you're in charge, basically?

13 A    We try to guide them so they can get through it.

14 Q    On the morning of this accident, you got to work around

15 seven?

16 A    A little earlier.

17 Q    Okay.  Mr. Fitzgerald had already been there?

18 A    I'm Mr. Fitzgerald.

19 Q    I did it again.

20 A    That's all right.

21 Q    Mr. Leutbecher had already been there?

22 A    Right.

23 Q    Okay.  He shoveled a pathway from your truck to the -- or

24 from the parking area on your side of the building, the west

25 side, employee's side, to the door, correct?

1   A      I guess he did, yeah.

2   Q      And then he --

3   A      It's only about a six foot, from where I park, six foot

4   from the building.

5   Q      But he shoveled whatever snow had fallen out of the way,

6   correct?

7   A      He did, yeah.

8   Q      And then he shoveled a path from the employee door right

9   through -- past the -- to the scale, correct?

10  A      I believe he did, yeah, a shovel width.

11  Q      I'm sorry?

12  A      A shovel width.

13  Q      It was just a shovel width?

14  A      I'm sorry?

15  Q      Showing you P-8 for identification -- I'm sorry -- in

16  evidence.  The bottom photograph, Number 5, that is -- that's

17  the employee side, correct?

18  A      Yup.

19  Q      All right.  Now, that's the truck -- the photographs that

20  were taken post-accident, correct?

21  A      Yeah.

22  Q      Right after that.  They were done by the investigating

23  police from the base?

24  A      I would imagine.

25  Q      Okay.  And that's the area he shoveled, the shovel width,

1  was from your truck -- from your parking area to the door?

2  A    I guess so.  I can't -- I wouldn't -- I don't remember it

3  being there.

4  Q    All right.  Well, does that photograph accurately depict

5  the way it looked that morning, your side of the building, the

6  employee's side?

7  A    Yeah, that's the way it looks, yeah.

8  Q    So -- and that -- the scale house, the two of you, you and

9  Mr. Leutbecher were responsible for clearing snow and ice

10 around the building, correct?

11 A    Are we responsible for it?  Yeah, when it becomes an

12 issue.  Yeah, we would clean it up.

13 Q    And that morning you said you opened the driver's door and

14 you put down a little Ice Melt?

15 A    Similar to that, right.

16 Q    Okay.

17 A    That's what that is, I believe, Ice Melt.

18 Q    So that's not shoveled, that's just from Ice Melt outside?

19 A    Well, it's hard to tell when that photograph was taken.

20 By this time, probably 30 people had come and gone through that

21 door.

22         THE COURT:  Is this of the employee's door or is

23 it --

24         THE WITNESS:  That's the employee's side, Your Honor.

25         THE COURT:  This is the employee's door.  So you're

1  talking about the driver's door?

2           MR. CHAMAS:  Well, he said --

3           THE COURT:  You're confusing me.

4           MR. CHAMAS:  I'm sorry, Your Honor.

5           THE COURT:  Because you asked him if he put down Ice

6  Melt on the driver's door, but then you show me a picture of

7  the employee's.

8           MR. CHAMAS:  Well, before I was asking about the

9  employee's door.  Now, I'm asking about the driver's door.

10          THE COURT:  That's not the driver's door that you've

11 got there.

12          MR. CHAMAS:  No, it's not, so I'll take it down.  The

13 driver's -- let's put up the driver's door.

14          THE COURT:  All right.  That's the driver's door.

15          MR. CHAMAS:  That's the driver's door.

16          THE WITNESS:  Right.

17 Q    And you put down a little bit of salt around that door?

18 A    Looks that way, yeah.

19 Q    And that's all you did?  You didn't put it down anywhere

20 else on that area, correct?

21 A    No.

22 Q    And you didn't shovel any of that area?

23 A    No.

24 Q    This pathway that you say was there, you indicate that the

25 pathway is not as drawn here?

1  A    It's close to it.  It's very close.  That's hard to tell

2  exactly it's angle.  But I would say it was lower, a little bit

3  lower, yeah.

4  Q    When you say lower, you're talking about toward the bottom

5  of the photograph?

6  A    Right.  Only by the width of what you're showing there.

7  Maybe another -- come down an inch or two.

8  Q    All right.  What I'd like you to do is draw that for us.

9  A    This way?

10  Q    Yeah.

11                           (Pause)

12  Q    All right.  What I'd like you to do is just put your

13  initials in the middle of it so we know that that's where you

14  say the path was.  Thank you.

15  A    Well, this angle gives you a, you know, hard to tell what

16  I'm looking at, to be honest with you.

17  Q    Well, did that -- where did that path end, that shoveled

18  path?

19  A    It was this pile of snow, like I tried to explain.  The

20  snow plow would come out in the morning.  They would push the

21  snow up.  We would dig an opening in it.  That's what this is.

22  They -- this picture might even be taken from that area.  It

23  might be standing -- actually standing in the opening to take

24  the photograph.  I -- it's hard to judge if it's, you know, if

25  they're going -- looking this way or this way at that

1 | photograph, how high you would standing when you took that
2 | photograph.
3 | Q    Well, I thought you testified on direct that they would
4 | push the snow over to where this pole was?
5 | A    Towards it.  Towards it, right.
6 | Q    Okay.
7 | A    In that general area.
8 | Q    Now, where did this path end, though?  I mean, you came
9 | down to where --
10 | A    Well, when it comes through that snow mound, it would go
11 | out into where the area had been plowed.
12 | Q    Okay.  And where -- well, the area plowed.  Is that where
13 | the truck is right there?
14 | A    Right.
15 | Q    All right.  So, basically, if we extended your lines down,
16 | the pathway ended right around the area --
17 | A    No, the path would end right in that -- where that snow
18 | mound is.  That snow mound come off the building at an angle.
19 | It didn't come straight across the front of the building.  Once
20 | he came past the building, it would be an angle this way, the
21 | snow mound.
22 | Q    All right.  I'm not sure I'm following your directions
23 | here.
24 | A    Do you want me to get up and show you, again?
25 | Q    Yeah, if you could, please.

