PETER CHAMAS, ESQ.
ERROLL J. HAYTHORN, ESQ.
GILL & CHAMAS, LLC
655 Florida Grove Road
P.O. Box 760
Woodbridge, New Jersey 07095
(732) 324-7600
FAX: (732) 324-7606
pchamas@gillandchamas.com
ehaythorn@gillandchamas.com

## UNITED STATE DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PAULETTE BROGNA and GEORGE BROGNA, her husband, | : | HONORABLE GARRETT E. BROWN, JR. |
| | : | Civil No. 05-4839 |
| Plaintiffs, | | |
| vs. | : | *Electronically Filed* |
| UNITED STATES OF AMERICA, et al., | : | |
| | : | |
| Defendants. | | |

---

## PLAINTIFFS' POST-TRIAL SUBMISSION WITH PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Trial Dates:  April 13, 2009
April 14, 2009

## TABLE OF CONTENTS

I.      Introduction ........................................................... 1

II.     Legal Stipulations ................................................... 3

III.    Factual Stipulations ................................................ 3

IV.     Plaintiffs' Proposed Findings of Fact Adduced at Trial ................3

V.      Plaintiffs' Proposed Conclusions of Law ...............................23

        A.      PLAINTIFF PROVED THAT DEFENANT USA WAS
                NEGLIGENT BY FAILING TO REMOVE ICE AND
                SNOW FROM THE AREA AROUND THE SCALE AND
                ABOUT THE DRIVER'S SIDE ENTRANCE TO THE
                SCALEHOUE ......................................................... 23

                1.   Defendant USA Had A Duty To Discover And
                     Eliminate Dangerous Conditions, To Maintain
                     Its Premises In A Safe Condition And To Avoid
                     Creating Conditions That Would Render the
                     Premises Unsafe ............................................ 23

                2.   Defendant USA Breached Its Duty Of Care To
                     Plaintiffs ..................................................... 25

                3.   The Negligent Acts And Omissions Of Defendant
                     USA Is The Proximate Cause of Plaintiff's Injuries ...... 32

                4.   As A Result Of The Negligence Of Defendant USA,
                     Plaintiff Sustained Severe And Permanent Personal
                     And Financial Damages ...................................... 37

        B.      PLAINTIFF GEORGE BROGNA IS ENTITLED TO
                PER QOUD DAMAGES ........................................... 37

IV.     CONCLUSION ............................................................. 38

## I.    INTRODUCTION

Plaintiffs Paulette Brogna and George Brogna, *per quod*, file this post-trial submission as directed by the Court.  This document is intended to supplement the Pre-trial Order and plaintiffs' previously filed Pre-Trial Submission and accompanying briefs. It therefore focuses on the evidence presented at trial and the findings of fact and conclusions of law justified by that evidence.

Plaintiffs herein allege that defendant USA and its employees failed to maintain its property, the Naval Weapons Station Earle, specifically, the area at or about Scalehouse L-25, in a safe condition.  Plaintiffs allege that defendant USA and its employees failed to clear ice and snow from the area at and about the truck drivers' side door and the scale and that such failures caused plaintiff Paulette Brogna to sustain severe and permanent personal injuries and financial losses.  Plaintiff George Brogna is asserting a *per quod* claim for loss of society, companionship and consortium as a result of the personal injuries suffered by his wife, plaintiff Paulette Brogna.

It is uncontested that defendant USA had a duty to clear all foreseeable paths for safe entry into the scalehouse to process paperwork and to keep the area hazard-free so that truck drivers may safely perform the weighing of their tractor trailers.  Plaintiff submits that defendant USA breached that duty by not clearing any path, let alone a foreseeable path, for safe passage into the scalehouse and failed to clear the ice and snow from the area around the scale, specifically the walkways and the corner of the scale closest to the driver's door.  Even if it is believed by this Court that there was an established path cleared, albeit shoveled a week before the subject fall, after a prior snow storm, for ingress and egress to the driver's side door, such path did not provide a safe

1

foreseeable passageway for passengers to exit the tractor at or near the scalehouse. In fact, defendant USA's own investigation determined that the walkway area by the scalehouse was very icy and the driver's side entrance was not safe to be walking on. Defendant USA's failure to clear such ice and snow caused plaintiff Paulette Brogna to slip and fall and to slide under the tractor trailer. The slip and fall on the ice and snow was the initial event that brought plaintiff Paulette Brogna immediately under the tractor being operated by plaintiff George Brogna.

Defendant USA neither disputes that it had duty to provide a hazard-free area for plaintiffs to enter and exit the scalehouse and to weigh their tractor trailer using the scale, nor does it dispute that plaintiff Paulette Brogna sustained severe and permanent personal injuries as a result of slipping, falling and sliding under the tractor trailer that ran over her.   However, defendant USA argues that it did not breach any duty to plaintiffs. Defendant USA submits that there was a diagonal path from the street to the driver's side door that was shoveled a week prior, after the previous snow storm.  Defendant USA submits that this path was sufficiently established to provide safe ingress and egress into the scalehouse from the street, even though it is undisputed that it was not shoveled on the morning of the subject fall.  Further, defendant USA argues that, even if it did breach this duty, such breach was not the proximate cause of plaintiff's injuries. Defendant USA argues that it was not the fall on the ice and snow that caused plaintiff's injuries, but rather it was being run over by the tractor trailer driven by *per quod* plaintiff, George Brogna.  Clearly defendant USA chooses to ignore the fact that the ice and snow plaintiff to slip and fall and slide under the tractor trailer.

Plaintiffs submit that the trial testimony and the exhibits admitted into evidence sufficiently prove the necessary elements of negligence. As such, respectfully submits that defendant USA is liable to the plaintiffs for monetary damages. Plaintiff Paulette Brogna is entitled to recover monetary damages for pain and suffering, loss of enjoyment of life, disability impairment, loss of past and future wages and payment of medical bills associated with the treatment of the injuries she sustained herein. Further, as the lawful husband of plaintiff Paulette Brogna, *per quod* plaintiff George Brogna may recover for the loss of society, companionship and consortium as a result the personal injuries sustained by his wife.

## II.    LEGAL STIPULATIONS

At the time of trial, it was stipulated by the parties that any fault of the *per quod* plaintiff George Brogna will not be compared to the fault of defendant USA to reduce any amount of damages awarded to plaintiff Paulette Brogna. It was further stipulated that any fault attributed to *per quod* plaintiff George Brogna could be compared to the fault of defendant USA, as well as to the fault of plaintiff Paulette Brogna, to reduce any amount of damages awarded to George Brogna on his *per quod* claim.

## III.    FACTUAL STIPULATIONS

The amount of medical bills incurred as related, reasonable and necessary for the treatment of the injuries sustained on January 26, 2004 is $678,505.06.

## IV.    FINDINGS OF FACT ADDUCED AT TRIAL

### A.    TRIAL TESTIMONY OF PAULETTE AND GEORGE BROGNA

Paulette Brogna is sixty-two (62) years old. She was born on March 27, 1947. Trial Transcript for 4/13/09 hereinafter referred to as "T1" 4:20-23. George is 64 years

old. He was born in 1944. T1 115:4-6. Paulette Brogna was married to George Brogna when she was 18 years old, right after she finished high school. T1 5:8-9, T1 115: 22-25. The Brognas have two (2) children. T1 5:17-18. Paulette Brogna became a truck driver in December of 1999 and began driving as a tandem, over-the-road truck driving team with her husband, George Brogna with TSMT. T1 9:17-18, T1 10:2-6.