Fitzgerald - Cross                              180

1  A    In other words, once the trucks would come across and

2  plow, this snow mound would, basically, be going this way.

3  Q    Okay.  So, in that case, then the path would end right

4  there?

5  A    Approximately that's where the path would end when it

6  broke through this snow mound.

7  Q    All right.  So, just for the record, the path would end

8  right around where the two lines that you've drawn

9  approximately?

10 A    Well, if that's the -- where the snow mound.  It's hard to

11 tell with this photograph where that snow mound ends.  But if

12 that snow mound is right here, it should be showing, that's

13 probably where it would end, but at the angle you're taking

14 this photograph, you could be standing in here.  This could be

15 another -- it could be down here.  I can't tell if you're

16 taking the photograph like this or like this.  It makes a

17 difference.

18 Q    Well, were you there when the investigating police

19 officers took these?

20 A    Sure I was.

21 Q    And you took -- and they took a statement from you?

22 A    Yes, they did.

23 Q    And you saw -- did you see them taking photographs?

24 A    No, I wasn't watching them taking photographs, no.  As a

25 matter of fact, they separated us.  I don't know what they were

1   doing.

2   Q    Okay.  And, in any event, this snow bank went from the

3   corner of the building all the way around --

4   A    That's the high point.  It tapered down.

5   Q    And it went all the way around up here --

6   A    Right.  Now you got --

7   Q    -- to that end like that?

8   A    Right.

9   Q    That -- there's red caution tape on this pole.

10          THE COURT:  Yellow.

11          MR. CHAMAS:  Yeah, I'm sorry.  Thank you, Your Honor.

12   Q    Yellow caution tape.  Do you see it there?

13   A    Yeah, I do.  Yeah.

14   Q    Okay.  And then there's some yellow caution tape down in

15   the corner of the area where you say that the -- well, strike

16   that.  There's -- do you see caution tape there?

17   A    Yeah, I don't know what that is.  It looks like that's the

18   corner of the building.

19   Q    That's the corner right where you were talking about

20   before with the Judge --

21   A    Right.

22   Q    -- where you said where the -- I'm sorry, I went one past

23   it -- where the slide began --

24   A    Mm-mm.

25   Q    -- correct?  And that caution tape before this particular

1  day actually stretched across from the corner to the pole?

2           MR. ORLOWSKI:  Objection, Your Honor, assumes facts

3  not in evidence.

4           THE COURT:  Sustained.

5  A    No.

6  Q    Do you know where that caution tape came from?

7           THE COURT:  Did you see that caution tape before the

8  day of the accident?

9           THE WITNESS:  No, I didn't.

10  Q    Did you see it on the day of the accident?

11  A    Well, I -- it was there.  No, I don't remember seeing it.

12  It might have been put up while they were doing all of this and

13  we took it down later.

14  Q    Now, you --

15  A    I don't remember seeing it.  It wasn't there.

16           THE COURT:  If you don't know, you can't speculate.

17  A    It didn't go from the pole to the corner, that I know.

18  Q    If you don't -- I'm sorry, I didn't hear what you said.

19  What do you know?

20  A    It didn't go from the pole to the corner that morning when

21  we opened up, obviously.  No, it wasn't there then.  So they

22  must have put it up after all of this.

23  Q    Now, the -- I want to go back to P -- I think we were on

24  P-33.  And you indicated that the slide, you believe, started

25  about a little bit past the corner, meaning a little bit east

1  of the corner toward the --

2  A    Right.

3            THE COURT:  What slide?  You say there's a slide?

4            MR. CHAMAS:  This -- (indiscernible), Your Honor.

5  The slide where she -- where -- the drag marks, I should say.

6            THE COURT:  Now you're confusing me, again.

7            MR. CHAMAS:  Okay.

8            THE COURT:  I've heard about the -- where the plow

9  left some snow up, but --

10           MR. CHAMAS:  No, I'm switching --

11           THE COURT:  -- it's the drag marks for the

12  individual.  Now you're talking about a slide.  I don't know

13  what you mean.

14           MR. CHAMAS:  Slide marks, skid, you know, drag marks

15  is what I'm talking about now.

16           THE COURT:  Well, because that's -- you called them

17  scrape marks before.

18           MR. CHAMAS:  Scrape marks, sorry.

19           THE COURT:  Okay.

20  Q    I -- all right.  Mr. Fitzgerald, there were scrape marks

21  in the snow, you said, correct?

22  A    Right.

23  Q    And those scrape marks began a little bit to -- looking at

24  P-33, a little bit to the right of the corner of the building?

25  A    Right.

1 Q    And those scrape marks went through the snow that had

2 fallen that morning?

3 A    Well, the trucks have gone over this, so it was a packed

4 snow.  But, yeah, it was -- you could see -- actually see a

5 little scrape in it.

6 Q    How much snow fell?

7 A    Approximately an inch, I'd say.

8 Q    All right.  Did you see the photographs of underneath the

9 tractor, showing P-11?

10 A    Yeah.

11 Q    Do you recognize that?

12 A    Well, I never saw this before, but, yeah.  That looks like

13 the conditions.

14 Q    Okay.  And actually you know what we had up there before,

15 I'm sorry, we had P-7 up earlier actually.  That was the -- if

16 you look at the tread marks where the truck was, and then we

17 have here basically where the new snow was?