On the morning of January 26, 2004, the Brognas arrived on Naval Weapons Station Earle at approximately 6:45 a.m. George Brogna was driving the truck that morning when they pulled up to the scalehouse. T1 19:23-25. They waited for 15 minutes before scalehouse employees arrived at the scalehouse. There are two (2) entrances to the scalehouse—one for the employees and one for the drivers. T1 17:24-18:8. When Mr. Leutbecher, a scalehouse employee, arrived at the scalehouse, he immediately shoveled the employee's entrance to the scalehouse. T1 17:11-18: T1 27:18-25. Although there is a factual dispute as to exactly how much snow fell over the weekend and during the night prior to the Brognas arriving at the scalehouse, it is clear that there was enough snow for Mr. Leutbecher to shovel the area around the employee's entrance door; along the building to the scale and into the roadway; and from the employee entrance parking lot to the employee's entrance door. Mr. Leutbecher shoveled a total of three (3) foreseeable paths on the employee entrance's side of the scalehouse

Plaintiff Paulette Brogna testified that she walked into the scalehouse by getting out of the truck that was parked across the street. She testified that the road in front of the scalehouse was not plowed that morning and there had been about three (3) inches of snow on the ground. T1 22:16-23:9. She testified that she followed another driver across the street and she walked up to the driver's door alongside the building. T1 20:15-24.

4

She testified that she followed the same path the driver in front of her had taken. T1 28:5-8: T1 82:11-12. She testified that the whole area was like a mound of snow. T1 109:9-11. Paulette Brogna further testified that when she walked across the street that morning, there was no noticeable path shoveled through the snow leading to the driver's side door. T1 26:18-20: T1 81:24-85:5-6. This testimony is also supported by the testimony of Jay Ellis, a truck driver who was also at the scalehouse on the morning of the subject fall. Mr. Ellis and his wife were at the scalehouse on the morning of January 26, 2004. Ellis Transcript 6:19-25. Mr. Ellis testified that he entered the scalehouse the morning of the subject accident and that he entered through the driver's side door. Ellis Transcript 11:12-14. Mr. Ellis testified that there was no cleared path through the snow to get to the driver's door. Ellis Transcript 11:15-18.

After picking up the loaded trailer, plaintiffs returned to the scalehouse. Paulette Brogna didn't notice a shoveled on her way back into the building that second time. However, she did notice that someone had thrown salt in front of the driver's doorway. T1 31:6-12. While inside the scalehouse, Paulette Brogna requested and was granted permission to weigh the truck. T1 76:24. Paulette Brogna was never told what the procedure was for weighing a truck at Naval Weapons Station Earle by any of its employees. T1 107:16-19. She was never stopped from leaving the scalehouse when she went out to weigh the truck. The employee never stopped her from leaving in any way. T1 108:6-8. Paulette Brogna walked out of the building in the same path of travel she had previously taken and stood on the side of the building. T1 32:16-33:4. Paulette Brogna then waved to George Brogna to tell him that it was okay to come onto the scale. T1 33:6-7: T1 132:1-8. When George Brogna pulled his truck around to put it on the

5

scale, he did not notice a pathway and observed that the walkway on the driver's side of the building had not been shoveled. T1 135:17-21. Paulette Brogna waited and made sure George Brogna was on the scale and then went into the scalehouse. T1 33:16-17. George Brogna drove the front two (2) tires on the scale to weigh the front axle. T1 34:12-18. Paulette Brogna then went back into the scalehouse to retrieve the weight. Therein, the scalehouse employee told her the weight and she wrote it down in her notebook. T1 34:22-25. It was Paulette Brogna's normal procedure to write down the weights after they scaled the loads. It was something she would normally do throughout her truck driving career. T1 111:1-6. Mr. Leutbecher then told Paulette to weigh the whole truck at once, by pulling the whole truck on the scale. T1 36:8-10.

Following the instructions, Paulette Brogna exited the scalehouse and entered the passenger side of the tractor to tell George Brogna to weigh the whole truck. When she got out of the truck, she closed the passenger door and stepped forward to round the corner of the building. She immediately slipped and fell onto the ice and snow and slid underneath the tractor. T1 37:4-13. Paulette Brogna testified that she could not have avoided the piles of snow that she slipped on. T1 109:24-25. Paulette Brogna landed on her back. T1 37:15-22 . Paulette realized that she was on a sheet of ice underneath the truck. T1 39:8-12. When she noticed the truck start to move, she kicked her feet up on the tires to push herself out of the way, towards the middle of the truck. T1 39:8-12. Paulette Brogna could not get out of the way of the moving truck and she got caught under the first two (2) tires. She ended up on her stomach. The last two (2) drive tires ran over her. T1 39:20-23. Paulette Brogna remembers lying on the ground, being cold. Mr. Leuctbecher came out waving and hollering at George Brogna to stop the truck,

6

saying "you just ran over your wife". The employee got her a blanket and pillow and called the ambulance, which took her to Jersey Shore's Trauma Center. T1 40:1-22.

George Brogna testified that after his wife told him that they were told to pull the whole tractor trailer onto the scale, he intend on doing so, even though that was not the normal way to do it, because he was told to do so. T1 144:16-20. However, George Brogna thought that it was strange to weigh the whole truck at once. T1 172:5-7. He testified that you do things the way they say and that's it, or else they "will be calling up his company". T1 143:8-18. George Brogna testified that after Paulette Brogna got out of the truck, he saw that his mirrors were clear and he did all of his checks. T1 147:16-23. The next thing he remembers after putting the truck into gear was one of the employees from inside the scalehouse coming out waving and saying, "You just ran over your wife". T1 147:16-23. When George Brogna exited the truck and saw his wife, she was lying on her stomach, shaking, with her notebook in her hand. T1 148:19-23

Paulette Brogna was in Jersey Shore University Hospital for one (1) month. T1 41:8. While at Jersey Shore, she found out she suffered a tibula/fibula fracture, a break near her ankle, she had a metal plate put into her ankle, and had multiple skin grafts done. T1 41:15-23. Paulette Brogna's pain at the hospital was maintained with morphine medication. T1 42:6. Paulette Brogna was transported by plane to Memorial Regional Hospital in Hollywood, Florida for rehabilitation. T1 42:11-14. Paulette Brogna was in Memorial Regional Hospital for three (3) months. T1 43:16-18. While at Memorial Regional Hospital, Paulette Brogna had additional surgery. Her ankle plate was removed because it developed an infection. She was given antibiotics twice per day, and went through extensive rehabilitation and wound care. T1 43:20-25. Paulette Brogna also had

7

a lot of skin debridement and wound cleaning performed.  T1 44:10-11.  Paulette Brogna endured daily wound care, whirlpool debridement and saw an occupational and physical therapist.  She required assistance from a healthcare worker to help her bathe and to get her in and out of bed.  Paulette Brogna continued physical therapy and pool therapy.  T1 45:3-19.  Paulette Brogna testified that even with two (2) OxyContins, debridement and therapy still hurt, and that it was still tough.  This lasted until January 2005.  T1 46:4-16.  Paulette Brogna returned to work in March 2005 as a truck driver.  T1 47:1-11.  Paulette Brogna made about $600 a week before this accident as a truck driver.  She was paid by the mile.  T1 47:12-21.  Paulette Brogna collected Workman' Compensation benefits until it was determined that she reached maximum medical improvement.  With no income or benefits, she then made the decision to go back to work.  T1 49:1-5.  However, Paulette Brogna had to stop working in September of 2006 because she was hurting and couldn't handle the physical part of the job anymore.  T1 49:14-23.  Paulette Brogna quit work mostly because she was fearful that there was no circulation in her legs; she was concerned about the swelling in her legs; she would be up the half the night in pain so she got no sleep; and she experienced severe leg cramps.   T1 103:10-15.  Paulette Brogna made approximately $800 a week net pay when she went back to work from March 2005 through September 2006.  T1 50:23-51:2.  Paulette Brogna enjoyed being together with George so when she stopped working, she lost that and had to get used to not being out on the road anymore.  T1 51:9-18.  She applied for and was awarded social security disability in September 2006.  She receives $905 a month.  T1 51:19-52:6.  Medical bills totaled $678,505.00 for the treatment of her injuries.  T1 52:22.  Paulette Brogna has scarring all over her abdomen and legs.  T1 57:11.  Paulette Brogna's leg skin dings,