18 A    It looks right.

19 Q    About two inches or so?

20 A    It doesn't look like --

21          MR. ORLOWSKI:  Objection, Your Honor.

22 A    It doesn't look like two inches to me.

23          MR. ORLOWSKI:  Mischaracterizes testimony.

24          THE COURT:  He already answered.  He said it doesn't

25 look like two inches.  Go ahead.

1  Q    Now, that morning you got to work after you -- did you

2  drop the salt out on the driver's door before or after anybody

3  entered, any of the drivers?

4  A    I would imagine I did it when -- as soon as I opened the

5  door in the morning because we have a salt bucket right inside

6  the door.

7  Q    Now, when -- after you did that, did anybody enter the

8  building?

9  A    Right away, yeah.

10 Q    Who entered?

11 A    We had two teams in there.  I imagine it was the Brognas

12 and the other team.

13 Q    Was Mr. Brogna in the building, as well?

14 A    I don't remember seeing him.

15 Q    The other team, were both driver and passenger in or just

16 one of them?

17 A    I don't remember more than one.

18 Q    Okay.  Now, when they got in there, they're supposed to

19 get -- first off, they got find out where their load is to pick

20 up?

21 A    Correct.

22 Q    Okay.  Then what happens?

23 A    Depends on what they're going to do.  Sometimes they're

24 delivering, sometimes they are loading the trailer they're

25 with.  Sometimes they're picking up a trailer that's already

 1  loaded.  So we would have to determine what they're supposed to

 2  do.

 3  Q    Well, that morning the other driver was also picking up,

 4  correct?

 5  A    Yeah, we had -- there were all outbounds that day.

 6  Q    Okay.  So -- and that day you had four outbounds?

 7  A    I can't quote that.

 8  Q    Do you recall the daily log?

 9  A    I'd have to look at the log.  I can only remember three.

10  Q    Okay.  Well, at least the two that came in that morning

11  were outbounds?  They were coming --

12  A    Yeah.

13  Q    -- to pick up trailers?

14  A    Right.

15  Q    And you, as part of that process, you got to tell them

16  where the trailer's at?

17  A    Right.

18  Q    What else do you have to do?

19  A    We check their identifications, their qualification, make

20  sure they're the right team and we inspect their -- have their

21  vehicle inspected, we make sure their satellite's working.

22  Q    Will you inspect it before they leave?

23  A    Before they leave the base?  Yeah.

24  Q    When -- but that -- I'm talking about that morning.  When

25  somebody checks in, what's the procedure?

1   A    We'd want to see their driver's -- well, we have to report

2   information to the traffic department so they can start the

3   bills.  They print the bills in another location.

4   Q    Okay.

5   A    And what we need there is the driver's -- the truck

6   number, the tractor number that's -- or if, in this case, it

7   would just be the tractor number because we already knew the

8   trailer number.  They were picking up a preloaded trailer.  If

9   it's a tractor and a trailer, we have to know both numbers and

10  we have to give them a seal number that we're going to use to

11  put on the truck when we're ready to ship it off the base.  So

12  we would do that part then and then we can send them out to get

13  the load to bring back to us for the final inspection.

14  Q    Do you look at the truck before it leaves to go get the

15  load?

16  A    Yeah, you can look at it.  You can look at it then.

17  Right.

18  Q    Well, I believe you testified in deposition that that's

19  the procedure that you check --

20  A    It is.  Right.

21  Q    -- because you don't want to send them out to get the load

22  and then when they come back find out that --

23  A    Right.

24  Q    -- you know, they can't leave the base --

25  A    Right.

1  Q     -- because there's something wrong with their truck.

2  A     Right.

3  Q     Do you recall doing that that morning?

4  A     Not with that team, no.

5  Q     All right.  There's a 626 form that's completed, correct?

6  A     Right.

7  Q     And so, if it was actually done with the Brognas, you

8  would have had that 626 form, correct?

9  A     I didn't do that, the 626 that day.  Probably Ralph did

10 it.

11 Q     So if Ralph didn't do it and you didn't do it, then that

12 procedure wasn't followed that morning?

13 A     It was followed.

14 Q     It was?

15 A     Somebody must have done the form.  I wouldn't have sent

16 them out.

17 Q     Ever find that 626 form on the Brognas?

18 A     No.

19 Q     But you remember it being done?

20 A     I didn't do that.  I didn't do it in the mornings --

21 Q     So Ralph had to have done it?

22 A     I would imagine he --

23 Q     I mean, there was nobody else in there, right?

24 A     Right.

25 Q     So if Ralph said that he didn't do it and you said you

Fitzgerald - Cross                      189

1  didn't do it, it wasn't --

2          MR. ORLOWSKI:  Objection, Your Honor,

3  mischaracterizes evidence.

4          THE COURT:  I'll allow the question.

5  Q    If Ralph said he didn't do it and you didn't do it, then

6  nobody did it that morning?

7  A    I don't remember doing it, no.

8  Q    Well, the question was, though, if Ralph said he didn't do

9  it and you say you didn't do it, then it wasn't done?

10         THE COURT:  It would have been done only by you or

11 Ralph --

12         THE WITNESS:  I don't remember doing it, so I can't

13 say it hasn't been done.  I just don't remember doing.

14         THE COURT:  You said you didn't do it and either you

15 or Ralph would have been the people to did it?

16         THE WITNESS:  Me or Ralph would have been -- one of

17 the two of us would have do it -- done it, excuse me.  I might

18 have done it.  I just don't remember doing it.

19 Q    But if you did it, you'd have a 626 form?  You would have

20 found it, right?