8

bruises, scabs, and chaffs easily because the skin is so thin. T1 57:19-25. Paulette Brogna has scarring on her right buttock. T1 58: 4. Paulette Brogna wears support hose on her legs to aide circulation. T1 59:10-12. Paulette Brogna has never had any prior injuries. T1 60:7-9. Paulette Brogna, before the accident, used to garden, and was physically active, self-sufficient, etc. T1 60:12-24. This incident and the resulting injuries have affected her relationship with her husband: she cannot hold her grandchildren on her lap; cannot drive a truck; etc. T1 61: 8-18. Paulette Brogna cannot go on the beach or be in the sun because of the severe scarring on her legs: she cannot get close to her husband or sleep next to him: she cannot walk around the block and talk with her girlfriends: and she and her husband don't have those types of "relations" anymore. T1 62:1-15. Paulette Brogan walks with a cane. T1 62:25. Paulette Brogna has to use a scooter to get around the mall or flea market. T1 64:1-4. Paulette Brogna cannot walk more than 30 minutes freestanding (without a treadmills assistance). T1 103:4. Paulette Brogna usually sits in the car now while George Brogna goes shopping: she cannot go into Wal-Mart where she used to like to shop. T1 103:22-25. George Brogna does most of the housework since the accident. T1 64:23. Paulette Brogna is on a narcotic pain killer called Tramadol. T1 65:15. Paulette Brogna is frustrated with not being able to do things anymore: she used to be athletic: its hard for her to put stockings on: she used to like to take walks and cannot do that anymore: and she can't bend her legs to reach her toes. T1 65:18-25. Paulette Brogna wakes up every couple hours in the night: has to sleep with a pillow between her legs which she's always adjusting: she has nightmares: she has trouble with seeing trucks driving next to her car on the road: and see has recurring "visions" of being run over. T1 66:5-18.

9

George Brogna testified that he stayed in the hospital with his wife for the entire month she was in Jersey Shore, watching over her, making sure that she got what she needed and helped with bandaging her.  T1 153:6-11.  George Brogna drove back to Florida when Paulette Brogna was transferred down there by plane.  T1 154:1-2.  George Brogna was at the hospital with Paulette Brogna in Florida during her entire admission. T1 154:11-13.

George Brogna could see the pain in his wife's eyes when they went back to work truck driving.   T1 155:20-21.  Paulette Brogna was weak: she couldn't walk around like she used to be able to: and she needed a cane or wheelchair all of the time. T1 157:15 – 158:8. Paulette Brogna has to give George Bronga a list of things to get at the store because she cannot shop like she used to.  T1 159:9-12.   Paulette Brogna now has to use a scooter at the parks in Florida where they like to walk around with their kids.  T1 159:3-6.   On the weekend before the trial, Paulette Brogna could not walk three (3) blocks to go to church for Easter.  T1 158:19-25.

Paulette Brogna has to keep her legs elevated, she is in pain with this.  T1 160:1-4.  Paulette Brogna cannot stand for any extended period of time.  T1 160:6.  Paulette Brogna used to do all of the cooking but not anymore.  T1 160:22 – 161:6.  George Brogna thinks that Paulette Brogna was better right after the accident than she is now: she seems to be getting progressively worse since.  T1 160:7-9.

George Brogna testified that their relationship has been affected by her injuries: he doesn't want to hurt her.   He can't touch her legs, and talking about it now after they have gotten over it and learned to deal with talking about it, brings it back up and doubles the hurt.  T1 161:14-25.

**B.**    **TRIAL TESTIMONY OF JAY ELLIS**

Mr. Ellis has been an over-the-road truck driver since 1959. Ellis Transcript 4:19-24. Mr. Ellis and his wife have been truck driving as a tandem team since 1987. Ellis Transcript 5:2-7. Mr. Ellis does not know either of the Brognas. Ellis Transcript 14:6-9.

In January of 2004, Mr. Ellis and his wife were working for trucking company called Landstar Ranger. Ellis Transcript 5:10-11. Over the years working as a tandem truck driving team, Mr. Ellis and his wife picked-up and dropped off loads at the NWS Earle. Mr. Ellis testified that he is familiar with the facility and the scalehouse. Ellis Transcript 6:10-18.

Mr. Ellis and his wife were at the scalehouse on the morning of January 26, 2004. Ellis Transcript 6:19-25. Mr. Ellis testified that he entered the scalehouse through the driver's side door on the morning of the subject accident. Ellis Transcript 11:12-14. Mr. Ellis testified that there was no cleared path through the snow to get to the driver's door, "just footsteps from other drivers." Ellis Transcript 11:15-18. Mr. Ellis testified that plaintiffs' Exhibit, P-8, accurately and clearly depicted the area around the scalehouse that morning. Ellis Transcript 11:19-12:4.

Mr. Ellis testified that when he would weigh his truck at NWS Earle's scalehouse, he would just pull it on himself. No one from the scalehouse would direct him onto the scale. Ellis Transcript 16:5-10. Mr. Ellis testified that either he or his wife would be in the scalehouse to get the weights to make sure they were accurate. Ellis Transcript 16:11-18: 24:17-25:4. Mr. Ellis testified that his wife does not get weighed with the truck if she is inside looking at paperwork or the scalehouse. Ellis Transcript 21:7-11.

Mr. Ellis testified that the proper procedure for weighing a truck depends on your own individual preference. Ellis Transcript 23:13-22.

## C.   TRIAL TESTIMONY OF DR. WAYNE NOLTE

Dr. Wayne F. Nolte holds a bachelors degree in civil engineering and a masters degree in civil engineering with a concentration in structural engineering and applied mechanics, as well as a Ph.D. in civil and mechanical engineering all from New Jersey Institute of Technology (NJIT). Trial Transcript for 4/14/09 hereinafter referred to as "T2" 3:17-4:1, Dr. Nolte began working as a lecturer in civil and mechanical engineering for NJIT, then became its director of applied research before leaving in 1981 to begin his own business. T2 4:2-7. Dr. Nolte began evaluating the reconstruction of existing buildings and sites, and now performs site evaluations and accident reconstructions. T2 4: 7-13.

Dr. Nolte described the subject incident as a fall accident based on property maintenance. T2 7:17-21. Dr. Nolte inspected the scalehouse and the surrounding area on May 20, 2008. T2 9:7-8. Dr. Nolte determined from the deposition testimony and the photographs taken on the date of the subject accident that the area at and about the employees side door was shoveled and the same area at or near the driver's side door was not. T2 17:23-18:3.

Dr. Nolte opined that to determine if property is properly maintained, you have to look at how the property is actually used by looking at the mode of operation. In this instance, Dr. Nolte opined that it is foreseeable that where there is a tandem team of drivers, the passenger would be exiting the tractor. T2 20:23-21:23.

12

Dr. Nolte further opined, "given how the facility was described in its use [sic] based on the documents that I have reviewed, the foreseeability that someone is going to exit the tractor on the passenger side, which is closest to the south wall of the building, there needs to be clearing for them to actually get to the door located on the east side of the building. That clearing was not there. Yet on the west side of the building for the employees there was a clearing. The east side of the building for the drivers there was no clearing." T2 22:10-23.

The investigating officer observed that the walkway area of the scalehouse was very icy on the driver's side and it was not safe for walking. T2 27:10-16: Plaintiffs' Exhibit, P-1.

Dr. Nolte further opined, "that based upon my understanding of the mode of operation of the facility from the documents reviewed that the area where this accident occurred was a foreseeable pathway for drivers and their passengers who were going to use the scalehouse and the weigh station itself. The surface where Mrs. Brogna stepped out of the vehicle on the day of this accident had not been treated in any way. It had not been shoveled, it had not been plowed, had not been treated with salt or sand. There was actually a remnant of snow from a plowing operation where it appeared to be across the scale in this area.

Paulette Brogna had no traction whatsoever in the ice and snow in that area to prevent a slip and fall accident. There were no signs in the area to indicate to her that she should not get out of the vehicle. She was not informed verbally that she should not get out of the vehicle. She was given no indication that what she did was against a procedure of some kind. There just weren't any procedures presented to her. T2 28:3-29:1.

13

Dr. Nolte opined that a passageway should have been cleared between the position of the tractors on the scale and the driver's side door. This is so because it was a foreseeable route that a passenger on a tractor would get out of the passenger side, walk along the front of the building and walk toward the driver's door side of the building in order to either retrieve the weight or to get paperwork. T2 29:13-25.