21 A    Well, we have this happen not this serious.  We have teams

22 come in and go through the procedures and then they're not

23 going to get the loads so everything's just, you know, it's

24 useless.  We would just discard it.  In other words, we've had

25 teams come in.  We've gone through, we fill out the 626, we

1   start a time sheet, and then for some reason the driver can't

2   take the load.  It could be something out of his control or

3   something wrong with his equipment.  We would say, all right,

4   you can't have the load.  You have to go -- or the company

5   would say, well, send another team in or you have to leave and

6   get your truck fixed before you can have the load.  Under those

7   circumstances, the 626 and the time sheet becomes useless to

8   us --

9   Q    So did --

10  A    -- so we would have discarded it.  We didn't know it was

11  going to become evidence.  We didn't destroy it as -- because

12  we thought it was -- we just discarded it because we thought it

13  was, you know, not going to be used and we didn't need it at

14  any time in the future.

15  Q    So before when you said it couldn't be found, now it's --

16  now you remember actually discarding it?

17  A    No, I don't, I said, but that would have been what could

18  have happened to it.  But I don't even remember filling it --

19         THE COURT:  It's ten past one right now, counsel.

20  I'm afraid we're going to have to run over to the 3:00 session

21  --

22         THE WITNESS:  I don't remember filling it out.

23         THE COURT:  -- right?  You don't remember filling it

24  out.  Okay.

25         MR. CHAMAS:  I would think so, Your Honor.

1              THE COURT:  All right.  How much more do you have?

2              MR. CHAMAS:  I hate --

3              THE COURT:  That's okay.  Take your time.

4              MR. CHAMAS:  I would think maybe 20 minutes or so,

5    but I'd hate to say --

6              THE COURT:  Well, I can't do it.  I'm 10 minutes late

7    already.

8              MR. CHAMAS:  I would think at least 10 and it's

9    definitely and possibly 20 and maybe even more.

10             THE COURT:  I've got a 1:00, I've got a 2:00.  I

11   can't really get back to you until 3:00 or so.  That's about

12   the best I can do, I'm afraid.  That's okay.

13             MR. CHAMAS:  I don't want to -- I mean there's other

14   areas that I do want to cover.

15             THE COURT:  Sure.  Okay.  Let's break until three

16   then.

17             MR. CHAMAS:  Your Honor, what I'd ask is that Mr.

18   Fitzgerald not talk to anyone during --

19             THE COURT:  Yes, he's on cross examination.  He can't

20   talk to anybody.  All right?

21             MR. CHAMAS:  Thank you.

22             THE COURT:  Very well.  We'll break until three.

23   Thank you.

24             MR. ORLOWSKI:  Thank you.

25             THE WITNESS:  Excuse me, Your Honor.  What does that

 1  mean?  I can't go to lunch with Ralph or --

 2             THE COURT:  You can go to lunch with him.

 3             THE WITNESS:  Okay.

 4             THE COURT:  Just don't discuss the case and your

 5  testimony.

 6             THE WITNESS:  Oh, okay.  All right.  Thank you.

 7             THE COURT:  Okay.  So I'll see you at 3:00 then.

 8  Thank you.

 9             (Unrelated matters heard at this time)

10             THE COURT:  I hadn't planned for an afternoon

11  session, but I got back to you just as soon as I can.  If the

12  witness will resume the stand.  Counsel for the plaintiff,

13  proceed.

14             MR. CHAMAS:  Thank you, Your Honor.

15  BY MR. CHAMAS:

16  Q    Mr. Fitzgerald, the -- you indicated on direct before we

17  broke that you put Ice Melt down on the driver's side by the

18  doorway.  You opened the door and you put Ice Melt down there

19  and that was to make sure that it wasn't too slippery so no one

20  would fall, right?

21  A    Right.

22  Q    Okay.  Now, the path the was shoveled the week before,

23  that came out away from the building?

24  A    Right.

25  Q    And the reason it came away from the building was because

1  the plow area -- this was higher and, basically, it was lower

2  over here so it was easier just to shovel through there?

3  A    Well, it was a curve out in the street, too, that we would

4  go out past that curb.  It was on -- out at the street level,

5  one lane past the truck.

6  Q    Well, but the curve was all the way out past where the

7  truck is?

8  A    Right.

9  Q    And the path just ended right there?  That --

10 A    Right.

11 Q    -- path that was supposedly shoveled?

12 A    Right.

13 Q    And it's the Government's Public Works Department that

14 does this plowing that put all this snow in that area, right?

15 A    Right.

16 Q    If they had pushed the snow so that the higher part was

17 over here and the lower part was over there, you would have

18 shoveled over there because it would have been where the lower

19 part was?

20         MR. ORLOWSKI:  Objection, Your Honor, speculation.

21         MR. CHAMAS:  I'm asking what he would have done.

22         THE COURT:  I'll allow it.

23 Q    Correct?

24 A    No, I don't --

25 Q    Well, on direct, you said you shoveled over here earlier

1   this -- before we broke because this was the lower area and

2   this was the big pile of snow.

3   A    Right.

4   Q    So if the Public Works Department made the pile of snow on

5   this side and the small pile over here, you just would have

6   shoveled over there?

7   A    Well, it would make sense, yeah.

8   Q    You called it an established pathway and that's not --

9   there was no designated sign of any kind that said this is

10  where you walk, right?

11  A    No.

12  Q    When you say established pathway, you're talking about

13  that's where it had been shoveled on prior occasions?

14  A    Correct.

15  Q    All right.  There wasn't any signs inside telling people

16  where to walk?

17  A    No.

18  Q    There's no written procedure or you didn't tell anybody

19  verbally, any of the drivers, this is where you need to walk,

20  right?