Dr. Nolte opined that people will take the shortest route between two points, certainly when there is bad weather or when there is snow on the ground. There was nothing to prevent anyone from taking the shortest route which would be along the two walls of the building. T2 30:3-23.

Dr. Nolte opined that within a reasonable degree of engineering certainty, the cause of the subject accident was defendant USA's failure to clear the snow and ice from the very foreseeable travel path given the tasks that the truck drivers and their passengers had to perform. T2 31:2-18. This opinion was not contradicted by an expert testifying on behalf of the defendant USA.

Dr. Nolte opined that the Brognas bore no responsibility for the injuries to Paulette Brogna. T2 58:12-15. This opinion, again, was not contradicted by an expert testifying on behalf of the defendant USA.

Dr. Nolte also relied, *inter alia*, on Fireman Bullock deposition testimony that the area around the scalehouse was snowy and icy. T2 61:10-17.

Dr. Nolte opined that a landowner must clear all foreseeable paths and must provide a hazard free environment. T2 69:11-18. This opinion, again, was not contradicted by an expert testifying on behalf of the defendant USA.

14

**D.**    **TRIAL TESTIMONY OF DR. JOHN KING**

Dr. John King completed his undergraduate degree at Wake Forest University, then completed two (2) years of graduate school at C.W. Post Long Island University and finally completed graduate school at NY College of Osteopathic Medicine.  Dr. King Transcript 5:20 – 6:3.  Dr. King completed his residency at St. Michael's in Newark, NJ and then did one (1) year of general surgery and four (4) years of orthopedic surgery at the Peninsula Hospital Center in Queens, NY.  Dr. King Transcript 6:4-15.  Dr. King served as the staff orthopedic surgeon for the military at the General Leonard Wood Army Community Hospital in Missouri for four (4) years.  Dr. King Transcript 7:12-20. Dr. King began a private practice in 2000 with his partner, Gregory Charko, M.D. with offices in Union and Woodbridge, NJ.  Dr. King Transcript 8:4-9.  Dr. King has surgical privileges at Trinitas Medical Center in Elizabeth, NJ.  He became board certified in orthopedics in 2002.  Dr. King Transcript 8:12-20.  Dr. King performs surgery two (2) days per week and treats in the office three (3) days per week.  He performs shoulder, knee, and arthroscopic surgeries as well as doing traumatic fracture work of the upper and lower extremities.  Dr. King also assists in spine surgery involving the neck and back.  Dr. King Transcript 9:17-10:4

Dr. King examined Paulette Brogna on November 14, 2006.  Dr. King Transcript 11:11-15.  Paulette sustained extensive injuries to both lower extremities and to the right side of her buttocks.  Dr. King Transcript 12:21-23.  When Dr. King examined Paulette Brogna, she had complaints of leg pain, more so when sitting or standing; she was still walking with a cane; she could not walk distances; and her knees were stiff and tight.  Dr. King Transcript 28:2-15.  Paulette used a cane for walking, and a wheelchair or

motorized scooter if she were to shop at a store.  She took medication for the pain, and had to continually elevate her legs with pillows when she was off of her feet.  Dr. King Transcript 28:18-24.  Paulette Brogna's limitations included not being able to kneel, not being able to do housework or chores, she was having sensations to her skin graft sites, she became fatigued when she walked distances, and had constant pain that ranged from a 4 to an 8 out of 10.  Dr. King Transcript 29:5-12

Dr. King's evaluation of Paulette included inspecting the extremities, measuring circumference of the leg and calf, assessing the range of motion of the knee and the ankle, and checking stability of the joints.  Dr. King Transcript 30:19-24.  Dr. King testified that Paulette Brogna sustained the following injuries -- she had multiple open wounds to both lower extremities, an open tibia fracture, complex involvement of the extremity with crush trauma, proximal fibula fractures, nondisplaced fractures about the tibia plateau, and a large wound to her right buttocks.  Dr. King opined that within a reasonable degree of medical certainty, the injuries sustained by Paulette Brogna are permanent.  More specifically, her legs are never going to be the same: she has limited motion: and chronic swelling and chronic pain in both legs, which all limit her ability to function.  Dr. King Transcript 31:12-32:8.  Dr. King further opined that all of these injuries were caused by the crush injury sustained when she was run over by the tractor trailer.  Dr. King Transcript 33:2-4.

Dr. King further opined that in the future, Paulette Brogna will have a concern for developing posttraumatic arthritis in the ankle, causing chronic pain in the ankle, and will have to be addressed in the future with conservative treatment and eventually a fusion-type surgery or replacement.  Dr. King Transcript 32:9-22.

Dr. King noted that Paulette Brogna stopped working because of complaints of leg pain, swelling and discomfort in her legs, and nocturnal pains in her calf and legs. Dr. King Transcript 27:17-23. With regard to Paulette Brogna's ability to return to work, Dr. King opined that she would continue to experience chronic swelling, fatigue, and extreme difficulty with her legs and that she will not be able to continue to stay in her line of work, truck driving.   Dr. King Transcript 33:13-20.   The problems that Paulette Brogna is experiencing  and her inability to work are, in Dr. King's opinion, causally related to the injuries she sustained. Dr. King Transcript 34:3-8. Moreover, because of the massive soft tissue injuries Paulette Brogna sustained and all of the debridement and removal of skin and tissue that she underwent, she will not develop new nerves in those areas which have the potential to develop pressure sores that she will be unaware of because of the lack of sensation. Dr. King Transcript 34:19-35:5.

Further, on Paulette Brogna's right leg above the knee, there is an area of demarcation which will have to be monitored over the course of time to make sure that infection does not develop. Dr. King Transcript 35:8-20. Because of Paulette Brogna's leg injuries, Dr. King predicted that the vein supply to the legs will be compromised and will be associated with swelling, stiffness, limited range of motion, and loss of strength in the lower extremities. Dr. King Transcript 30:5-15.

Dr. King's overall assessment of Paulette is that she has significant functional impairment. Dr. King Transcript: 39:19-23. She requires the constant ability to elevate her legs. Dr. King Transcript 48:1-4. Dr. King expects Paulette's condition and the problems she is having with both lower extremities to get worse over time. Dr. King Transcript 54:7-10.

17

**E.**   **TRIAL TESTIMONY OF RAPLH LEUTBECHER**

Ralph Leutbecher had only been working at the scalehouse for 6 months when the subject fall occurred.  T2 122:21-23.  The hours of the scalehouse were 7am to 3:30pm. T2 86: 2-5.  Mr. Leutbecher arrived at the scalehouse at around 7am.  T2 99:2-4.  The day of the subject fall was a Monday.  It had snowed over the weekend.  T2 98:15-21.  Mr. Leutbecher was the first employee to arrive at the scalehouse.  He first grabbed a shovel and shoveled a walkway to the employee pick-up truck outside the employee's door. This was done to "keep the snow from tracking in the building."  T2 99: 10-25.  Mr. Leutbecher then shoveled along the side of the building from the employee's door to the scale.  T2 123:17-20.  Mr. Leutbecher testified that along that edge is not a walkway, because there are no "walkways" around that building.  Rather, he testified that that area was shoveled because it was just "the direct path".  T2 123:17-24.  Mr. Leutbecher did not shovel any portion of the area at or about the driver's side of the scalehouse.  T2 101:23-24.  Mr. Leutbecher testified that he didn't shovel the driver's side door area because he simply didn't get a chance to because he was so busy.  T2 101:25-102:2. However, Mr. Leutbecher admitted that there were only 2 drivers waiting for the scalehouse to open that morning.  T2 138: 13-23.  Mr. Leutbecher further admitted that they leave the driver's door locked until they were ready to let the trucker drivers in to do business.  T2 86:6-13.