21  A    No.

22  Q    They can walk in any section, any area over there?

23  A    Of course.

24  Q    Any of your superiors ever tell you that you're

25  responsible for clearing the snow around the building?

1  A    No.

2  Q    That's just something you understood that was part of your

3  responsibility?

4  A    It was sort of grandfathered in, yeah.

5  Q    I'm sorry?

6  A    Sort of a grandfathered thing.  It was done before, so

7  you --

8  Q    So they never told you exactly what you needed to do then?

9  A    No.

10  Q    You just -- whatever you felt was appropriate is what you

11  did or what Mr. Leutbecher felt was appropriate you would do?

12  A    Correct.

13  Q    Now, when the drivers would come in and check in that --

14  in the morning or once they get their load, they'll come in and

15  they'll have their paperwork and their notebooks, right, stuff

16  that they normally carry?

17  A    Most of the time they bring it in, yeah.

18  Q    Do you recall Ms. Brogna coming in with a notebook that

19  morning?

20  A    No.

21  Q    She didn't or you just don't recall?

22  A    I don't recall.

23  Q    Now, the drivers are not supposed to get on the scale

24  until you tell them to do so, right?

25  A    Yeah, that's true.

Fitzgerald - Cross                          196

1 Q    When the Brognas got their load and they came back, where

2 did they stop?

3 A    I'm not sure.  I was inside the building.  They were

4 outside the building.  I don't know where they stopped the

5 first time.

6 Q    But you know they stopped the first time after they got

7 their load?

8 A    Well, obviously, they stopped.  Yeah, they stopped.  She

9 came in the building and while she was in the building, he

10 moved the truck onto the scale.

11 Q    Okay.  So she came in --

12 A    Right.

13 Q    -- and while she came in you heard the truck moving onto

14 the scale?

15 A    I'm not sure if she was in the building yet or he was on

16 the scale.  It was, basically, simultaneously.

17 Q    Okay.

18                          (Pause)

19 Q    I want you to refer to your deposition on Page 64, Line

20 11.  Do you remember having your deposition taken?

21 A    Three years ago.

22 Q    Now, let's see.

23 A    Two years, three years, or four years ago.  I don't --

24           THE COURT:  What exhibit is that?

25           UNIDENTIFIED SPEAKER:  I don't -- P-25.

1          UNIDENTIFIED SPEAKER:  No, the deposition transcript.

2          MR. CHAMAS:  Mr. Fitzgerald's, that's D-25 in

3    plaintiffs.

4          UNIDENTIFIED SPEAKER:  In plaintiffs?

5          MR. CHAMAS:  In defendants.  P-92.

6          THE COURT:  Thank you.

7          MR. CHAMAS:  February 21st, 2007.  So two years ago

8    or so.

9    Q    Now, I'm just showing on Page 64, there was a question on

10   Line 11.  So when you say the hood of his tractor, the front

11   bumper?  Answer, Yeah, all I could see was what tractor it was.

12   I knew which one it was, the Tri-State.  And he stopped there

13   and she entered the building seconds after that.  Do you recall

14   testifying to that?

15   A    No.

16   Q    Okay.  That is your testimony, though, right?

17   A    Well, if I said it then, then I guess I did, but I don't

18   remember saying it.

19   Q    Okay.  So today --

20   A    You -- is that my deposition?

21   Q    (Indiscernible).

22   A    What was the question before?

23   Q    Well, here, let me first show you.  Front page Thomas

24   Fitzpatrick (phonetic).  And the question before is, "So you

25   started to tell me where you said the steering axle was and" --

1          THE COURT:  Well, let's see what point in time this

2    was when he was talking about it.  Let's see now.  It says it

3    has to do with blinds or something, a nose, the engine

4    compartment.  Do we know what point in time this was?  Is

5    there --

6          MR. CHAMAS:  Judge, yeah, it does.  I mean --

7          THE COURT:  Okay.  Here we go.  Maybe it goes back --

8          MR. CHAMAS:  If you go back to 63, it gives you an

9    idea.

10          THE COURT:  61.  Okay.  Referring to the scale house.

11   You mentioned a moment ago that the -- Mr. Brogna had pulled

12   the tractor trailer up by your window.  Which window was that?

13   That would be the right window, the very first.  So pulled it

14   up to his window when?  Do we know when that was?  Where's the

15   first reference to a truck being pulled up to his window?

16   Well, it goes way back here.  It goes -- I can understand your

17   confusion, sir.

18          THE WITNESS:  Yeah.

19          THE COURT:  I mean, the question by itself is

20   extremely ambiguous.  Let's see what we can do to try to give

21   you some background on this.

22                         (Pause)

23          MR. CHAMAS:  Judge, if I may?

24          THE COURT:  Yes.

25   Q    Ms. Brogna entered the building how many times that day?

1  A     Twice.

2  Q     Okay.  The first time she entered, where was the tractor

3  parked at?

4  A     I'm not sure.  Outside in the street.  That's all I can

5  tell you.

6  Q     And the first time she parked it -- first time the

7  tractor's parked it wasn't -- it was bobtailing, correct?

8  A     Right.

9  Q     So then the second time would have been this time we're

10 talking about right here?

11 A     Right.

12 Q     Okay.  So this would be the occasion where after they got

13 the load, they came back?

14 A     Right.

15 Q     All right.  And at that -- and the point when I took your

16 deposition, you said the truck pulled up and a few -- stopped

17 right by your window --

18 A     Right.

19 Q     -- a few seconds later?

20        THE COURT:  This is the second time when they're --

21 and they got the load attached, right?