Mr. Leutbecher testified that public works is responsible for plowing the snow in the street across from the scalehouse and on the scale itself.  T2 98:2-4: T2 107:5-6. However, with regard to removing snow and ice from around the scalehouse, Mr. Leutbecher testified that it is "not really a requirement".  T2 98:5-10.  There was no set

procedure for removing snow and ice from the walkways around the scalehouse.  The scalehouse employees would shovel the areas around the scalehouse "if they needed shoveling".  T2 98:11-14.  With regard to the alleged walkway that was shoveled a week prior, Mr. Leutbecher never walked out the driver's door or inspected the driver's side area that morning to even determine if that alleged walkway was visible.  T2 102:11-13.  Mr. Leutbecher testified that he knew that the plow's operation and the runoff from melting snow forms a mound of ice and snow at the corner of the scalehouse between the scale and the driver's side door.  Mr. Leutbecher admitted that this area was not shoveled out on the morning of the subject fall.  T2 108: 3-21.  Mr. Leutbecher testified that the pathway he shoveled the week before extended from the driver's door, past the scale and over the curb and into the street.  T2 106:14-107:2.

There was no prohibition to walking on or around the scale.   In fact, Mr. Leutbecher was aware of truck drivers walking across it to get to their trucks.  T2 109:5-6.  With regard to the walkway between the scalehouse and the scale, Mr. Leutbecher admitted that drivers use that area to walk to the driver's side door.  T2 109: 16-20.  Mr. Leutbecher admitted that the drivers will take a direct route to their trucks.  T2 135:12-16.

Mr. Leutbecher testified that the Tri-State Motor Transit (TSMT) drivers are required to be tandem teams, due to the sensitive cargo.  T2 92:3-11.  Mr. Leutbecher testified that Paulette Brogna initially entered the scalehouse around 7:15am.  T2 100:16-21.  After retrieving the loaded trailer, Paulette Brogna again entered the scalehouse to ask permission to weigh the truck.  Mr. Leutbecher testified that he replied, "that's what the scale is for, yes."  Mr. Leutbecher said nothing else.  Mr. Leutbecher provided no

other instruction.  Mr. Leutbecher testified that the steer axles were already on the scale.
T2 110:15-20: T2 111:16-21.  Mr. Leutbecher testified that he knew the truck was on the
scale prior to Paulette Brogna coming into the scalehouse to ask permission to weigh the
truck.  Mr. Leutbecher further testified that at no time did he tell the Brognas to get off
the scale.  T2 145:13-146:20.

Mr. Leutbecher testified that the only time the scalehouse employees will weigh a
tractor trailer is if the truck drivers ask.  Mr. Leutbecher further testified that the
weighing of the truck is a courtesy and is not required by the US Navy.  T2 150:2-18.

Mr. Leutbecher testified that he found Paulette Brogna under the truck on her
stomach, facing the front of the truck.  Her ankle was turned between the two truck tires.
There was bleeding at her knee through the denim jeans.  The hanger bolts were dug into
her backside.  He testified that it appeared that she had been dragged about 7 or 8 feet.
T2 116:10-25.  He further testified that the drag marks started before the edge of the
scale.  T2 117:1-4.

### F.     TRIAL TESTIMONY OF THOMAS FITZGERALD

Thomas Fitzgerald testified that he was a traffic management specialist for US
Navy, Department of Defense stationed at NWS Earle on the date of the subject fall.  Mr.
Fitzgerald held this position for the past 20 years.  T2 158:18-25.  Mr. Fitzgerald and Mr.
Luetbecher were the only employees working at the scalehouse on January 26, 2004.  T2
159:21-25.

On that morning, there was fresh snow on the ground.  T2 160:1-9.  Mr.
Fitzgerald arrived around 20 minutes before 7am and Mr. Leutbecher was already there.

20

T2 160:10-17.  Mr. Fitzgerald testified that when he arrived at the scalehouse that morning, he went inside, turned on his computer and checked his emails. T2 160:18-22. He testified that when he unlocked and opened the driver's side door, he cleared the snow in the area that spanned the width of the door, so that the door would open and close and probably put some salt down.  T2 161:1-7.

Mr. Fitzgerald and Mr. Leutbecher did not agree on the location of the alleged path that was previously shoveled the week before.  T2 162:7-18.  That pathway was allegedly shoveled in that area because that was the easiest path to shovel through due to the plowing, and not because it was the most direct route or because that was the route the drivers would use to enter or exit driver's door to the scalehouse.  T2 163:24-164:6. Mr. Fitzgerald estimated that from the front corner edge of the driver's side of the building, the alleged path was 12-15 feet away from the building on an angle.  T2 164:18-166:18.

Mr. Fitzgerald testified that when Paulette Brogna entered the scalehouse to ask permission to weight the truck, Mr. Leutcbecher responded, "that's what it's there for or yes" and at that point the truck was already on the scale.  T2 167:1-19.  Mr. Fitzgerald testified that he then clicked off the website he was on and walked to the other side of the building. About 15 to 20 seconds later, the truck was moving.  T2 167:22-168:2.

Mr. Fitzgerald testified that the drag marks started before the corner edge of the building on the driver's door side.  T2 172:2-173:11: T2 183:20-25.  The drag marks were visible in the fresh snow.  T2 184:1-7.

Mr. Fitzgerald testified that there was a path shoveled through the previous fallen snow. T2 161:16-19. The path extended from the driver's door to the snow mound. He identified the snow mound in defendant's Exhibit 8. T2 178:17-180:6.

Mr. Fitzgerald testified that he was never told by his superiors that he or Mr. Leutbecher were responsible for clearing ice or snow around the scalehouse. T2 194:24-195:7. The scalehouse employees were never told by the US Navy what was supposed to be done with regard to ice and snow removal. T2 195:2-12. Mr. Fitzgerald testified that the scalehouse employees' responsibility to remove ice and snow was "sort of a grandfathered thing". T2 95:2-7. The employees were left to do what they felt was appropriate. T2 195:8-12.

Mr. Fitzgerald testified that he never told the Brognas that they were not supposed to be on the scale. T2 201:11-19.

Mr. Fitzgerald admitted that drivers weigh the trucks with only the driver in it and without the passenger. T2 207:14-19.

Mr. Fitzgerald testified that here was no requirement that the load attached to the Brogna tractor had to be weighed. T2 209:16-19.

## G.   TRIAL TESTIMONY OF COMMANDER TRETTEL

In January of 2004, Commander Trettel was assigned as the officer in charge of the Atlantic Ordnance Command, Detachment Earle. The scalehouse and the scale was part of the Atlantic Ordnance Command. Trettel Transcript 6:6-25.

Commander Trettel testified that he responded to the scalehouse after hearing about the accident. Trettel Transcript 7:1-3. When he arrived, Commander Trettel testified that he spoke with Mr. Fitzgerald and Mr. Luetbecher. Trettel Transcript 11:10-

13.  Commander Trettel testified that Mr. Fitzgerald and Mr. Leutbecher told him that they had shoveled the path that morning.  Trettel Transcript 11:14-19.

Commander Trettel testified that while at the scalehouse, Mr. Fitzgerald and Mr. Leutbecher told him that Paulette Brogna entered the building and asked if she could pull the truck onto the scale to weigh it and they told her it was okay to do so.  Trettel Transcript 12:18-13:4.  Commander Trettel also testified that Mr. Fitzgerald and Mr. Leutbecher didn't object to Paulette Brogna pulling onto the scale and, in fact, gave her permission.  Trettel Transcript 13:9-11.

Mr. Fitzgerald and Mr. Leutbecher also told Commander Trettel that Paulette Brogna then left the building and the next thing they heard was some kind of noise.  Trettel Transcript 13:5-8.

## V.   CONCLUSIONS OF LAW

### A.   PLAINTIFFS PROVED THAT DEFENDANT USA WAS NEGLIGENT BY FAILING TO REMOVE ICE AND SNOW FROM THE AREA AROUND THE SCALE AND AT AND ABOUT THE DRIVER'S SIDE ENTRANCE TO THE SCALEHOUSE

Plaintiffs have proven the four (4) core elements of negligence: "(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages [.]" Weinberg v. Dinger, 106 N.J. 469, 484, 524 A.2d 366 (1987) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts, § 30 at 164-65 (5th ed. 1984)); Polzo v. County of Essex, 196 N.J. 569, 584, 960 A.2d 375, 384 (2008).