22        THE WITNESS:  Right --

23        THE COURT:  Truck pulled up beside your window?

24        THE WITNESS:  Correct.

25        THE COURT:  Okay.  Now proceed.

1  Q    And a few seconds later Ms. Brogna -- at least in your

2  deposition, you said a few seconds later, that's when Ms.

3  Brogna came in?

4  A    That's when I noticed.  I don't know if she was in the

5  building or not, but, yeah, that's when I noticed.  Yeah.

6  That's when she asked to load the -- to weigh the truck.

7  Q    Okay.  And at that point, Mr. Leutbecher says yes.

8  A    Right.

9  Q    She asks if she can load the truck.  Now, on direct

10 testimony --

11 A    Right.

12 Q    -- you said something about Mr. Leutbecher saying that's

13 what it's there for?

14 A    Right.

15 Q    Do you recall in your deposition just saying the word yes?

16 A    Exact what his words were, I don't remember.  I remember

17 he said something along those lines.  Yes, that's what it's for

18 or that's why it's there.

19 Q    In your deposition, the only thing you told me he said was

20 yes.

21 A    All right.

22 Q    And I can find that if we need to.  But do you recall that

23 being the gist of the answer, just yes?

24 A    Yes.  It was -- he said yes.  Yeah.

25 Q    So when she asked if she could weigh the scale and Mr.

1  Leutbecher said yes, what did you say then?

2  A    Nothing

3  Q    You didn't say anything?

4  A    I didn't say a word.

5  Q    And you were sitting where?

6  A    In my desk.

7  Q    All right.  And the tractor was, basically, if you looked

8  out your window, the tractor's right there, it's on the scale?

9  A    The front -- the nose of the truck was on the scale,

10  correct.

11  Q    All right.  Now, you just told us a little while ago

12  tractor trailer drivers are not supposed to be on the scale

13  until you tell them to get on it, right?

14  A    Correct.

15  Q    Okay.  So Ms. Brogna walks in, she says can I weigh the

16  load, Mr. Leutbecher says yes and you don't say anything to her

17  about moving the tractor off the scale or the fact that they're

18  on it and not supposed to be there?

19  A    No.

20  Q    Did Mr. Leutbecher say anything to her about not being

21  allowed on the scale?

22  A    No.

23  Q    Did anybody tell her to get off the scale?

24  A    I didn't have a chance.

25  Q    Didn't have a chance?  Why not?

1  A    She want out of the building.

2  Q    How long would it have taken for you to say you're not

3  supposed to be on the scale?

4  A    Well, that's three words, take a second to say it.

5  Q    All right.  So how fast did she get inside the building

6  and out after Mr. Leutbecher said yes?

7  A    I don't understand what you mean.

8  Q    Well, she wasn't standing in the doorway yelling to you

9  guys over by where you were sitting saying can I weigh the

10  truck, was she?

11  A    She was standing at the counter.

12  Q    Okay.  So -- and the counter, we saw earlier, is, you

13  know, a little bit of ways from the doorway.  So she's at the

14  counter, says can we weigh the truck, Mr. Leutbecher says yes

15  and neither of you say anything to her, she turns around and

16  walks all the way out the door and nobody bothers to tell her

17  that she's not supposed to be on the scale at all at that point

18  in time?

19  A    No, why would we?

20  Q    Well --

21  A    That's what the drivers do all the time, they pull up on

22  the scale before they are told to and we have to tell them to

23  back off, but we don't do it right then and there.  We go out

24  the front, out the other side, and tell them back down.

25  Q    Why wouldn't you just tell her to get off?  Why would you

1  have to go out the other side and do that?

2  A    I didn't have -- I just told you, I didn't have time to.

3  She moved -- she left the building before we could tell her to

4  back off the scale.

5  Q    After she left, what did you do?

6  A    I started to get out of my chair to go out the other door

7  to do exactly what I was going to do, set up the scale for

8  weighing and tell him to back down off the scale so I could

9  zero it.

10 Q    You got off your chair and, I'm sorry, you were going over

11 to the exit -- to the employee's door --

12 A    Correct.

13 Q    -- to go outside?

14 A    Correct.

15 Q    And you were going to tell him to back off the scale?

16 A    Correct.

17 Q    So both you and Mr. Leutbecher did that?

18 A    No, Ralph hadn't gotten up yet.  I was just getting out of

19 my chair.

20 Q    So if Mr. Leutbecher testified that he was going to do

21 that, to zero out the scale, and let him out, that would be

22 wrong?

23 A    I can't tell you what Ralph was thinking.  I just know

24 that I was getting out of my chair to go do it, where Ralph was

25 doing -- was Ralph -- whatever Ralph said he was doing.  He

1  might have had the same thing in mind.

2  Q    Now, I'm going to show you what's been marked as P-2 for

3  identification.  Do you recognize that document?

4  A    Yeah, it looks like the statement I made about maybe a

5  half hour after the incident?

6  Q    Okay.  And that was given to the police?

7  A    Right.

8  Q    All right.  That was requested to get an idea of what --

9  A    Yeah, a --

10  Q    In other words, they requested to find out what you knew,

11  correct?

12  A    Standard procedure, right.

13  Q    All right.  You didn't say anything on there about them

14  being on the scale and not supposed to be being on the scale,

15  right?

16  A    No, I don't think so.  I don't know what it says there.

17  Q    Oh, I'm sorry.  I guess I should have left it with you.

18  Take a -- take the time and read through it.

19                         (Pause)

20  A    Yeah, it's basically how it went down in my memory.

21  Q    Nothing in here talks about them being on the scale and

22  not supposed to be being on the scale, correct?

23  A    No.

24  Q    You don't say in here that, you know, you were going to

25  tell them to get off the scale when you heard the screech or

1  the screaming?