#### 1.   DEFENDANT USA HAD A DUTY TO DISCOVER AND ELIMINATE DANGEROUS CONDITIONS, TO MAINTAIN ITS PREMISES IN A SAFE CONDITION AND TO AVOID CREATING CONDITIONS THAT WOULD RENDER THE PREMISES UNSAFE

Defendant USA, as the landowner of NWS Earle has "a non-delegable duty to use reasonable care to protect invitees against known or reasonably discoverable dangers." Rigatti v. Reddy, 318 N.J. Super. 537, 541, 723 A.2d 1283, 1285 (App. Div. 1999)(citing Kane v. Hartz Mountain Indus., 278 N.J. Super. 129, 140, 650 A.2d 808 (App. Div. 1994), aff'd, 143 N.J. 141, 669 A.2d 816 (1996).  An invitee is either a member of the public invited onto the property "for a purpose for which the land is held open to the public" or a business visitor invited onto the property "for a purpose directly or indirectly connected with business dealings with the possessor of the land." Restatement (Second) of Torts § 332 (1965).  "Business owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation." Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563, 818 A.2d 314 (2003).  That duty of care requires business owners to "discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe." Ibid; Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 433, 625 A.2d 1110 (1993)( This duty is of the highest duty and includes, a duty of "reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered and encompasses the duty to conduct a reasonable inspection to discover latent dangerous conditions." ).

The Brognas, in this instance, are business invitees as they were as employees of TSMT contracted to pick up a loaded trailer from the US Navy and deliver it pursuant to a commercial bill of lading to Crane Army Ammunitions Activity in Crane, Indiana. The Brognas' legal status as business invitees and their lawful presence at NWS Earle is undisputed.

24

## 2.   DEFENDANT USA BREACHED ITS DUTY OF CARE TO PLAINTIFFS

Plaintiffs submit that defendant USA breached its duty to discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe. See Nisivoccia, supra, 175 N.J. at 563, 818 A.2d 314 (2003).  To satisfy its duty of care in this instance, plaintiffs submit that defendant USA was obligated to look at how the truck drivers and their passengers would use the scalehouse and the scale and to eliminate dangerous conditions on that portion of the property.  T2 37:3-7.  In this regard, Dr. Nolte concluded that defendant USA failed to provide a hazard free environment by failing to clear all foreseeable paths.  T2 69:11-18.  This opinion was not challenged by any expert testimony proffered on behalf of the defendant USA.  Rather defendant USA argues that simply any path will satisfy its duty, regardless if such path was a foreseeable path that would be used by the truckers at the facility.

Although testimony revealed that the Public Works Department is responsible for plowing the street in front of the scalehouse and the scale itself, the US Navy had no set procedure in place for removing snow and ice from the walkways around the scalehouse and the scale.  The scalehouse employees would simply shovel "if the[] [walkways] needed shoveling".   T2 98:11-14.  In fact, Mr. Leutbecher candidly admitted that removing snow and ice from the scalehouse was "not really a requirement".  T2 98:5-10.  Mr. Fitzgerald confirmed that he was never told by his superiors that he or Mr. Leutbecher were responsible for clearing ice or snow from the walkways around the scalehouse and the scale.   T2 194:24-195:7.   Rather, the scalehouse employees' responsibility to remove ice and snow was "sort of a grandfathered thing".  T2 95:2-7.

25

The scalehouse employees were never told by the US Navy what was supposed to be done with regard to ice and snow removal. T2 195:2-12. The employees were left to do what they felt was appropriate. T2 195:8-12. The evidence revealed that there was absolutely no procedure in place to ensure a hazard-free area around the scalehouse and the scale for the truck drivers to safely process their paperwork and/or to scale their loads.

It is astounding defendant USA, which has procedures for almost everything on the base, failed to have in place any plan to protect business invitees from slip and fall hazards. Defendant USA gave the scalehouse employees no guidance and accordingly the employees took steps that only removed the hazard from their entrance to the building.

On the morning of January 26, 2004, when the Brognas arrived the scalehouse, fresh snow was on the ground. T1 125:23-25. This fresh snow was on top of what was already on the ground from the previous snow storm. T2 126:2-5. When Mr. Leutbecher arrived at the scalehouse that morning, shortly after the Brognas arrived, he immediately shoveled the employee's entrance to the scalehouse. T1 17:11-18; T1 27:18-25. Mr. Leutbecher then shoveled a "direct" path along the edge of the building from the employee's door to the scale. T2 123:17-20; T2 123:17-24. Thereafter, Mr. Fitzgerald arrived at the scalehouse. T2 160:10-17. Mr. Fitzgerald testified that when he arrived that morning, he went inside and turned on his computer to check his e-mails. T2 160:18-22. He testified that it was only when he unlocked and opened the driver's side door to allow the drivers into the scalehouse to begin processing the their paperwork, he vaguely recalled throwing "ice melt" right outside the driver's side door so that the driver's door would open and close. T2 161:1-7.

It is undisputed that neither of the two (2) scalehouse employees, Mr. Fitzgerald nor Mr. Leutbecher shoveled any snow or cleared any ice at or near the driver's side entrance, on the walkway along the side of the scalehouse or the walkway between the scalehouse and the scale on the morning of January 26, 2004.   It is also undisputed that on that morning, prior to the fall, the Public Works Department did not clear any ice or snow from the area in front of Scalehouse L-25 or around the scale. T2 98:2-4.

Although plaintiffs deny that on the morning of January 26, 2004, there was an established path leading from the street to the driver's side door, Mr. Leutbecher testified that he shoveled that path after the previous snowfall. T2 101:18-22.   Mr. Leutbecher testified that he didn't shovel the path that morning because he did not get a chance to do so because he was too busy. T2 101:25-102:2.  However, Mr. Leutbecher admitted that there were only 2 drivers waiting for the scalehouse to open that morning.  T2 138: 13-23.  When Mr. Leutbecher was asked whether that path was visible that morning, he testified that he did not know because he never walked out the driver's door to inspect or observe the driver's side area that morning.  T2 102:11-13.  The scalehouse employees simply failed to discover and eliminate the hazardous conditions presented by the ice and snow.

Assuming that a path was shoveled a week prior, after the previous snow storm, such path was insufficient to satisfy defendant USA's duty in this regard.  Even if there was an established, diagonal path cleared for ingress and egress to the driver's side door, albeit a week prior after the previous snow storm, such path did not provide a safe foreseeable passageway for passengers to exit the tractor at or near the scalehouse.  T2 39:7-40:2.  Mr. Fitzgerald estimated that from the front corner edge of the driver's side of

the building, the alleged path was 12-15 feet away on an angle away from the building. T2 164:18-166:18. The alleged path was not shoveled in that location because it was a "direct" or "foreseeable" route for the truckers to enter and exit the scalehouse from either the street or the scale, but rather it was shoveled there because it was the easiest route to shovel due to the piled snow from the snow plows. T2 163:24-164:6. This alleged path was not sufficient for drivers or their passengers who had to get out of the tractor while it was at the scale and go into the scalehouse in order to retrieve the axle weights. T2 37:24-38:5. Both Mr. Fitzgerald and Mr. Leutbecher acknowledged that truck drivers will walk across the scale when entering and exiting the building. Mr. Leutbecher also indicated that he would put ice melt down on the scale to get snow and ice off of it and to prevent people from falling. T2 153:20-154:1.

Although the alleged diagonal path may have been the easiest route to shovel, Dr. Nolte testified that "that part of the property was not considered [ ] a foreseeable passageway." T2 37:24-38:5. Dr. Nolte opined that a passageway should have been cleared between the position of the tractor on the scale and the driver's side door. Dr. Nolte opined that where there is a tandem team of drivers, it is foreseeable that the passenger of the tractor would get out on the passenger side, walk along the front of the building and walk toward the driver's door side of the building in order to either process the required paperwork or to retrieve the axle weights while weighing the tractor trailer at the scale. T2 29:13-25; T2 20:23-21:23. Dr. Nolte opined that consideration should have been given to the fact that people will take the shortest route between two points, certainly when there is bad weather or when there is snow on the ground. T2 30:3-23.