2  A    No, it doesn't say that in there.

3  Q    In fact, the way this statement's written is you say that

4  she -- that the female went outside, that she came in when the

5  male driver was outside, and the female went out -- sorry --

6  trying --

7          UNIDENTIFIED SPEAKER:  I'm having a hard time reading

8  that.  I'm sorry.  Just a second.

9          THE WITNESS:  Well --

10  Q    Well, in order to get the weight on the front axles, you

11  got to zero out the scale, correct?

12  A    Right.

13  Q    So if Ms. Brogna had entered the scale -- I want you to

14  assume that she -- I'm sorry -- entered the scale house and got

15  the weight on the front axle, somebody would have already had

16  to have zeroed out that scale, correct?

17  A    No.  It hadn't been zeroed out, so there's no way she

18  could have come in and got the first weight and nobody gave her

19  the first weight.

20  Q    Well, I want -- if Ms. Brogna's testimony is correct, was

21  she came in, asked to weigh the scale -- asked to weigh the

22  load --

23  A    Right.

24  Q    -- and she was -- at least we know this much.  She asked

25  to weigh the load and somebody said yes, correct?

1  A    Right.

2  Q    If her testimony's correct that she walked outside and

3  waved the driver on, that wouldn't be a problem, right, once

4  she was told they could weigh the scale?

5  A    I don't know what she did once she left the building.  I

6  don't know --

7  Q    I realize that.  What I'm asking you is there wouldn't be

8  an issue with Ms. Brogna if she came in and asked to weigh the

9  load, right?  That happens -- not all the time, but it would

10  happen?

11  A    Right.

12  Q    And then you guys would, obviously, say yes they can weigh

13  the load?

14  A    Right.

15  Q    She walked out.  And if she waved on the driver because

16  now she was told that she could weigh the load, there wouldn't

17  be an issue with that, right?

18          MR. ORLOWSKI:  Objection, Your Honor.  With respect

19  to waving it on, where are we talking about?

20          MR. CHAMAS:  Waving on the scale.

21          MR. ORLOWSKI:  Waving onto the scale or waving

22  towards the building?

23          THE COURT:  I'll sustain, unclear.

24  Q    When Ms. Brogna walked out and said okay and waved to wave

25  the driver onto the scale, there wouldn't be an issue with that

1  at that point, correct?

2  A    Well, yeah, there would be.

3  Q    There would?

4  A    She should have gotten in her truck and waiting for us to

5  instruct her what to do.

6  Q    And how did she know to do that?

7  A    That's the standard in the industry.  You weigh your

8  tractor trailer, everything, the people in it, the drivers, the

9  dogs, the cats, the food, everything gets weighed.

10 Q    So, do you know who Mr. Ellis is?

11 A    No.

12 Q    You know the driver for LandStar?

13 A    All right.  I'll take your word for it.  I don't know him.

14 Q    All right.  If he were to testify that he's been at Earle

15 Naval Base and he would weigh his truck with just him in it and

16 his wife would be inside getting the numbers --

17 A    Right.

18 Q    -- you're saying that never happened?

19 A    Oh, that happens, yeah.

20 Q    Okay.  And if Commander Treddle testified that the way I

21 just explained it that Ms. Brogna came in, asked if it could be

22 weighed, walked outside and she waved on Mr. Brogna to get onto

23 the scale and he said that's okay, you're saying Commander

24 Treddle is wrong, the person in charge of the scale house?

25 A    Well, I'm not saying he's wrong, but he would have been

1  doing the procedure wrong.

2  Q    Is this procedure written down anywhere?

3  A    Well, it probably is written somewhere, but I wouldn't be

4  able to find it.  But that's the way it's done.  You have to

5  have a gross weight of your truck.  A gross weight is the gross

6  weight of everything.

7  Q    Well --

8  A    So now if I'm going to get the gross weight of her truck,

9  I need her in it.

10  Q    But you don't -- it doesn't matter to you, right, what the

11  weight of that truck is?  In other words, the drivers are

12  weighing it because -- for themselves, not for the Government

13  purposes, correct?

14  A    I can't say what she was weighing it for.  She might have

15  wanted it for balance purposes.  She might have wanted to know

16  what her axle weights were.

17  Q    Well, my point is, is that the Government doesn't care if

18  the truck is weighed or not, correct?

19  A    Well, yeah.  If they want the weights to -- they don't

20  want certain weights exceeded.

21  Q    But --

22  A    That particular load, no they wouldn't have -- I -- that

23  particular load, I'd have to go back to see what the weights

24  were.  I don't remember the total weight of that truck.

25  Q    I'm sorry.  Are you saying now that the Government has a

Fitzgerald - Cross                                    209

1  requirement that certain loads have to be weighed?

2  A     Yeah, they do.   They have to be -- we have to be sure

3  we're under 80,000 pounds.

4            THE COURT:  In the trailer or total?

5            THE WITNESS:  The gross weight of the whole --

6  whatever's on the road, Your Honor.

7  Q     Do you remember testifying at deposition that it's all --

8  it's based on whether the driver wants to weigh the load or

9  not, it had nothing to do with whether you guys tell them to

10 weigh the load?

11 A     We'll give them weights even when they don't require it

12 just to be -- accommodate them for balance purposes.   If we

13 have any suspicions that the truck's going to be heavy because

14 we know what the commodity in it, the Government requires us to

15 weigh it.

16 Q     Okay.   In this particular case, there wasn't any

17 requirement that this particular load be weighed?

18 A     I don't believe this load would have exceeded 80,000

19 pounds.   No.