28

As for the walkway along the scale and the driver's side of the scalehouse, Mr. Leutbecher testified that he knew that the plow's operation and the runoff from melting snow forms a mound of ice and snow at the corner of the scalehouse between the scale and the driver's side door. T2 107:20-108:19. Mr. Leutbecher admitted that this area was not shoveled on the morning of the subject fall. T2 108: 3-21. Defendant USA's own investigation determined that the walkway area by the scalehouse was very icy and the driver's side entrance was not safe to be walking on. T2 27:10-16: See P-1. This conclusion is further support by Fireman Bullock's deposition testimony, which was brought out in plaintiff's case-in-chief, that the area around the scalehouse was snowy and icy. T2 61:10-17.

Paulette Brogna, immediately prior to falling, exited the tractor and took a step forward to round the corner of the scalehouse. To rebut any argument by defendant USA concerning whether Paulette Brogna should have been walking in the area at the corner of the scalehouse and scale where she fell, there was absolutely no prohibition to walking on or around the scale. In fact, Mr. Leutbecher was aware of truck drivers walking across that area it to get to their trucks. T2 109:5-6. In addition, with regard to the walkway between the scalehouse and the scale, Mr. Leutbecher admitted that drivers use that area to walk to the driver's side door. T2 109: 16-20. Mr. Leutbecher admitted that the drivers will take a direct route to their trucks and the scalehouse. T2 135:12-16. Moreover, there were no signs whatsoever to indicate that drivers or passenger should not get out of the vehicle in this area. Although Paulette Brogna fell at the corner of the scalehouse she was not told to stay out of this area. She was given no indication that what she was doing was against any procedure of any kind. In fact, no one told her she

couldn't do it even after she went into the scalehouse. T2 38:6-14. If Mr. Leutbecher's version of events is to be accepted as factual, then he was aware that Paulette Brogna walked across the area depicted on Plaintiffs' Exhibit, P-8, photo No. 6, when she entered the building to ask about weighing the truck on the scale. According to Mr. Leutbecher, the passenger door to the tractor was right at the corner of the building depicted in that photograph. T2 139:20-23. He never told Paulette Brogna what the procedure was or that she couldn't be on the scale. T2 142:17-22. Most pointedly, there was nothing to prevent anyone from taking the shortest route which would be along the two walls of the building. T2 30:3-23; T2 28:3-29:1. There was absolutely no forethought concerning the safety of the trucker drivers in this instance.

The version of events testified to at trial by Mr. Fitzgerald and Mr. Leutbecher is implausible. They state that when the Brognas returned the second time, they pulled right onto the scale. Notwithstanding that they were on the scale, Mr. Leutbecher told her it was okay to weigh the truck and allowed her to walk out of the building without telling her to pull the truck off of the scale so it could be cleared.

Mr. Leutbecher and Mr. Fitzgerald's versions of the events of January 26, 2004 must be questioned. First, the defendant's own investigation concluded that the driver's side entrance was very icy and driver's side entrance was not safe to be walking on. See Plaintiffs' Exhibit, P-1. It does not mention anything about a cleared walkway. Furthermore, the defendant's own investigator wrote that Mr. Leutbecher stated, "V/Brogna came inside the Scalehouse driver's door to ask if their trailer could get weighed. W/Leutbecher said he told V/Brogna 'yes' and she went back outside to let

30

W/Brogna know to move the trailer up on the scale."   See Plaintiffs' Exhibit, P-1.  This completely contradicts Mr. Leutbecher's trial testimony.

The only logical reason for George Brogna to have moved forward once he was on the scale was that he was told to do so by Paulette Brogna, after she was told by Mr. Leutbecher to pull the whole truck onto the scale.  This was after Paulette Brogna obtained the weight of the front axle, which she wrote down in the notebook she was holding when the accident occurred.    There may, however, have been a misunderstanding.  Paulette Brogna thought they wanted the entire tractor and trailer on the scale and so informed George Brogna.  Mr. Leutbecher may have told Paulette Brogna to pull the trailer on the scale, which is consistent with his statement to Investigator Kiernan in P-1.  However, all that matters is that George Brogna was moving the truck after his team member, Paulette Brogna, informed him that Mr. Leutbecher said to do so.

The path traveled by Paulette Brogna was reasonably foreseeable given the mode of operation at this facility.  Not only was it foreseeable but the scalehouse employees had knowledge that truck drivers would traverse the area around the scale.   The scalehouse employees also were aware that the truck drivers would take the most direct path when entering the scalehouse or traversing to their trucks.  There is no question that defendant USA failed to clear the snow and ice from the reasonably foreseeable travel path traveled by other truck drivers and Paulette Brogna on the morning of January 26, 2004.  T2 31:2-18.  By failing to have a set procedure in place to eliminate the dangerous condition presented by ice and snow, coupled with the fact that no snow removal was

performed whatsoever on the driver's side of the scalehouse, defendant USA breached it duty to plaintiffs in this instance.

**3.    THE NEGLIGENT ACTS OF DEFENDANT USA IS THE PROXIMATE    CAUSE    OF    PLAINTIFF    PAULETTE BROGNA'S INJURIES**

A tortfeasor is held answerable for the injuries which result in the ordinary course of events from his negligence and it is generally sufficient if his negligent conduct was a substantial factor in bringing about the injuries.  Lutz v. Westwood Transportation Co., 31 N.J.Super. 285, 289, 106 A.2d 329 (App. Div. 1954), certif., denied, 16 N.J. 205, 108 A.2d 120 (1954).  Intervening causes which were foreseeable or were normal incidents of the risks created does not relieve the tortfeasor of liability.  See Prosser, Torts § 49 (2d ed. 1955): cf. Menth v. Breeze Corporation, Inc., 4 N.J. 428, 442, 73 A.2d 183, 18 A.L.R.2d 1071 (1950): Andreoli v. Natural Gas Company, 57 N.J.Super. 356, 366, 154 A.2d 726 (App. Div.1959).

Defendant USA breached its duty to use reasonable care to protect plaintiff against known or reasonably discoverable dangers by failing to remove snow and ice from the area at or about the drivers' entrance door to the scalehouse and the area at and about the scale.  Defendant USA's failure in this regard was the proximate cause of the injuries to plaintiff Paulette Brogna.

In order to impose tort liability upon a defendant, a plaintiff must prove the defendant's wrongful conduct, injury and proximate cause.  See Dawson v. Bunker Hill Plaza Associates, 289 N.J. Super. 309, 322, 673 A.2d 847 (App. Div.), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996).  Plaintiff has the burden of proving by a preponderance of the evidence that a defendant's negligent conduct is a cause-in-fact of the plaintiff's

injury.  See Kulas v. Public Serv. Elec. & Gas Co., 41 N.J. 311, 317, 196 A.2d 769

(1964); see also Thorn v. Travel Care, Inc., 296 N.J. Super. 341, 346-347, 686 A.2d

1234, 1237 (App. Div. 1997); Battista v. Olson, 213 N.J. Super. 137, 148-49, 516 A.2d

1117 (App. Div. 1986).

There may be multiple causes of an injury, however, these causes "'need not, of

themselves, be capable of producing the injury; it is enough if they are 'a substantial

factor' in bringing it about.' " Conklin v. Hannoch Weisman, 145 N.J. 395, 417, 419, 678

A.2d 1060 (1996)(quoting Scott v. Salem County Memorial Hosp.,116 N.J. Super. 29,

34, 280 A.2d 843 (App.Div.1971); see also Thorn v. Travel Care, Inc., 296 N.J. Super.

341, 346-347, 686 A.2d 1234, 1237 (App. Div. 1997); Grassis v. Johns-Manville Corp.,

248 N.J. Super. 446, 457, 591 A.2d 671 (App. Div. 1991) (noting that the law does not

require a plaintiff to prove a single cause, only that defendant's conduct was a substantial

factor in causing the injury).