20 Q     Okay.  We went off on a tangent.  Let's try and get back

21 to where we were.   If Ms. Brogna's testimony is correct -- I'm

22 not saying that you agree with it, I'm just asking -- if it's

23 correct in the sense that she came into the building the second

24 time after getting a load and somebody gave her the weight on

25 the front axle and she wrote it down, in order for you or Mr.

1  Leutbecher to give her that weight, that scale would have had

2  to have been zeroed out before the truck got on the scale,

3  correct?

4  A    Correct.  That never happened.

5  Q    Now, you're in the scale house.  Ms. Brogna is in there.

6  Ms. Brogna comes in, asks to weigh, she leaves and then for

7  some unknown reason Mr. Brogna just starts pulling forward on

8  the scale?

9  A    Right.

10 Q    Did you ever wonder why he was pulling forward on the

11 scale?

12 A    Yeah.

13 Q    What did you come up with?

14 A    Well, as I was getting out of my --

15         MR. ORLOWSKI:  Objection, Your Honor, speculation.

16         MR. CHAMAS:  I'm asking his own opinion as to why --

17 what he came up with as to why Mr. Brogna would --

18         THE COURT:  I'll sustain.  His opinion as to Mr.

19 Brogna's mental process is sustained.  Move on.

20         MR. CHAMAS:  Not to Mr. Brogna's mental processes,

21 Your Honor, what he thought could have been occurring, meaning

22 a rationale that Mr. --

23         THE COURT:  What he thought Brogna thought.  No,

24 sustained.  Move on, please.

25                        (Pause)

1          MR. CHAMAS:  P-83, Your Honor.

2          THE COURT:  All right.

3   Q    Do you remember answering interrogatories?

4          MR. ORLOWSKI:  What number was that, counsel?

5          MR. CHAMAS:  P-83.

6          THE COURT:  P-83.

7          MR. ORLOWSKI:  Thank you.

8   Q    The written questions about the accident?

9   A    No, I don't.

10  Q    Well, take a look at the last page.  Is that your

11  signature on there?

12  A    Looks like it.

13  Q    Okay.  Can I see those for a second?  Interrogatory Number

14  3 asks --

15          THE COURT:  Let me see now.

16          MR. CHAMAS:  Sure.

17          THE COURT:  Is he the one that certified these?

18          MR. CHAMAS:  Yes, Your Honor.

19          THE COURT:  Thomas Fitzgerald.  Okay.  Do you

20  remember seeing these?  You signed this certification.  Do you

21  see that?

22          THE WITNESS:  All I've seen is the last page, Your

23  Honor.  I don't remember seeing it.  I don't remember any of

24  these questions and I'm reading some of them.  I don't remember

25  when this was done, either.

1          THE COURT:  Okay.  As to legal contentions or

2    questions requiring positions on this litigation, the attorney

3    for the United States has advised the employees on answering

4    interrogatories numbering and including three since no fact

5    witnesses possess this information.  So, is your Question 3, is

6    that what're asking?

7          MR. CHAMAS:  Yes, it is, Your Honor.  But it deals

8    with the fact portion of the answer, not the legal premises.

9          THE COURT:  Well, let me see it now.  Under the fact

10   portion, it contends that she was negligent doing this,

11   negligent doing that, further negligence.  Sustained.

12         MR. CHAMAS:  Judge --

13         THE COURT:  Yes.

14         MR. CHAMAS:  -- if I may.

15         THE COURT:  If you're asking him about a contention

16   interrogatory by counsel as to why she was negligent, I --

17         MR. CHAMAS:  No, I'm not, Your Honor, I'm not.  If

18   your -- the second, without saying it in front of the witness,

19   the second sentence talks about the movement of the truck.

20   That's the purpose of my question here, not dealing with the

21   negligence.

22         THE COURT:  What's the Government's position?  Seems

23   to me it's a contention interrogatory and so stated in the

24   certification.

25         MR. ORLOWSKI:  Your Honor, this appears to be a legal

1  conclusion based upon the attorneys --

2          THE COURT:  Sustained.

3          MR. CHAMAS:  Judge, it's a legal conclusion based on

4  a fact contained in the answer.

5          THE COURT:  It is a legal conclusion expressly so

6  state there.  I'm going to sustain the objection.

7                         (Pause)

8  Q    You saw Ms. Brogna underneath the tractor?

9  A    Yeah.

10 Q    Did you notice the notebook she had with her?

11 A    No.

12 Q    Do you know what happened to that notebook?

13 A    Never saw it.

14                         (Pause)

15         MR. CHAMAS:  That's all, Your Honor.

16         THE COURT:  Okay.  Counsel, anything else?

17         MR. ORLOWSKI:  No redirect, Your Honor.

18         THE COURT:  All right.  Well, then we'll recess until

19 this.

20         MR. ORLOWSKI:  Your Honor, based on the admissions

21 made by the plaintiff during their portion of the case, we've

22 determined that we're not going to need to call either of our

23 two experts.  And, at this point, we're going to rest.

24         THE COURT:  All right.

25         MR. ORLOWSKI:  Your Honor, at this point, I would

1  also --

2          THE COURT:  So you're not going to call Dr. Bursic

3  (phonetic) or --

4                      *  *  *  *  *

5              **C E R T I F I C A T I O N**

6          We, LYNN SCHMITZ and KELLI PHILBURN, court approved

7  transcribers, certify that the foregoing is a correct

8  transcript from the official electronic sound recording of the

9  proceedings in the above-entitled matter, and to the best of

10 our ability.

11

12 /s/ Lynn Schmitz_____

13 LYNN SCHMITZ

14

15 /s/ Kelli Philburn_____

16 KELLI PHILBURN

17 J&J COURT TRANSCRIBERS, INC.        DATE:  APRIL 22, 2009

18

19

20

21

22

23

24