There may be two or more concurrent and directly cooperative proximate causes

of an injury.  Scott v. Salem County Memorial Hosp., 116 N.J. Super. 29, 33, 280 A.2d

843 (App. Div. 1971).  Such causes need not be exclusively capable of producing the

injury, they need only be a substantial factor in bringing about the harmful result. Id. at

34, 280 A.2d 843.  Stated differently, "[l]iability attaches not only to the dominating

cause but also to any cause which constitutes as any event a substantial factor in bringing

about the injury."  Dawson v. Bunker Hill Plaza Associates, 289 N.J. Super. 309, 322-

323, 673 A.2d 847, 853 (App. Div.1996)(citing Peer v. City of Newark, 71 N.J. Super.

12, 28, 176 A.2d 249 (App.Div.1961).

There can be more than one proximate cause of an injury.  Davis v. Brooks, 280 N.J. Super. 406, 410 (App. Div. 1993).  There is no requirement that a tortfeasor's conduct "be the sole proximate cause of the plaintiff's injury." Id. at 411. As noted in Davis, "to be a proximate cause, ... conduct need only be a cause which sets off a foreseeable sequence of consequences, unbroken by any superseding cause, and which is a substantial factor in producing the particular injury.... The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective "realm of foreseeability." Ibid. (quoting from Bendar v. Rosen, 247 N.J. Super. 219, 239 (App. Div. 1991)).  Indeed, "there may be any number of causes intervening between a negligent act and a final injurious occurrence." Id. at 412.  So long as "they are reasonably foreseeable, each intermediate cause may be deemed a proximate result of the first wrongful act." Ibid.

In Davis v. Brooks, 280 N.J. Super. 406 (App.Div. 1993), plaintiff was injured in an automobile accident and sued for damages.  Defendant moved for summary judgment, contending that plaintiff's injuries did not meet the verbal threshold as it was then framed. Id. at 408.  Prior to the return date of the motion, plaintiff amended her claim for damages.  She asserted that her physician had recommended a bone scan to determine the source of her persistent hip and leg pain.  Id. at 409.  Unbeknownst to plaintiff, she was three-weeks pregnant at the time of the bone scan.  Ibid.  Based upon the recommendation of her treating gynecologist, she had a therapeutic abortion.  Ibid.  The Davis Court  rejected defendant's argument that plaintiff's bone scan constituted a superseding cause which relieved him of liability.  The Court explained,

> There is no question that there may be any number of
> causes intervening between a negligent act and a final

34

injurious occurrence. If they are reasonably foreseeable, each intermediate cause may be deemed a proximate result of the first wrongful act. The original negligence is deemed to continue and operate contemporaneously with all intervening acts of negligence that might reasonably be foreseeable, so that the original negligence is regarded as a concurrent cause of the final resulting injury. The causal connection may be broken by a superseding intervening cause. Such a cause must be one that so entirely supersedes the operation of the first tortfeasor's negligence that it alone caused the injury, **without the first tortfeasor's negligence contributing thereto in any material way**. But where the original tortfeasor's negligence is an essential link in the chain of causation, such a causal connection is not broken if the intervening cause is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable.

Id. at 412 (emphasis added).

Here, plaintiff Paulette Brogna slipped and fell on ice and snow and, **immediately,** slid under the tractor-trailer, whereby she was run over when Mr. Brogna pulled the tractor trailer forward onto the scale. Defendant USA argues that plaintiff Paulette Brogna's injuries and the way in which they occurred are not a reasonably foreseeable consequence of a failure to remove ice and snow from the walkways around the scalehouse. See Defendant USA Trial Brief, p. 20. In order for defendant USA's negligence to be considered a proximate cause of the accident, it must "only be a cause which sets off a foreseeable sequence of consequences." Davis, supra, 280 N.J. Super. at 411. It is not necessary for the precise mechanism of injury to be foreseeable as long as the ultimate occurrence was within "an objective realm of foreseeability." Ibid. Defendant USA's failure to remove the ice and snow from around the scale area set in motion the fall that brought plaintiff Paulette Brogna under the tractor trailer that was about to move forward to be weighed. Cf. Griesenbeck by Kuttner v. Walker, 199 N.J. Super. 132 (App. Div.), certif. den., 101 N.J. 264 (1985) (Where court refused to impose

35

liability upon social hosts for deaths allegedly related to the improper service of alcohol when defendants' conduct in serving liquor to plaintiffs' decedent, prior to her driving several miles to her home and an hour or more before the fire was reported, **is not so closely and significantly connected** with the consequences.).

Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence. If they are such as might with reasonable diligence have been foreseen, the last result as well as the first, and every intermediate result, is to be considered in law as the proximate result of the first wrong cause. Menth v. Breeze Corporation, Inc., 4 N.J. 428, 441 (1950); Andreoli v. Natural Gas Co., 57 N.J. Super. 356, 366-367 (App. Div. 1959). Here, there is snow; there is ice; there are moving tractor-trailers. It is reasonably foreseeable that a passenger of a tractor trailer tandem team may slip and fall on the ice and slide under a moving tractor trailer. The slip and fall, as did the motor vehicle collision in Davis, supra, set in motion the occurrence that placed plaintiff Paulette Brogna under the tractor-trailer. Any negligence that may be attributed to plaintiff George Brogna for moving the tractor-trailer forward at that time, unbeknownst to him that his wife was underneath, cannot break the chain of causalty. It cannot be said that any negligence attributed to plaintiff George Brogna could have alone caused the injuries. "But for" defendant USA's negligence, which is so closely related in time and sequence, plaintiff Paulette Brogna would not have been under the tractor-trailer and the tractor trailer moving forward at that point in time would not have caused any injuries to plaintiff Paulette Brogna. Therefore, defendant USA's negligence is the proximate cause of the injuries sustained by plaintiffs Paulette and George Brogna.

**4.** **AS A RESULT OF THE NEGLIGENCE OF DEFENDANT USA, PAULETTE BROGNA SUSTAINED SEVERE AND PERMANENT PERSONAL INJURIES AND FINANCIAL DAMAGES**

The injuries sustained and the treatment endured by Paulette Brogna is uncontested. Defendant USA did not call any medical expert to rebut any of the opinions or findings of Dr. King. Plaintiff relies on the medical records and photographs admitted into evidence and the trial testimony of Paulette Brogna, George Brogna and Dr. King with regard to the severity and permanency of such injuries. The photographs of Paulette Brogna's injuries speak volumes about the pain, disability and emotional suffering she has endured and will continue to endure the rest of her life. Paulette Brogna has a life expectancy of 20.3 years.

Due to the negligence of defendant USA, as aforementioned, and the severe and permanent injuries sustained as a result thereof, plaintiff Paulette Brogna is entitled to recover monetary damages from defendant USA for pain and suffering, loss of enjoyment of life, disability and impairment. Paulette Brogna is also entitled to her loss of past and future wages and payment of medical bills associated with the treatment of the injuries she sustained, which was stipulated as $678,505.06. Paulette Brogna's past lost wages are $136,200.00 (59 weeks @ $600.00 per week/126 weeks @ $800 per week). Her future lost wages are $326,400.00 (408 weeks @ $800 per week).

**B.** **PER QUOD CLAIM**

Plaintiff George Brogna, as the lawful husband of plaintiff Paulette Brogna, sustained a loss of society, consortium and companionship. As the lawful husband of plaintiff Paulette Brogna, plaintiff George Brogna is entitled to monetary damages for loss of the consortium, society and companionship of his wife, Paulette Brogna.

37

## VI.    CONCLUSION

As a result of the negligence of defendant USA, as aforementioned, plaintiff Paulette Brogna is entitled to recover monetary damages from defendant USA for pain and suffering, loss of enjoyment of life, disability, impairment, loss of past and future wages and payment of medical bills associated with the treatment of the injuries she sustained.

As the lawful husband of plaintiff Paulette Brogna, plaintiff George Brogna is entitled to monetary damages for loss of the consortium, society and companionship of his wife, Paulette Brogna.

Respectfully submitted,

S/ Peter Chamas

PETER CHAMAS